# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Civil Action No. 77-2019-APM

CAROLEE BRADY HARTMAN, et al.,

Plaintiffs,

v.

MICHAEL R. POMPEO, et al.,

Defendants.

## DEFENDANTS' CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR FINAL DETERMINATION OF ATTORNEYS' FEES

JESSIE K. LIU
United States Attorney

DANIEL F. VAN HORN
Chief, Civil Division

PETER C. PFAFFENROTH
Assistant United States Attorney

U.S. Attorney's Office
Civil Division − Room E4226
555 4th Street, N.W.
Washington, D.C. 20530

(202) 252-2506
(202) 252-2513

daniel.vanhorn@usdoj.gov
peter.pfaffenroth@usdoj.gov

January 16, 2020

# Table of Contents

Table of Defendants' Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

1.    History of the *Hartman* Class Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

2.    Plaintiffs' Previous Attorney Fees Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

1.    The Common Fund Doctrine is Inapplicable to Plaintiffs' Fee Request . . . . . . . . . . . .  16

2.    Plaintiffs' Counsel Have Received Reasonable Lodestar Fees . . . . . . . . . . . . . . . . . . .  23

3.    No Further Enhancement of the Lodestar Fees is Appropriate . . . . . . . . . . . . . . . . . . .  35

4.    Plaintiffs' Attorneys Have Been Appropriately Compensated for Delay . . . . . . . . . . . .  39

5.    Professor Rubenstein's Declaration Contributes Nothing to the Resolution
      of Plaintiffs' Fee Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

TABLE OF DEFENDANTS' EXHIBITS

Defendants' Exhibit 1:       1994 Affidavit of Laurel Pyke Malson and 1993 Affidavit of
                             Thomas P. Gies

Defendants' Exhibit 2:       1994 Affidavit of Peter H. Doyle

Defendants' Exhibit 3:       Memorandum in Support of Plaintiffs' Second Motion for Interim
                             Attorneys' Fees and Expenses, dated February 16, 1996

Defendants' Exhibit 4:       1996 Affidavit of Laure Pyke Malson

Defendants' Exhibit 5:       1996 Affidavit of Peter H. Doyle

Defendants' Exhibit 6:       1995 Declaration of Douglas B. Huron

Defendants' Exhibit 7:       1999 Declaration of Laurel Pyke Malson and related Tables
                             submitted by Plaintiffs' Fee Counsel with Seventh Interim Fee
                             Petition

Defendants' Exhibit 8:       Declaration of Daniel F. Van Horn

Defendants' Exhibit 9:       Declaration of Elizabeth A. Parish

Defendants' Exhibit 10:      Selected Record Materials[*]

    10-1:   Order of Reference to Special Master, filed October 1, 1991

    10-2:   Special Master's Report on Motion by Plaintiffs for Interim Attorney's Fees,
            dated February 18, 1994 [R. 126]

    10-3:   Plaintiffs' Reply to Special Master's Report on Motion by Plaintiffs for Interim
            Attorney Fees and to Defendant's Objections Thereto, dated March 15, 1994 [R.
            129]

    10-4:   Plaintiffs' Memorandum in Support of an Interim Award of Attorneys' Fees and
            Costs Without Requiring Plaintiffs to Post a Surety Bond, dated March 23, 1994
            [R. 133]

───────────────

[*] Citations to the Court's PACER Docket ("R. __") are provided where available.  Docket
entries prior to April 3, 1992, are available only on the paper docket.

10-5:    Special Master's January 17, 1995 Report, with Substitute Pages, dated January 18, 1995 [R. 177, 181]

10-6:    Order re Interim Fee Award, filed January 24, 1995 [R. 179]

10-7:    Special Master's May 15, 1996 Report and Recommendations Regarding Plaintiffs' Second Motion for Interim Attorneys' Fees and Expenses [R. 218]

10-8:    District Court's Memorandum re Foreign Service Positions, filed June 24, 1997 [not entered on docket]

10-9:    Memorandum Order re Prejudgment Interest, filed February 5, 1998 [R. 506]

10-10:   Special Master's Report and Recommendations Regarding Plaintiffs' Fifth Motion for Interim Attorneys' Fees and Expenses, dated April 15, 1998 [R. 523]

10-11:   Memorandum Order, filed June 17, 1998 [R. 567]

10-12:   Special Master's Report and Recommendations Regarding Plaintiffs' Seventh Motion for Interim Attorneys' Fees and Expenses, dated December 6, 1999 [R. 849]

10-13:   Consent Decree, filed March 24, 2000 [R. 866]

10-14:   Joint Pre-Hearing Brief in Support of Consent Decree, filed June 22, 2000 [R. 904]

10-15:   Memorandum in Support of Plaintiffs' Seventh Motion for Interim Attorneys' Fees and Expenses, filed with Special Master on May 25, 1999

10-16:   1999 Declaration of Douglas B. Huron and related Tables submitted by Plaintiffs' Fee Counsel with Seventh Interim Fee Petition

## TABLE OF AUTHORITIES[*]

Cases                                                                      Page(s)

*Amaya v. Logo Enterprises, LLC,*
  251 F. Supp. 3d 196 (D.D.C. 2017) ..................................................... 34

*American Lands Alliance v. Norton,*
  525 F. Supp. 2d 135 (D.D.C. 2007) ..................................................... 31

*Barton v. U.S. Geological Survey,*
  2019 WL 4750195 (D.D.C.).................................................................. 34

*Berke v. Bureau of Prisons,*
  942 F. Supp. 2d 71 (D.D.C. 2013) ....................................................... 30

*Blake v. Califano,*
  626 F.2d 891 (D.C. Cir. 1980) .............................................................. 39

*Blum v. Stenson,*
  465 U.S. 886 (1984) .............................................................................. 38

*Boeing Co. v. Van Gemert,*
  444 U.S. 472 (1980) ...................................................................... 17, 20

*Brown v. Sec'y of the Army,*
  78 F.3d 645 (D.C. Cir. 1996) ................................................................ 39

*Brundle v. Wilmington Trust, N.A.,*
  919 F.3d 763 (4th Cir. 2019)...........................................................17-18

*Burkhart v. Washington Metro. Area Transit Auth.,*
  112 F.3d 1207 (D.C. Cir. 1997) ........................................................... 42

*Burks v. District of Columbia,*
  2019 WL 2189488, *adopted*, 2019 WL 2185371 (D.D.C.) .................... 34

*Burlington v. Dague,*
  505 U.S. 557 (1992) ................................................................ 23, 36, 37

*Campbell v. District of Columbia.,*
  202 F. Supp. 3d 121 (D.D.C. 2016) ..................................................... 34

*Cobell v. Jewell,*
  234 F. Supp. 3d 126 (D.D.C. 2017) ..................................................... 19

---

[*] Authorities on which Defendants chiefly rely are designated by asterisks.

*Cobell v. Kempthorne*,
   455 F.3d 317 (D.C. Cir. 2006) ........................................................................ 8

*Cobell v. Salazar*,
   96-cv-1285-TFH (D.D.C.).............................................................................18

*Cohen v. Chilcott*,
   522 F. Supp. 2d 105 (D.D.C.2007).................................................................19

*D.L. v. District of Columbia*,
   924 F.3d 585 (D.C. Cir. 2019).......................................................................33

*De Medina v. Reinhardt*,
   686 F. 2d 997 (D.C. Cir. 1982)........................................................................3

*De Medina v. Reinhardt*,
   1979 WL 39 (D.D.C.).......................................................................................3

*Dillon v. Powell*,
   2001 WL 41046 (D.C. Cir.)........................................................................9, 32

*Dillon v. Powell*,
   534 U.S. 1078 (2002)..................................................................................9, 32

*Duffey v. Hartman*,
   520 U.S. 1240 (1997)........................................................................................5

*Eley v. District of Columbia*,
   793 F.3d 97 (D.C. Cir. 2015).........................................................................34

*Frederick Cnty. Fruit Growers Ass'n v. Martin*,
   968 F.2d 1265 (D.C. Cir. 1992).....................................................................41

*Gisbrecht v. Barnhart*,
   535 U.S. 789 (2002).......................................................................................23

*Griffin v. Washington Convention Center*,
   2000 WL 1174967 (D.D.C.)...........................................................................41

*Haggart v. Woodley*,
   809 F.3d 1336 (Fed. Cir. 2016).....................................................................22

*Hartman v. Duffey*,
   8 F. Supp. 2d 1 (D.D.C. 1998)...................................................................8, 40

*Hartman v. Duffey*,
   19 F.3d 1459 (D.C. Cir. 1994)........................................................................5

*Hartman v. Duffey*,
    88 F.3d 1232 (D.C. Cir. 1996) ....................................................................................5

*Hartman v. Duffey*,
    158 F.R.D. 525 (D.D.C. 1994) ...................................................................................5

*Hartman v. Duffey*,
    973 F. Supp. 189 (D.D.C. 1997) .............................................................................7, 8

*Hartman v. Duffey*,
    973 F. Supp. 199 (D.D.C. 1997) ...........................................................11, 12, 26, 35, 40

*Hartman v. Gelb*,
    1992 WL 754646 (D.D.C.) .........................................................................................4

*Hartman v. Wick*,
    600 F. Supp. 361 (D.D.C. 1984) .................................................................................4

*Hartman v. Wick*,
    678 F. Supp. 312 (D.D.C. 1988) .........................................................................4, 6, 7

*Hartman v. Wick*,
    1988 WL 39856 (D.D.C.) ...........................................................................................8

*Heller v. District of Columbia*,
    832 F. Supp. 2d 32 (D.D.C. 2011) ........................................................................30-31

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) .................................................................................................23

*Hubbard v. Donahue*,
    958 F. Supp. 2d 116 (D.D.C. 2013) ..........................................................................20

*In re Black Farmers Discrimination Litig.*,
    953 F. Supp. 2d 82 (D.D.C. 2013) ........................................................................18-19

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    2018 WL 1635648 (E.D. Pa.) ....................................................................................19

*In re Olson*,
    884 F.2d 1415 (D.C. Cir. 1989) ................................................................................33

*In re Vitamins Antitrust Litig.*,
    2001 WL 34312839 (D.D.C.) ...............................................................................19-20

*Ingram v. The Coca-Cola Co.*,
  200 F.R.D. 685 (N.D. Ga. 2001)........................................................................19

*Int'l Bh'd of Teamsters v. United States*,
  431 U.S. 324 (1977)..........................................................................................4

*Jefferson v. Milvets System Technology, Inc.*,
  986 F. Supp. 6 (D.D.C. 1997)..........................................................................41

*Keepseagle v. Perdue*,
  334 F. Supp. 3d 58 (D.D.C. 2018)....................................................................18

*Kifafi v. Hilton Hotels Retirement Plan*,
  999 F. Supp. 2d 88 (D.D.C. 2013)....................................................................22

*Lee v. District of Columbia*,
  298 F. Supp. 3d 4 (D.D.C.)...............................................................................35

*Library of Congress v. Shaw*,
  478 U.S. 310 (1986).........................................................................................39

*MacClarence v. Johnson*,
  539 F. Supp. 2d 155 (D.D.C. 2008)..................................................................31

*McKeage v. Bass Pro Outdoor World, LLC*,
  943 F.3d 1148 (8th Cir. 2019)..........................................................................21

*McKeage v. TMBC, LLC*,
  847 F.3d 992 (8th Cir. 2017).............................................................................18

*McKenzie v. Kennickell*,
  875 F.2d 330 (D.C. Cir. 1989)...........................................................................35

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  Case No. 05-C-6583 (N.D. Ill.)..........................................................................19

*Miller v. Holzmann*,
  575 F. Supp. 2d 2 (D.D.C. 2008).......................................................................31

*Missouri v. Jenkins*,
  491 U.S. 274 (1989).........................................................................................39

*Nat'l Treasury Employees Union v. Nixon*,
  521 F.2d 317 (D.C. Cir. 1975)...........................................................................22

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*,
 478 U.S. 546 (1986)...................................................................................23, 38

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*,
 483 U.S. 711 (1987)...........................................................................................38

*Perdue v. Kenny A.*,
 559 U.S. 542 (2010).........................................................................23, 27, 36-37

*Petruzzi's Inc. v. Darling-Delaware Co., Inc.*,
 983 F. Supp. 595 (M.D. Pa. 1996).....................................................................20

*Pleasants v. Ridge*,
 424 F. Supp. 2d 67 (D.D.C. 2006)......................................................................31

*Poulsen v. Dep't of Homeland Sec'y*,
 2016 WL 1091060 (D.D.C.)...............................................................................34

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
 530 F. Supp. 2d 216 (D.D.C. 2008)....................................................................41

*Radosti v. Envision EMI, LLC*,
 760 F. Supp. 2d 73 (D.D.C. 2011)......................................................................19

*Roberts v. Texaco, Inc.*,
 979 F. Supp. 185 (S.D.N.Y. 1997)......................................................................19

*Role Models America, Inc. v. Brownlee*,
 353 F.3d 962 (D.C. Cir. 2004)............................................................................38

*Swedish Hospital Corp. v. Shalala*,
 1 F.3d 1261 (D.C. Cir. 1993)...............................................................17, 20, 22

*Tillson v. United States*,
 100 U.S. 43 (1879)..............................................................................................39

*Trout v. Secretary of the Navy*,
 317 F.3d 286 (D.C. Cir. 2003)............................................................................40

*U.S. Airways, Inc. v. McCutchen*,
 569 U.S. 88 (2013)..............................................................................................17

*Venegas v. Mitchell*,
 495 U.S. 82 (1990)..............................................................................................18

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,
  246 F.R.D. 349 (D.D.C. 2007) ................................................................... 19

Statutes

42 U.S.C. § 2000e-5(k) ............................................................................. 15

42 U.S.C. § 2000e-16(d) ........................................................................... 40

Pub. L. No. 102-166, § 114(2), 105 Stat. 1079 ...................................... 40

Pub. L. No. 105-277, §§ 1301 et seq., 112 Stat. 2681-761 ...................... 2

Rules

Fed. R. Civ. P. 23(e) ................................................................................. 9

Fed. R. Civ. P. 23(h) ............................................................................... 15

Fed. R. Civ. P. 53(e)(2) ............................................................................. 2

Fed. R. Civ. P. 54(b) ................................................................................. 8

Fed. R. Civ. P. 54(d) ............................................................................... 16

Fed. R. Evid. 702 .................................................................................... 41

Other

*5 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS*
  (electronic 5th ed. June 2019 Update) ............................... 17, 20, 22, 38, 42

https://www.law.com/americanlawyer/almID/1202597273265/
  (last visited December 12, 2019) ......................................................... 30

https://advance.lexis.com/api/permalink/ecf8becd-9d99-4a50-b8d7-
  4405b360d989/?context=1000516 (last visited December 12, 2019) ...................... 30

https://www.justice.gov/usao-dc/civil-division
  (U.S. Attorney's Office attorney fee matrices) ....................................... 29, 32

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CAROLEE BRADY HARTMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 77-2019-APM |
| | ) | |
| MICHAEL R. POMPEO, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR FINAL DETERMINATION OF ATTORNEYS' FEES

Defendants, by their undersigned attorneys and pursuant to the Court's Minute Order entered on October 17, 2019, hereby oppose Plaintiffs' Motion for Final Determination of Attorneys' Fees [R. 1080] filed October 10, 2019, as amended with the substitute declarations submitted with Plaintiffs' Errata [R. 1082] filed November 8, 2019.[1]  As shown herein, Plaintiffs are attempting far too late to augment the reasonable attorney fees that have previously been paid to class counsel.  None of Plaintiffs' arguments for now increasing the reasonable fees that class counsel have already received has merit, and indeed Plaintiffs invite error, as several of their proposed paths to an additional fee award are contrary to law.

---

[1] The following citation conventions are used herein:  "R." denotes the corresponding numbered document in the Court's PACER docket for this action.  Docket entries prior to April 3, 1992, do not appear on the PACER docket and are on the paper docket.  The Memorandum [R. 1081] submitted by Plaintiffs in support of their fee motion is cited as "Pl. Mem.," and the exhibits submitted by Plaintiffs therewith are cited as "Pl. Ex."  The exhibits submitted with this Opposition are cited as "Def. Ex."  All page citations refer to the original page numbering in the cited document, not to the page numbers assigned by the Court's ECF system.  Significant record materials that are not otherwise available electronically through PACER or from commercial content providers (e.g., Westlaw) are submitted herewith in Def. Ex. 10.

**STATEMENT OF FACTS**

**1.      History of the *Hartman* Class Action**

This case was initiated in 1977 on behalf of women who unsuccessfully applied for

Foreign Service or Civil Service positions at the United States Information Agency ("USIA").

Plaintiffs alleged that USIA engaged in gender-based discrimination in its hiring practices in

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.

United States District Judge Charles R. Richey presided over the case until his death in

1997, after which the case was assigned to United States District Judge James Robertson, who

presided over the case until his retirement from the bench in 2010.  There was no permanently-

assigned presiding judge from 2010 until October 16, 2019, when the current presiding judge

was assigned to the case shortly after Plaintiffs filed their pending motion for an additional fee

award.

Judge Richey appointed Professor Stephen A. Saltzburg of George Washington

University Law School to serve as the Special Master in this case, and Professor Saltzburg

continued to serve in that capacity under Judge Robertson.  As the Special Master, Professor

Saltzburg conducted hearings and made decisions, subject to the Court's review and approval

under Fed. R. Civ. P. 53(e)(2), on claims by individual class members, as well as on Plaintiffs'

requests for interim attorney fees.

USIA was abolished effective October 1, 1999, pursuant to the Foreign Affairs Reform

and Restructuring Act of 1998, Pub. L. No. 105-277, §§ 1301 et seq., 112 Stat. 2681-761.

Certain agency functions were transferred to the Department of State and others were placed

under the control of a new independent agency, the Broadcasting Board of Governors (now

named the United States Agency for Global Media).  Consequently, as a result of that legislation,

the Secretary of State and the Chair of the Agency for Global Media in their official capacities became the nominal defendants in the case.

On April 20, 1978, the Court conditionally certified this case as a class action. The class consisted of "all women who have applied for employment with or are currently employed by [USIA] and who have been or continue to be adversely affected by the discriminatory employment practices of the defendant." The Court bifurcated the proceedings into a liability phase and a remedial phase.

In October 1979, following a bench trial limited to liability issues, the Court modified the class certification to exclude women who applied for clerical positions, held that Plaintiffs had failed to prove a prima facie case, and dismissed the case. The Court rejected both sides' statistical evidence and found that Plaintiffs' anecdotal evidence concerning individual instances of alleged sex discrimination was not persuasive. *De Medina v. Reinhardt*, 1979 WL 39 (D.D.C.).

Plaintiffs appealed from the Court's October 1979 decision, and the Court of Appeals reversed in part. Specifically, the Court of Appeals held that the District Court had not evaluated Plaintiffs' statistical evidence correctly, and remanded the case for a new finding on whether Plaintiffs had established a prima facie case of discrimination in hiring based on Plaintiffs' statistical evidence and, if so, whether Defendant had rebutted it. The Court of Appeals did not disturb the District Court's findings with respect to the individual claims of discrimination. *De Medina v. Reinhardt*, 686 F.2d 997 (D.C. Cir. 1982).

After the 1982 remand from the Court of Appeals, the parties resubmitted the case for decision on liability on the existing record. In 1984, the Court found that USIA had

discriminated against women as a class with regard to hiring in six occupational categories. *Hartman v. Wick*, 600 F. Supp. 361 (D.D.C. 1984).

The Court conducted a second bench trial in 1987 to determine appropriate class-wide remedies.  In 1988, based on the record of that trial, the Court ruled that the class includes women who applied for one of the positions at issue in the case between October 8, 1974, and November 16, 1984, and defined the scope of relief for the class members.  The Court ordered different relief for class members who applied for certain entry-level Foreign Service positions than for class members who applied for other Foreign Service positions and for Civil Service positions.  *Hartman v. Wick*, 678 F. Supp. 312 (D.D.C. 1988).

For class members who applied for certain entry-level Foreign Service positions, the Court modeled relief on the consent decree in *Palmer v. Shultz*, Civ. No. 76-1439 (D.D.C.), a sex discrimination case against the Department of State.  Specifically, the Court ordered that women whose claims were based on having taken the Foreign Service Entrance Examination between 1978 and 1984 (later narrowed to 1978 – 1983 by Order filed October 5, 1988) were entitled to reconsideration under the Foreign Service hiring system, and to compete among themselves for a fixed number of Foreign Service positions.  678 F. Supp. at 338-40.  The other members of the class were given the right to individual hearings, commonly referred to as "*Teamsters*" hearings, patterned on the Supreme Court's decision in *Int'l Bh'd of Teamsters v. United States*, 431 U.S. 324 (1977), in which relief is determined on a claimant-by-claimant basis.  *Id.* at 328-38.

In 1992, the Court ruled that 39 Foreign Service positions would be set aside for the class members who had been awarded *Palmer*-type relief. R. 33 [*Hartman v. Gelb*, 1992 WL 754646 (D.D.C.)].  This ruling enabled Defendant to take an interlocutory appeal, and was the first opportunity that Defendant had to appeal after the 1984 liability finding in Plaintiffs' favor.

- 4 -

Defendant raised several issues in the appeal, but the Court of Appeals reached only the class certification issue.  The Court of Appeals held that it could not determine whether the class certification decision was correct, and remanded the case for the District Court to make the necessary findings on, and to consider possible revisions to, class certification.  *Hartman v. Duffey*, 19 F.3d 1459 (D.C. Cir. 1994).

On November 23, 1994, the District Court confirmed the Court's previous class certification decision and class-wide liability finding.  R. 170 [*Hartman v. Duffey*, 158 F.R.D. 525 (D.D.C. 1994)].  The Court of Appeals subsequently affirmed those ruling in all significant respects, and the Supreme Court denied further review.  *Hartman v. Duffey*, 88 F.3d 1232 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1240 (1997).  With those decisions, class certification and the class-wide liability finding became "final" orders no longer subject to reconsideration, appeal, or review.

One issue left unresolved after Defendant's appeal from the District Court's 1994 decision concerned the number of entry-level Foreign Service positions to be set aside for class members who were awarded *Palmer*-type relief.  *See* 88 F.3d at 1239.  On June 24, 1997, the Court reaffirmed its 1992 ruling to set aside 39 such positions, and Defendant did not seek further review of that decision.[2]  Indeed, by that time the *Palmer*-type portion of the case had concluded.

After the Court's 1992 ruling about the *Palmer*-type relief, approximately 9,400 class members requested reconsideration for Foreign Service hiring.  Their scores on the USIA portion

---

[2] The Court issued several rulings in this case on June 24, 1997.  The memorandum opinion issued on that day reaffirming the Court's earlier ruling on the 39 Foreign Service Officer positions does not appear on the PACER docket.  A copy of that memorandum opinion is included in Def. Ex. 10.

of the Foreign Service Entrance Examination were ranked, and class members were then invited in descending rank order for oral examination, with some later receiving security and medical screening and ultimately offers of employment. Once the 39th class member was hired in 1995, USIA's obligations to the class members who were awarded *Palmer*-type relief ceased, although class members who had applied for entry-level Foreign Service positions during the period 1974 – 1977, or who had applied for mid-level Foreign Service positions at any time during the entire class period remained eligible to participate in the *Teamsters* portion of the case. *See* R. 904 [Joint Pre-Hearing Brief in Support of Consent Decree] at 3-4 n.5.

Approximately 1,100 women were eligible to seek *Teamsters* relief.[3] Those proceedings began on September 30, 1991, when the Court adopted an Order of Reference to Special Master to guide those proceedings. In the Order of Reference, the Court authorized the Special Master to "conduct individual hearings for the contested claims," and directed the Special Master to "abide by the allocation of the burdens of proof, the presumptions, and the standards of proof set forth by the Court in its Order of January 19, 1988, as amended." Order of Reference at 8.

In the 1988 decision on remedies, the Court described a claimant's burden of proof at a *Teamsters* hearing as follows:

> [E]ach claimant . . . must prove . . . by a preponderance of the evidence, that she applied for a position at issue in this suit during the time period relevant to this suit and that she was rejected for that position.

678 F. Supp. at 345. Accordingly, "[a] claimant may sustain her burden by showing that she applied for a job during the relevant time period and that she was unsuccessful in her application. That showing entitles her to the rebuttable presumption that she was indeed rejected, and that the

---

[3] Although 1,134 individuals (including some men) filed claim forms for *Teamsters* relief, 38 of those individuals were later removed from the class, leaving 1,096 women as *Teamsters* claimants. *See* Pl. Mem. at 11 n.15 & 12.

rejection was because of discrimination."  R. 410 at 8 [*Hartman v. Duffey*, 973 F. Supp. 189, 193 (D.D.C. 1997)].

The Court's 1988 decision further provided that, once a claimant sustained her burden of proving an unsuccessful application, Defendant could overcome the resulting presumption of discrimination only by clear and convincing evidence of a legitimate, non-discriminatory reason for rejecting her application.  678 F. Supp. at 345.  In 1988, the use of the "clear and convincing" standard was in accordance with well-established law.  In 1997, however, the Court found that the "clear and convincing" standard had been abrogated by an intervening Supreme Court decision, and so amended the Order of Reference "to provide that defendant's burden of proof is to be measured by the preponderance, not the clear and convincing, standard."  973 F. Supp. at 194.

Changing Defendant's burden of proof had little, if any, practical effect on the *Teamsters* hearings:

> Because it is impossible to recreate the process that led to rejection of a plaintiff's employment application, all doubt must be resolved against the proven discriminator rather than the innocent applicant.  Thus, if there is any uncertainty about the actual reason that defendant rejected a claimant's employment application, that doubt must be resolved against the defendant.

678 F. Supp. at 335 (citations and internal quotation marks omitted).  In this connection, although the Court did not fault USIA "for discarding records it had reason to think irrelevant to court proceedings," and so expressly denied Plaintiffs' request to find that USIA's destruction of records demonstrated bad faith or a deliberate attempt to impede class members' claims, *id.* at 328 n.11, the Court made clear that Defendant would suffer adverse consequences in the *Teamsters* hearings due to the absence of complete applicant files:

> [D]efendant may have difficulty showing lack of qualifications because he has not retained applicant files for most of the ten-year period at issue in this suit.  While

- 7 -

> the Court has not subjected defendant to penalty because of this routine
> destruction of files, it cannot allow the lack of information resulting from
> defendant's practices to affect the legal requirements governing this suit. If the
> defendant-discriminator faces difficulties, they are difficulties of his own making,
> and the law cannot penalize the innocent victims of his discrimination simply in
> order to ease his tasks.

*Hartman v. Wick*, 1988 WL 39856, at *2 (D.D.C.); *accord* 973 F. Supp. at 193; *see also* Def. Ex.

8 [Van Horn Declaration] ¶¶ 5, 9-12 at 3-4, 6-8.

From 1996 until the end of 1999, the Special Master conducted two rounds of *Teamsters*

hearings, involving claims by 48 class members. The claimant prevailed in 46 of those hearings.

Successful claimants were awarded back pay and injunctive relief (i.e., instatement and creation

or adjustment of Federal retirement accounts). The back pay awards were computed with a

proxy-salary damages model that was created by Court-appointed experts, and that was approved

by the Court, with two modifications, in 1998. R. 550 [*Hartman v. Duffey*, 8 F. Supp. 2d 1

(D.D.C. 1998)]. The individual relief awards were later embodied in final judgments entered by

the Court pursuant to Fed. R. Civ. P. 54(b). *See, e.g.,* R. 622 to 631. The Solicitor General

ultimately declined to pursue an appeal from any of those judgments.[4]

The *Teamsters* hearings were suspended early in 2000 by mutual consent of the parties

because an agreement in principle had been reached to settle the case. The parties then finalized

the details of the settlement and incorporated its terms into a Consent Decree, which the parties

signed on March 21, 2000. For a cash payment of $508 million, plus interest, the Consent

---

[4] Plaintiffs exaggerate when they assert that each successful claim "had to be fully
prepared and defended three times," and that "[e]ach judgment was affirmed" following a
"government appeal[] [of] these rulings to the D.C. Circuit." Pl. Mem. at 15. In fact, the
government appeals were all voluntarily dismissed. *See, e.g.*, Clerk's Order, No. 98-5548
(D.C. Cir. Apr. 13, 1999) (granting motion to dismiss appeal voluntarily). *See also Cobell v.
Kempthorne*, 455 F.3d 317, 335 (D.C. Cir. 2006) (observing that granting "the government's
motion for voluntary dismissal" of an appeal is not an "affirm[ance] on the merits").

Decree resolved the claims of class members who had not been awarded individual relief in the *Teamsters* hearings. [5]  The Consent Decree also resolved all the liability issues affecting the 48 class members whose claims were the subject of *Teamsters* hearings conducted by the Special Master, but did not resolve all the remedial issues involving those class members.  R. 866.

The Consent Decree was approved by the Court, following a fairness hearing, on July 12, 2000.  R. 917.  Four women (hereafter the "Petitioners") who had unsuccessfully petitioned to be included in the class appealed from that decision, contending that the original class notice was constitutionally defective.  That contention was rejected by the Court of Appeals, which summarily affirmed the District Court's approval of the Consent Decree on March 15, 2001, and denied Petitioners' rehearing petitions on June 14, 2001.  Petitioners' petition for a writ of certiorari was denied by the Supreme Court on January 7, 2002.  *See Dillon v. Powell*, 2001 WL 41046 (D.C. Cir.), *cert. denied*, 534 U.S. 1078 (2002).  With the denial of the Petitioners' certiorari petition, the District Court's approval of the Consent Decree became final.

After signing the Consent Decree on March 21, 2000, the parties worked together cooperatively to secure approval of the Consent Decree pursuant to Fed. R. Civ. P. 23(e), and then to carry out the Consent Decree's terms, including implementation of the individual relief that was awarded to class members in the *Teamsters* hearings.  The implementation process continued until mid-2018, when all the individual relief awards were resolved.  Implementation

---

[5] The class members who received *Palmer*-type relief received no further relief under the Consent Decree.  *See* R. 866 ¶ 3 at 4.  Thus, even assuming that *all* 1,100 *Teamsters* claimants were also included among the 9,400 class members who were awarded *Palmer*-type relief, the class members who received *only Palmer*-type relief outnumbered the *Teamsters* claimants by more than 7:1 [8,300:1,100].  See pp. 5-6 & n.3 above.  Accordingly, at least 87.88% of the *Hartman* class members received no relief beyond a failed assessment for an entry-level Foreign Service position [(8,300 – 39) / 9,400].  By focusing solely on the *Teamsters* claimants, Professor Rubenstein overstates the "average class member recovery" more than eightfold.  *See* Pl. Ex. 1 [Rubenstein Declaration] at 9 & 27.

of the Consent Decree's terms was accomplished by agreement, without any further litigation or

any intervention by the Court apart from the routine approval of stipulations and uncontested

motions that were necessary or appropriate to bring the case to an end.  *See* Def. Ex. 8 [Van Horn

Declaration] ¶ 14 at 9.

### 2.      Plaintiffs' Previous Attorney Fees Requests

Plaintiffs submitted seven formal petitions seeking interim attorney fees and expenses

prior to the approval of the Consent Decree, and those formal fee petitions were the subject of

litigation before both the Special Master and the District Court.

Plaintiffs submitted their first fee petition (the "First Petition") on July 30, 1993, seeking

an interim award of the attorney fees and expenses incurred from the inception of the case in

1977 through August 31, 1992.  On February 18, 1994, and January 17, 1995, the Special Master

issued reports recommending an award of approximately 90% of the amount sought in fees, as

well as a quality enhancement and compensation for delay.  R. 126,[6] 177.

On January 24, 1995, the Court, deferring full consideration of the First Petition, awarded

Plaintiffs $722,089.70, consisting of interim attorney fees of $500,000 plus $222,089.70 for

expenses.  The Court also admonished plaintiffs "for having waited all these years to file an

interim application for attorneys' fees and costs after being encouraged to do so in open Court on

several occasions."  R. 179 at 2.

On February 16, 1996, Plaintiffs submitted their second petition for interim attorney fees

and expenses (the "Second Petition"), which covered the period from September 1, 1992,

through December 31, 1994.  On May 15, 1996, the Special Master issued a report

---

[6] Although this report is dated February 18, 1994, it is recorded in PACER as
February 17, 1994.

recommending payment of about 93% of the amount requested.  R. 218.  The parties

subsequently stipulated that Defendant would pay $900,000 in partial settlement of the Second

Petition, and the Court approved this stipulation on July 16, 1996.  R. 230.

On December 5, 1996, because the Court had not fully resolved Plaintiffs' claims for

attorney fees, quality enhancement, and compensation for delay in the First and Second Petitions,

Plaintiffs moved for a final resolution of those petitions.  R. 279.

Plaintiffs filed their third petition for interim attorney fees (the "Third Petition") on

December 31, 1996, seeking payment for work in 1995.  On January 8, 1997, Plaintiffs filed

their fourth petition for interim attorney fees (the "Fourth Petition"), seeking payment for work

from January 1, 1996 through November 30, 1996.

The Special Master issued reports with his recommendations on the Third and Fourth

Petitions on May 16, 1997, and May 29, 1997, respectively.  Those reports recommended

reductions of less than 3% of the amount sought in the Third Petition, and less than 2% of the

amount sought in the Fourth Petition.[7]

At oral argument on Plaintiffs' motion for final resolution of the First and Second

Petitions on June 30, 1997, the Court ordered Defendant to pay the unpaid, undisputed amounts

for those two Petitions, which totaled $1,868,551.09.  R. 419.  Shortly thereafter, the Court

affirmed in large part the Special Master's recommendations with respect to the First and Second

Petitions.  R. 450 [*Hartman v. Duffey*, 973 F. Supp. 199 (D.D.C. 1997)].  The parties stipulated

that the Court-awarded amount was $2,331,935.90, consisting of $2,075,234.45 in unpaid,

---

[7] The Special Master's Reports on Plaintiffs' Third and Fourth Interim Fee Petitions
do not appear to have been entered on the PACER docket.

- 11 -

historic lodestar attorney fees, $188,968.70 as a quality enhancement, and $67,732.75 in expenses.  R. 490.

While Plaintiffs' Third and Fourth Petitions were pending before the Court, the parties stipulated on December 30, 1997, that Defendant would pay the attorney fees and expenses sought in those Petitions that Defendant did not dispute, namely $2,441,487.98.  R. 503.  This payment represented more than half of the amount Plaintiffs sought in the Third and Fourth Petitions.  The Court subsequently adopted almost all of the Special Master's recommendations with respect to the Third and Fourth Petitions.  R. 551.

Plaintiffs' fifth petition for interim attorney fees (the "Fifth Petition") was filed on January 21, 1998, and covered the period from December 1996 through June 1997.  On April 15, 1998, the Special Master recommended that Plaintiffs receive more than 99% of the fees and expenses sought in that Petition.  R. 523.  The Court largely adopted the Special Master's recommendations on June 17, 1998.  R. 567.

In the August 4, 1997, decision on Plaintiffs' motion for final resolution of the First and Second Petitions, the Court ruled that Congress had not waived sovereign immunity to permit prejudgment interest on fees and expenses in this case.  973 F. Supp. at 201.  The Court subsequently reconsidered that ruling and, on February 5, 1998, ruled that prejudgment interest would be permitted, and would begin to accrue on November 21, 1991, the effective date of the Civil Rights Act of 1991.  R. 506.

Following the Court's February 5, 1998, order requiring the government to pay prejudgment interest on fees and expenses beginning as of November 21, 1991, and the Court's orders adopting in large part the Special Master's recommendations on the Third, Fourth, and Fifth Petitions, the parties stipulated, subject to the reservation by both sides of all previously-

stated objections, to the amount of remaining fees, expenses, and interest due on the first five

petitions.  Those stipulated amounts were as follows:

| | |
|---|---|
| First and Second Petitions | $  666,872.85 |
| Third and Fourth Petitions | $2,026,250.76 |
| Fifth Petition | $2,073,022.00 |

R. 706.

Plaintiffs filed their sixth petition for interim attorney fees (the "Sixth Petition") on

September 30, 1998.  The Sixth Petition covered the period from July 1, 1997, through

December 31, 1997.  On May 13, 1999, the Special Master recommended that Plaintiffs receive

over 99.9% of the fees and expenses sought in the Sixth Petition.  R. 737.  Defendant's

objections to that recommendation were pending before the Court when the parties entered into

the Consent Decree in 2000.  R. 755.

Plaintiffs filed their seventh petition for interim attorney fees (the "Seventh Petition") on

May 25, 1999.  The Seventh Petition covered the period from January 1, 1998, through June 30,

1998.  On December 6, 1999, the Special Master recommended that Plaintiffs receive virtually

all the fees and expenses sought in the Seventh Petition.  R. 849.  Defendant's objections to that

recommendation were pending before the Court when the parties entered into the Consent

Decree in 2000.  R. 854.

After the Consent Decree was finalized, the parties reached agreement on the interim fee

claims contained in the Sixth and Seventh Petitions, as well as Plaintiffs' claims for "fees for

fees" through June 30, 1998, which had not been included in any of the previous fee petitions.

Defendant agreed to pay $2,380,985.36 to settle the claims for interim fees, expenses, and

interest in the Sixth and Seventh Petitions, and $954,408.14 to settle the claims for fees and

- 13 -

expenses incurred through June 1998 to litigate attorney fees issues, plus interest.  Those

settlements were approved by the Court on April 28, 2000.  R. 874, 875.

Following the approval of the Consent Decree, the parties settled twenty-one interim fee

requests, thereby resolving those claims for attorney fees, expenses, and interest without

litigation or intervention by the Special Master or the Court apart from routine approvals of the

stipulated payments.  *See* Def. Ex. 8 [Van Horn Declaration] ¶ 15 at 9.  Pursuant to those

stipulations, Plaintiffs' counsel have been paid:

(1) $4,166,046.48 for fees, expenses, and interest for work from July 1, 1998 through

December 31, 1999 [R. 975];

(2) $1,082,391.77 for fees, expenses, and interest for work from January 1 through June 30,

2000 [R. 984];

(3) $889,936.91 for fees, expenses, and interest for work from July 1 through December 31,

2000 [R. 1005];

(4) $1,033,860.15 for fees, expenses, and interest for work in calendar year 2001 [R. 1013];

(5) $914,304.44 for fees, expenses, and interest for work in calendar year 2002 [R. 1016];

(6) $585,095.92 for fees, expenses, and interest for work in calendar year 2003 [R. 1017];

(7) $267,825.25 for fees, expenses, and interest for work in calendar year 2004 [R. 1023];

(8) $211,612.27 for fees, expenses, and interest for work in calendar year 2005 [R. 1024];

(9) $118,031.18 for fees, expenses, and interest for work in calendar year 2006 [R. 1025];

(10) $95,471.04 for fees, expenses, and interest for work in calendar year 2007 [R 1026];

(11) $128,533.70 for fees, expenses, and interest for work in calendar year 2008 [R. 1030];

(12) $130,464.09 for fees, expenses, and interest for work in calendar year 2009 [R. 1032];

(13) $121,688.28 for fees, expenses, and interest for work in calendar year 2010 [R. 1036];

(14) $86,522.62 for fees, expenses, and interest for work in calendar year 2011 [R. 1040];

(15) $79,622.03 for fees, expenses, and interest for work in calendar year 2012 [R. 1044];

(16) $26,630.75 for fees, expenses, and interest for work in calendar year 2013 [R. 1046];

(17) $10,296.89 for fees, expenses, and interest for work in calendar year 2014 [R. 1051];

(18) $48,685.20 for fees, expenses, and interest for work calendar year 2015 [R. 1062];

(19) $71,583.18 for fees, expenses, and interest for work in calendar year 2016 [R. 1064];

(20) $81,020.28 for fees, expenses, and interest for work in calendar year 2017 [R.1076]; and

(21) $17,016.18 for fees, expenses, and interest for work in calendar year 2018 [R. 1078].

In sum, the total amount of fees, expenses, and interest that the government has paid to Plaintiffs' counsel on account of this litigation to date is $26,532,242.39.

### ARGUMENT

Pursuant to Fed. R. Civ. P. 23(h), "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  The Plaintiffs in this case are entitled to receive attorney fees and expenses in addition to the $508 million settlement payment provided for in the Consent Decree and the amounts awarded to individual class members as a result of the *Teamsters* hearings.

Paragraph 8 of the Consent Decree provides:

> Plaintiffs shall be entitled to reasonable attorneys' fees, expenses, and costs from the initiation of this case through the final distribution of amounts in the settlement fund or the final resolution of any issues that may arise under this Decree, whichever is later.  Reasonable attorneys' fees, expenses, and costs shall include reasonable fees and expenses associated with administering the settlement, including but not limited to notifying the Class Members of this Decree, establishing and maintaining a qualified settlement fund, distributing the fund to the Class Members, complying with legal obligations governing such matters, and retaining appropriate third parties to perform such tasks.  The parties shall endeavor to reach agreement on all of Plaintiffs' claims for attorneys' fees, expenses, and costs, but each party reserves the right to litigate any claims that cannot be resolved informally.

R. 866 ¶ 8 at 6-7.  Plaintiffs invoke this provision of the Consent Decree as well as Title VII's

fee-shifting provision, 42 U.S.C. § 2000e-5(k), and Fed. R. Civ. P. 54(d) to seek an additional

fee award in excess of $34 million.[8]  Plaintiffs attempt to justify this additional fee award both

under the "common fund" doctrine and as an enhancement of their "lodestar" fees.  Neither

justification withstands analysis.  Plaintiffs should be awarded no amount beyond what the

government already has paid.

### 1.        The Common Fund Doctrine Is Inapplicable to Plaintiffs' Fee Request

Although Plaintiffs acknowledge that "this is not a classic common fund case," Pl. Mem.

at 26, they nevertheless contend that their counsel are entitled to a final fee award under the

common fund doctrine, i.e., an award based on a percentage of the class's total recovery.  In fact,

such an award would not only be antithetical to the principles on which the common fund

doctrine is based, it also would be wholly unprecedented and contrary to the fee-shifting

methodology prescribed by the Supreme Court.

Plaintiffs' expert witness, Professor William B. Rubenstein, writing in his role as the

author of *Newberg on Class Actions*, describes the common fund doctrine as follows:

> Under the "common fund" doctrine, a lawyer responsible for creating a common
> fund that benefits a group of litigants is entitled to a fee from the fund.  Courts
> and commentators often characterize the common fund fee award as an exception
> to the American Rule that prevailing litigants are responsible for paying their own
> attorney's fees.  But that is not an entirely accurate portrayal because in common
> fund cases the prevailing litigants are, indeed, paying their own attorney's fees –
> that is, the beneficiaries of the fund pay fees out of the fund that they received. . . .
> In one small sense, then, the common fund fee award is an exception to the
> American Rule: the few individual clients who hired the attorney get to *share* the
> costs of that counsel with their co-beneficiaries (or *shift* some of those costs to
> their co-beneficiaries), meaning that these few original litigants do not *alone* pay
> the attorney's fee.  But in most ways the common fund fee award is consistent

---

[8] Rule 54(d) establishes procedures for attorney fee claims, but does not provide
substantive authorization for a fee award.

> with the American Rule, at best a variant of it, in that the prevailing plaintiffs are paying their own attorney's fees, not shifting those costs to their losing adversary. Common fund fee awards are therefore different from statutory fee-shifted awards. . . .  Generally speaking, the former are treated by courts as fees paid by clients while the latter are viewed as fees paid by adversaries; these distinction [sic] help explain why similar issues (such as multiplied fees awards) are treated differently under the different regimes.

5 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS (electronic 5th ed. June 2019 Update) (hereafter cited as *Newberg on Class Actions*) § 15.53 (footnotes omitted).

The Supreme Court has explained that the common fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense" and that "jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *accord U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013) ("the common fund doctrine has deep roots in equity" that "are set in the soil of unjust enrichment"; citing authorities).  "The underlying justification for attorney reimbursement from a common fund . . . is that unless the costs of litigation are spread to the beneficiaries of the fund they will be unduly enriched by the attorney's efforts."  *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993); *see Newberg on Class Actions* § 15.61.

"Although both the common fund doctrine and fee-shifting statutes facilitate suit by plaintiffs who may otherwise lack the means to hire counsel, they operate in distinct ways and serve distinct purposes."  *Brundle v. Wilmington Trust, N.A.*, 919 F.3d 763, 786 (4th Cir. 2019). As the Fourth Circuit has recently explained:

> A common fund recovery places the plaintiffs' cost of litigation on the *recovering beneficiaries of a lawsuit*, whereas a fee-shifting statute places this burden on the *losing party*.  A fee-shifting statute thus creates an exception to the "American rule" that "the prevailing litigant is ordinarily not entitled to a reasonable

> attorneys' fee from the loser."  In contrast, the common fund doctrine – though
> often similarly described as an exception – better accords with the American rule
> by holding the beneficiaries of a judgment or settlement responsible for
> compensating the counsel who obtained the judgment or settlement for them.
>
> Furthermore, the purpose of the common fund doctrine, unlike a fee-shifting
> statute, is to avoid unjust enrichment.  Thus, although a statutory fee award
> against a defendant generally *may not* include a contingency enhancement, courts
> routinely impose enhanced common fund awards to compensate counsel for
> litigation risk at the expense of beneficiaries who did not shoulder this risk.
>
> From these distinctions, it follows that a "reasonable" fee payable by a *defendant*
> to compensate the prevailing plaintiff's counsel is not necessarily identical to a
> "reasonable" fee owed by a *recovering beneficiary* to plaintiff's counsel,
> particularly where the contingency risk to plaintiff's counsel is substantial.

*Id.* at 786-87 (emphasis in original; citations omitted); *citing Venegas v. Mitchell*, 495 U.S. 82,

85, 90 (1990) (affirming $406,000 contractual fee paid by client as not "unreasonable" even

though "reasonable" statutory fee paid by opposing party was only $117,000); *McKeage v.

TMBC, LLC*, 847 F.3d 992, 1004 (8th Cir. 2017) (emphasizing "distinction between the amount

a losing party may be required to pay" under contractual fee-shifting provision "and the amount

a class member should equitably be required to pay" under common fund doctrine).

Plaintiffs' request for a fee award based on a percentage of the class's total recovery

overlooks the distinctions between the common fund doctrine and fee-shifting provisions such as

those contained in Title VII and the Consent Decree.  Because Plaintiffs' requested fee award

would not be spread among the class members who were benefited by class counsel's work, but

would instead be paid by the government over and above the amounts the government already

has paid, the cases Plaintiffs cite to support their requested common fund award are not on point.

*See Keepseagle v. Perdue*, 334 F. Supp. 3d 58, 60 (D.D.C. 2018) (fees paid "as part of the

common fund awarded to the Class"); *Cobell v. Salazar*, 96-cv-1285-TFH (D.D.C.), ECF Doc.

3850, ¶ 15 at 9-10 (fee award paid "out of the Settlement Account holding plaintiffs' funds"); *In*

- 18 -

*re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 84 (D.D.C. 2013) (fee award paid

from "the common fund that has been established for the payment of successful claims in this

action"); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, Case No. 05-C-6583 (N.D.

Ill.), ECF Doc. 611-1 § VII.A. at 27-28 (fees paid from settlement fund); *Ingram v. The Coca-*

*Cola Co.*, 200 F.R.D. 685, 694 & n.16 (N.D. Ga. 2001) (fees paid from settlement fund); *Roberts*

*v. Texaco, Inc.*, 979 F. Supp. 185, 193 (S.D.N.Y. 1997) (fees paid from settlement fund). *See*

*also Cobell v. Jewell*, 234 F. Supp. 3d 126, 153-55 (D.D.C. 2017) (describing *Cobell* settlement

and attorney fees award).

Plaintiffs' reliance on "constructive common fund" case law is equally misplaced. Such

cases involve situations where, in a settlement, the parties negotiate a specified lump sum

amount for the plaintiffs' attorney fees as part of a "package deal" that also includes separately

specified relief for the class members. In order to evaluate the reasonableness of the amount set

aside for attorney fees, the court combines that sum with the other elements of the settlement to

create an overall constructive common fund, and then calculates the percentage of the

constructive common fund attributable to the fee settlement. *E.g., In re Nat'l Football League*

*Players' Concussion Injury Litig.*, 2018 WL 1635648, *2-3 (E.D. Pa.) (separate $112.5 million

fund established to pay class counsel's fees and costs); *Radosti v. Envision EMI, LLC*, 760 F.

Supp. 2d 73, 77 (D.D.C. 2011) (defendant agreed to pay up to $1,455,000 "inclusive of all fees,

costs, and expenses of any kind"); *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 122 (D.D.C. 2007)

(fees paid "out of the fund set aside for that purpose in the Settlement Agreement"); *Vista*

*Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 363-64 (D.D.C. 2007) (fees

paid from $1.1 million Fees Fund); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, *1, *4

(D.D.C.) (fees paid from separate attorney fees funds in specified amounts established under settlement agreement).

Significantly, just as in "classic" common fund cases, the defendant's maximum liability for the fee award in a constructive common fund case is fixed. *E.g., Hubbard v. Donahue*, 958 F. Supp. 2d 116, 124 (D.D.C. 2013) (the defendant, "unlike the loser in a fee-shifting case, stands to lose no more" in constructive common fund case, *quoting Swedish Hospital*, 1 F.3d at 1269). Plaintiffs do not cite a single example where the constructive common fund procedure was used to determine a defendant's liability for attorney fees where there was no previously negotiated maximum attorney fee amount specified in a settlement agreement. Nor have Plaintiffs identified a single case where a percentage of a previously distributed common fund has been awarded to resolve contested fee litigation under a statutory or a contractual fee-shifting provision, which is the outcome Plaintiffs seek here. *Cf. Petruzzi's Inc. v. Darling-Delaware Co., Inc.*, 983 F. Supp. 595, 604 (M.D. Pa. 1996) ("where class counsel and the settling defendant dispute the fee award, the lodestar method that is typically employed in 'conventional bipolar litigation' appears more appropriate" than a common fund award).

Professor Rubenstein, again writing in his role as the author of *Newberg on Class Actions*, has stated that "[f]or a court to award counsel fees from a common fund, two threshold requirements must be met: *first*, there must be a common fund, and *second*, the fund must be under the court's supervision." *Newberg on Class Actions* § 15.55 (footnotes omitted); *see Boeing*, 444 U.S. at 478 ("[j]urisdiction over the fund involved in the litigation" enables court to invoke common fund doctrine). Both of those conditions were satisfied in the cases cited by Plaintiffs. But neither of those conditions is satisfied here. In marked contrast to the cases on which they rely, Plaintiffs seek to create a different and entirely novel kind of "common fund"

- 20 -

award that, divorced from precedent, would impose a surcharge, equal to a percentage of the class's total prior – and already disbursed – recovery, on the amounts previously paid by the defendant.  Plaintiffs do not identify a single case (and we are aware of none) where a fee award made pursuant to a statutory or contractual fee-shifting provision in a contested fee proceeding has been computed as a percentage of the amounts previously paid to the successful plaintiffs under a judgment or a settlement.

Plaintiffs' fee request should be judged under the principles applicable to fee-shifting provisions.  *Cf. McKeage v. Bass Pro Outdoor World, LLC*, 943 F.3d 1148 (8th Cir. 2019) (post-remand appeal after lodestar fee award under contractual fee-shifting provision).  Therefore, Plaintiffs' reliance on the so-called "*Lorazepam* factors," which are used to evaluate the reasonableness of common fund fee awards, is simply beside the point.  *See* Pl. Mem. at 30-33; Pl. Ex. 1 [Rubenstein Declaration] at 9-28.  Plaintiffs' counsel could have sought a common fund percentage fee award from the $508 million *Hartman* settlement fund, but instead chose a different path.

The Consent Decree expressly requires that the entire *Hartman* settlement fund be distributed to the class members, thereby precluding an attorney fee award from that common fund.  R. 866 ¶ 5 at 5.  Plaintiffs certainly were not obliged to accept such a provision, and class counsel understood its ramifications for their fees.  *See* Pl. Ex. 2 [Frederickson Declaration] ¶ 65 at 24.  If Plaintiffs' counsel had instead reserved the right to seek a percentage fee award from the settlement fund – as is typical in class actions similar to this case – then Plaintiffs' counsel could have requested up to 30% of the settlement fund as a common fund fee award, consistent

with D.C. Circuit precedent.  *Swedish Hospital*, 1 F.3d at 1272 ("a majority of common fund

class action fee awards fall between twenty and thirty percent").[9]

Class counsel now seem to regret that the Consent Decree did not reserve their right to

seek a percentage fee award from the *Hartman* settlement fund.  But class counsel chose not to

pursue such an award and thereby waived the right to do so.  Similarly, class counsel could have

sought, but did not, a percentage fee award from the amounts paid to individual class members as

a result of the *Teamsters* hearings; instead they chose to be compensated with fee-shifting

lodestar awards.  *See Newberg on Class Actions* § 15.56 (fixed stream of payments can be a

common fund, *citing Nat'l Treasury Employees Union v. Nixon*, 521 F.2d 317 (D.C. Cir. 1975));

*see also Kifafi v. Hilton Hotels Retirement Plan*, 999 F. Supp. 2d 88, 95 (D.D.C. 2013) (attorney

fee equal to 15% of increased benefits, resulting in 15% reduction in each class member's benefit

increase).  Plaintiffs' counsel surely understood the ramifications of those choices for their fees.

Plaintiffs' counsel's opportunity to seek a percentage fee award under the common fund

doctrine passed almost two decades ago.  The $508 million *Hartman* settlement fund has been

fully distributed; all the individual relief awards have been paid.  There is no longer any common

fund under the Court's jurisdiction from which a percentage fee award could be paid.  Plaintiffs'

arguments about the *Lorazepam* factors come nearly 20 years too late, and have been rendered

---

[9] "[N]uanced questions" can arise when "counsel secure a common fund while
litigating under a statute that enables fees to be shifted to the defendant." *Newberg on Class
Actions* § 15.58 (footnotes omitted).  Those questions concern the extent to which the
plaintiff's counsel may receive fees both from the class members as a percentage of the
common fund, and from the defendant as a lodestar award under the fee-shifting statute.  *See,
e.g., Haggart v. Woodley*, 809 F.3d 1336, 1354-59 (Fed. Cir. 2016) (fee-shifting statute
preempted application of common fund doctrine).  The Court need not address any such
questions here, however, because Plaintiffs' current fee request is based only on statutory and
contractual fee-shifting provisions, and seeks fees only from the government.

moot by class counsel's decision to forgo a common fund fee award when they could have asked for it.

### 2. Plaintiffs' Counsel Have Received Reasonable Lodestar Fees

The procedure for calculating "reasonable" attorney fees under fee-shifting provisions such as those in Title VII and the Consent Decree is well-established: the Court must multiply "the number of hours reasonably expended on the litigation  . . . by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see Pennsylvania v. Delaware Valley Citizens' Council for Clean Air* (*"Delaware Valley I"*), 478 U.S. 546, 563-64 (1986).  The Supreme Court has described this "lodestar" methodology as "the guiding light of our fee-shifting jurisprudence."  *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010) (*quoting Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002), and *Burlington v. Dague*, 505 U.S. 557, 562 (1992)).  This methodology was used by the parties, the Special Master, and the Court to calculate the interim fee awards in this case.[10]

Plaintiffs contend that the interim fee awards fail to reflect class counsel's "true market value" because the hourly rates used for the lodestar fee calculations were too low.  In this connection, Plaintiffs assert that "the rates used to determine the lodestar for the interim fee petitions were not market rates" because those rates were capped at the levels set by the *Laffey* matrix prepared by the U.S. Attorney's Office, Pl. Mem. at 38, and those *Laffey* rates were not "commensurate with the high-end market rates that [Plaintiffs' counsel] would receive in cases not governed by the federal fee-shifting statutes."  *Id.* at 40.  Plaintiffs' assertions are misleading at best.

---

[10] Plaintiffs have not renewed their claims to be compensated for time and expenses that the Special Master and the Court excluded from the lodestar interim fee calculations. The Court, therefore, should deem those claims waived.

No rate cap applied to Plaintiffs' First and Second Petitions, which collectively covered the period from the inception of this case in 1977 through December 31, 1994, and the hourly rates used to compute the lodestar fees for that 17-year period were a subject of litigation before the Special Master and the Court.  In connection with those Petitions, Plaintiffs' counsel requested that they be compensated at their standard hourly rates, except for lawyers at firms that typically engaged in plaintiff's work and charged below-market rates to their clients.  For attorneys at the latter firms, Plaintiffs requested the use of market rates derived from composite, non-contingent rates actually charged by Crowell & Moring attorneys.  *See* R. 126 [Special Master's Report on First Petition] at 2.

Plaintiffs' First Petition was supported by affidavits attesting that the hourly rates Plaintiffs requested were in fact bona fide market rates.  Laurel Pyke Malson, Esq., and Thomas P. Gies, Esq., submitted affidavits showing the standard hourly billing rates for attorneys at Crowell & Moring, and Mr. Gies testified that "[t]he rates reflected in this affidavit are non-contingent rates that were actually charged this year to fee-paying clients that pay promptly on a current basis," and "are the non-contingent rates in effect today for employment discrimination work."  Def. Ex. 1 [1993 Gies Affidavit] ¶¶ 42-43 at 13.  Mr. Gies's affidavit also provided "Crowell & Moring's historic non-contingent rates for attorneys working on employment matters" that Plaintiffs used to compute the lodestar fees for the attorneys who customarily billed their clients at discounted rates.  *Id.* at 14-15.  Similarly, Peter H. Doyle, Esq., of Arter & Hadden, submitted an affidavit verifying his billing rate "for clients who paid promptly on current work for non-contingency matters."  Def. Ex. 2 [1994 Doyle Affidavit] ¶ 3.

The Special Master accepted the hourly rates Plaintiffs proposed:

My review of the lodestar rates relied upon by Plaintiffs indicates that the rates are reasonable.  Aside from attorneys at Webster & Frederickson and Hudson,

- 24 -

Leftwich & Davenport, counsel seek hourly rates which they have charged to fee paying clients in other cases.  This is clearly the market rate for services rendered, and that rate appears to be reasonable when measured against the so-called Laffey Matrix which has been frequently used in this District and has been accepted in this Court . . . .  [The fees claimed by the plaintiffs] are in many respects lower than the Laffey Matrix rates which could have been relied upon. . . .  The Defendant has offered no reason to believe that the rates relied upon by the Plaintiffs are unreasonable or that the Webster and Hudson firms have not devoted substantial parts of their capacity to representation of clients who are charged below-market rates.  Even taking into account the fact that I limited discovery, I believe that the record is clear that the Defendant has not matched the Plaintiffs' evidence and has made no showing that the fees claimed are not market rates.

* * *

Plaintiffs have submitted detailed information about their actual billing rates, their practice of billing clients at below market rates, and the rationale for using blended Crowell & Moring rates to determine the market rates for lawyers who billed below market.  The approach taken by Plaintiffs is reasonable, and the rates fall within the rates in the Laffey Matrix which have been deemed reasonable by this Court and the Court of Appeals.

R. 126 at 9-12, 79.

Plaintiffs' Second Petition was likewise supported by affidavits to demonstrate that the

hourly rates requested by Plaintiffs corresponded to the "billing rates . . . <u>actually charged</u> and

collected by plaintiffs' counsel from fee-paying clients for similar legal services" to those

provided by counsel in the *Hartman* case.  Def. Ex. 3 [Memorandum in Support of Plaintiff's

Second Motion for Interim Attorneys' Fees and Expenses] at 12 (emphasis in original).  Ms.

Malson affirmed that "[t]he rates for Crowell & Moring personnel reflected in this affidavit are

the non-contingent rates that were actually charged for the work of each timekeeper during the

year the work was performed, to fee-paying clients who pay promptly on a current basis."  Def.

Ex. 4 [1996 Malson Affidavit] ¶ 52 at 12.  She further confirmed that "[t]he rates for Webster &

Fredrickson that are set forth in this affidavit are composites of the non-contingent rates for

Crowell & Moring timekeepers of an equivalent level of experience."  *Id.*  Similarly, Mr. Doyle

verified that the hourly rates requested on behalf of Arter & Hadden "are the noncontingent District of Columbia rates that were actually charged to fee-paying clients that pay promptly on a current basis for the work of each timekeeper, during the year that the work was performed," and that those rates were "Arter & Hadden's District of Columbia rates for litigation work that were in effect at the time the work was performed." Def. Ex. 5 [1996 Doyle Affidavit] ¶ 14 at 7. And Douglas B. Huron, Esq., testified that the hourly rates requested on behalf of Kator, Scott & Heller corresponded to the firm's "customary hourly rate[s]." Def. Ex. 6 [1995 Huron Declaration] ¶ 2.

The Special Master again accepted the hourly rates that Plaintiffs requested to calculate Plaintiffs' second fee award:

> There is substantial authority in this and other Circuits to support [the] notion that Plaintiffs' counsel are entitled to be recompensed at their normal hourly rates, since the market rates are substantial evidence of reasonableness. I compared the Plaintiffs' rates with the reported rates of law firms in this City, and I find that the Plaintiffs' rates are reasonable. I compared the Plaintiffs' rates with the Laffey Matrix and find that, except in a few cases, the rates fall within the Matrix or extremely close to it. I have also examined the number of hours billed by each attorney in this case, and I find that the Plaintiffs have not used their highest priced talent in any excessive manner. Thus, I find that the Plaintiffs' rates are reasonable.

R. 218 [Special Master's Report on Second Petition] at 12. Indeed, the Special Master pointed out that "if all counsel billed according to the Laffey Matrix the Plaintiffs' fees might be higher than they are at market rates." *Id.*

In the opinion resolving Plaintiffs' motion for final resolution of the First and Second Petitions, the Court adopted the historic market rates approved by the Special Master. 973 F. Supp. at 201. Accordingly, for all work done during the first 17 years of this case, class counsel were compensated using hourly rates that the Special Master found and the Court approved as market rates for the periods when the services were rendered, and so reflected the

- 26 -

contemporaneous market value of class counsel's time. Because those rates were based on Plaintiffs' counsels' own submissions, using those rates to compute the fee awards perforce resulted in "reasonable" lodestar fees for the 17-year period covered by the First and Second Petitions. *See Perdue*, 559 U.S. at 557 n.7 ("[t]here was nothing unfair about compensating these attorneys *at the very rates they requested*"; emphasis in original).

In December 1996, prior to the filing of the Third Petition, the parties made an informal agreement about the hourly rates that would be used to compute the interim fee award requested in that petition, and this agreement continued in effect for all of Plaintiffs' subsequent interim fee requests. The parties agreed that for two firms – Crowell & Moring and Heller, Huron, Chertkof, Lerner & Salzman – the historic rates actually charged for the work of each timekeeper at the time the work was performed would govern, provided that those rates did not exceed the U.S. Attorney's Office *Laffey* matrix rates. For lawyers at Webster, Fredrickson & Brackshaw (successor to Webster & Fredrickson), because the bulk of that firm's work involved "public interest" cases for which the firm charged below-market rates, the Crowell & Moring hourly rates would be used, again subject to the *Laffey* matrix rate cap. *See, e.g.,* R. 849 [Special Master's Report on Seventh Petition] at 2-3. This agreement effectively ended the litigation about the hourly rates used to compute Plaintiffs' interim attorney fee payments.

Plaintiffs now contend that the informal 1996 rate agreement was highly disadvantageous to their counsel because there was a large disparity between the true market value of their attorneys' time and the maximum rates that their attorneys could be paid consistent with the *Laffey* matrix. As Mr. Frederickson concedes, however, at the time of the 1996 rate agreement, "the rates in the *Laffey* matrix were roughly comparable to the prevailing market rates in the District of Columbia." Pl. Ex. 2 [Fredrickson Declaration] ¶ 63 at 23.

- 27 -

From the materials submitted with the formal fee petitions filed by Plaintiffs after the 1996 rate agreement, it is possible to gauge just how comparable *Laffey* rates were to then-prevailing market rates.  For example, Ms. Malson submitted a declaration in support of the Seventh Petition, which covered work done from January 1, 1998, through June 30, 1998.  Her declaration shows the "non-contingent rates that were actually charged during this period for each of the timekeepers whose time is sought in Plaintiffs' seventh fee petition," and so enables a comparison to be made between those rates and the "somewhat different" *Laffey* rates used to calculate Crowell & Moring's requested lodestar interim fee award pursuant to the 1996 rate agreement.  Def. Ex. 7 [1999 Malson Declaration] ¶¶ 41-42 at 12-13.

The following chart compares the Crowell & Moring timekeepers' "actual" and "as applied" hourly billing rates for work covered by the Seventh Petition:

| Timekeeper | Crowell & Moring Actual Hourly Rate for FY 9/1/97-8/31/98 | As Applied Hourly Rate for Seventh Petition (1/1-6/30/98) |
|---|---|---|
| Thomas P. Gies (Lawyer) | $315 | $315 |
| Laurel P. Malson (Lawyer) | $295 | $285 for January – May 1998 $290 for June 1998 |
| Glenn D. Grant (Lawyer) | $225 | $225 |
| Terence F. Flynn (Lawyer) | $225 | $225 |
| Lisa T. Greenlees (Lawyer) | $195 | $195 |
| Felicia G. Schweitzer (Lawyer) | $150 | $150 |
| Kimberly Hartwell (Lawyer) | $135 | $135 |
| Joseph P. Mastrosimone (Law Clerk) | $85 | $85 |
| Robin S. McKinney (Legal Assistant) | $90 [see note] | $85 |
| Amy C. Bishop (Legal Assistant) | $90 [see note] | $85 |

Note: For Legal Assistants, Ms. Malson's declaration reports only that actual hourly rates range from $75 – 90, and does not state the specific actual hourly rate for either Ms. McKinney or Ms. Bishop.  The highest reported actual rate is shown in the table above for both of the Legal Assistant timekeepers, and is used for the calculations below.

*See id.* and the related Tables in Def. Ex. 7, which were submitted with the Seventh Petition by

Plaintiffs' fee counsel and which reflect the Crowell & Moring hours claimed and "as applied"

rates used in the Seventh Petition.[11]

The total lodestar fee award requested for Crowell & Moring in the Seventh Petition,

using the "as applied" rates pursuant to the 1996 rate agreement, was $413,415.00.  *See id.*

[Tables submitted by Plaintiffs' fee counsel with Seventh Petition].  If that lodestar fee amount is

recalculated using Crowell & Moring's actual hourly rates as reported by Ms. Malson, the total is

$418,401.25.  The 1996 rate agreement, therefore, caused only a 1.19% reduction in Crowell &

Moring's lodestar fee request.  Consequently, Ms. Malson's 1999 testimony shows that, at least

as of June 30, 1998, the *Laffey* rates were not just "roughly" comparable to market rates, the

*Laffey* rates were virtually identical to then-prevailing market rates.  *See* Memorandum in

Support of Plaintiffs' Seventh Motion for Interim Attorneys' Fees and Expenses (filed with

Special Master on May 25, 1999) [Def. Ex. 10-15] at 10-11 & n.20 (affirmatively stating that the

hourly rates in the U.S. Attorney's Office *Laffey* Matrix for time period covered by Seventh

Petition are "market rates . . . supported by the rates awarded in recent cases in this Circuit as

well as rate information provided in exhibits to previous <u>Hartman</u> fee petitions").

---

[11] Just as the Special Master found when considering the First and Second Petitions,
*see*  R. 126 at 9-12, 79; R. 218 at 12, the *Laffey* rates for this period exceeded the hourly rates
Crowell & Moring charged for some timekeepers at that time.  For instance, for the period
through May 31, 1998, Mr. Gies's *Laffey* rate was $330/hour, whereas his actual billing rate
as a senior Crowell & Moring litigation partner was $315/hour, thereby confirming that the
*Laffey* rates at that time were closely aligned with rates charged for complex federal litigation
by a major District of Columbia law firm.  *See*  https://www.justice.gov/usao-dc/civil-
division/laffey-matrix-1992-2003 (1997-98 *Laffey* rate).  *See also* Def. Ex. 10-15 at 10 &
Def. Ex. 10-16 [1999 Huron Declaration and related Tables submitted by Plaintiffs' fee
counsel as Exhibits 4A and 4B to Seventh Petition] ("as applied" billing rates for Heller
Huron timekeepers in Seventh Petition pursuant to 1996 rate agreement were identical to
those timekeepers' "actual" hourly billing rates during period covered by Seventh Petition).

The Seventh Petition was the last formal interim fee petition submitted by Plaintiffs.  All of Plaintiffs' subsequent interim fee requests were resolved informally.  Thus, the record of this case does not include contemporaneous data about historic market rates for periods after June 30, 1998.  Nevertheless, additional insight about the claimed disparity between those market rates and the corresponding rates in the U.S. Attorney's Office *Laffey* matrix is provided by *Berke v. Bureau of Prisons*, 942 F. Supp. 2d 71 (D.D.C. 2013), a civil rights case in which the plaintiff was represented by attorneys from Ballard Spahr, a national law firm comparable to Crowell & Moring.[12]  Ballard Spahr sought compensation for its work on the case, pursuant to a fee-shifting statute, based on its attorneys' standard billing rates.  After comparing the requested rates to the rates in the U.S. Attorney's Office *Laffey* matrix, the Court found:

> The rates charged by the five Ballard Spahr attorneys who worked on this case, though not identical to the *Laffey* rates, are very much "in line" with them. . . . Altogether, two of the five Ballard Spahr attorneys charged higher rates than provided for by the USAO *Laffey* matrix, two charged lower rates, and one charged exactly the same rate.  The Court therefore concludes that Ballard Spahr's standard billing rates are reasonable.

*Id.* at 78.

The fee award in *Berke* was for work that was done in 2012, approximately 10 years after the litigation in the *Hartman* case ended.  Furthermore, *Berke* is only one of many cases that endorsed the U.S. Attorney's Office *Laffey* Matrix as "relevant evidence of the 'prevailing' rates in the Washington, D.C. area," *id.*, for periods subsequent to the *Hartman* Consent Decree and the conclusion of litigation in the *Hartman* case.  *See, e.g., Heller v. District of Columbia*, 832 F.

---

[12] The fee award in *Berke* was for work done in 2012.  According to the rankings published by *The American Lawyer* in 2012 (based on 2011 data), Crowell & Moring and Ballard Spahr were then, respectively, the 84th and 103rd largest law firms in the United States by gross revenue.  *See* https://www.law.com/americanlawyer/almID/1202597273265/ (last visited December 12, 2019); https://advance.lexis.com/api/permalink/ecf8becd-9d99-4a50-b8d7-4405b360d989/?context=1000516 (last visited December 12, 2019).

Supp. 2d 32, 48 (D.D.C. 2011) ("The Court finds the frequency with which the USAO Laffey Matrix rates are applied to be strong evidence of both their prevalence and their reasonableness"); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 18 n.29 (D.D.C. 2008) (noting the "widespread acceptance of the U.S. Attorney's Office *Laffey* Matrix"), *aff'd in part, vacated in part on other grounds*, 608 F.3d 871 (D.C. Cir. 2010); *MacClarence v. Johnson*, 539, F. Supp. 2d 155, 160 (D.D.C. 2008) ("[u]nder *Laffey*, everyone is paid the same rate as charged by a senior partner in one of the large Washington firms"); *American Lands Alliance v. Norton*, 525 F. Supp. 2d 135, 150 (D.D.C. 2007) (referring to the U.S. Attorney's Office *Laffey* Matrix as the "standard matrix" in this jurisdiction); *Pleasants v. Ridge*, 424 F. Supp. 2d 67, 71 n.2 (D.D.C. 2006) (describing the U.S. Attorney's Office *Laffey* Matrix as "the benchmark for reasonable fees in this Court").

*Berke* and similar decisions indicate that any significant divergence between market rates for complex federal litigation in the District of Columbia and the U.S. Attorney's Office *Laffey* matrix rates did not occur until well after the litigation in *Hartman* was over. Accordingly, that divergence is not a valid basis either for an adjustment to Plaintiffs' historic lodestar fee awards or for an additional fee award. The fact that attorneys are paid "high-end market rates" for conducting complex federal litigation, Pl. Mem. at 40, does not mean that they are entitled to be paid those same high-end rates for work that involves no litigation at all.

After the parties signed the Consent Decree on March 21, 2000, the litigation between Plaintiffs and Defendants ceased, and the *Hartman* case entered a distinct and lengthy non-litigation phase. Upon signing the Consent Decree, the parties' interests aligned and they combined forces to secure Court approval of the Consent Decree. *See* R. 904 [Joint Pre-Hearing Brief in Support of Consent Decree]. That goal was readily achieved. The Court brushed aside

the objections to the settlement, including the objections by the four Petitioners who challenged the original class notice.  *See* R. 917 [Memorandum and Order Approving Consent Decree] at 4-6 & n.1.  The Petitioners' appeals from that ruling were summarily rejected.  *See Dillon v. Powell*, 2001 WL 41046 (D.C. Cir.), *cert. denied*, 534 U.S. 1078 (2002).

Plaintiffs and Defendants then worked cooperatively to implement the Consent Decree's terms.  Plaintiffs' counsel were assisted in those efforts by a Claims Administrator (Poorman-Douglas Corp., later Epic Systems), and by a law firm that specializes in tax matters (Caplan & Drysdale), both of which were selected by Plaintiffs' counsel and paid by the government pursuant to Paragraph 8 of the Consent Decree.  *See* Def. Ex. 8 [Van Horn Declaration] ¶ 13 at 8.  Defendants also worked cooperatively with Plaintiffs' counsel to fully effectuate or otherwise resolve the individual relief awards.  All of that work was carried out by mutual agreement of the parties.  There was no litigation or dispute that required Court intervention.  *See id.* ¶ 14 at 9; Def. Ex. 9 [Parish Declaration].  Indeed, following Judge Robertson's retirement, it was not even necessary for a judge to be permanently assigned to this case until Plaintiffs filed their current fee motion.

Plaintiffs' counsel were compensated for their work during the non-litigation phase of the case with lodestar fee payments calculated with the hourly rates specified in the attorney fee matrices prepared by the U. S. Attorney's Office, which are adjusted annually for inflation.  *See* https://www.justice.gov/usao-dc/civil-division (U.S. Attorney's Office attorney fee matrices).  Like the individual relief awards, those fee requests were resolved by mutual agreement and without any litigation or intervention by the Court except for routine approvals of the stipulated payments.  *See* Def. Ex. 8 ¶ 15 at 9.  Plaintiffs' counsel, of course, were not required to accept the use of the U. S. Attorney's Office's fee matrices, and could have requested higher hourly

rates at any time during the past 23 years, but chose instead to defer that request until now.  *See* Pl. Ex. 2 [Fredrickson Declaration] ¶ 63 at 24.

Plaintiffs' counsel seek compensation for their work during the non-litigation phase of the case at hourly rates that Plaintiffs proffer as current (i.e., 2019) rates for complex federal litigation in the District of Columbia.  *See* Pl. Ex. 6 [Lang Declaration] ¶¶ 71-74 at 13-14. Putting aside for the moment the use of current rates, see pp. 39-41 below, there is a critical omission from this request.  Specifically, the ninth decile hourly rates proposed by Plaintiffs for complex federal litigation have no obvious bearing on what would be reasonable hourly billing rates for non-litigation work of the sort Plaintiffs' counsel performed during the non-litigation phase, and Plaintiffs provide no explanation to bridge this logical gap.

In *D.L. v. District of Columbia*, 924 F.3d 585 (D.C. Cir. 2019), the Court of Appeals rejected the most recent version of the U.S. Attorney's Office attorney fee matrix as not sufficiently tailored to complex federal litigation conducted in the District of Columbia because the underlying data incorporated hourly rates for all legal services in the District of Columbia metropolitan area.  The Court of Appeals reasoned that such an approach impermissibly skewed the resulting rates downward in part because hourly rates for non-litigation work are lower than hourly rates for complex federal litigation.  *Id.* at 592.  The corollary of this proposition is that the premium rates paid for complex federal litigation would unreasonably overcompensate Plaintiffs' counsel for their work during the nearly two-decade long non-litigation phase of this case.  And it is proper for the Court to analyze that phase of the case separately to determine a reasonable attorney fee award.  *See In re Olson*, 884 F.2d 1415, 1419-22 (D.C. Cir. 1989); *cf.* Pl. Mem. at 6-17 (describing "phases" of the case).

- 33 -

The case law confirms that top-of-the-market rates are not appropriate for legal work that does not involve complex federal litigation.  *See, e.g., Burks v. District of Columbia*, 2019 WL 2189488, \*6-7, *adopted*, 2019 WL 2185371 (D.D.C.) (reduced rates for non-complex IDEA litigation; collecting cases); *Barton v. U.S. Geological Survey*, 2019 WL 4750195, \*4-8 (D.D.C.) ("straightforward" FOIA action; reduced rate for administrative tasks); *Amaya v. Logo Enterprises, LLC*, 251 F. Supp. 3d 196, 202 (D.D.C. 2017) (no litigation needed to resolve FLSA case); *Campbell v. District of Columbia*. 202 F. Supp. 3d 121, 130, 131 (D.D.C. 2016) (paralegal work performed by attorney compensated at paralegal rate; travel time compensated at half the attorney's hourly rate); *Poulsen v. Dep't of Homeland Sec'y*, 2016 WL 1091060, \*6 (D.D.C.) (reduced rate where "particular tasks" involved in case were not complex federal litigation).  *See also* Pl. Ex. 1 [Rubenstein Declaration] at 33 (complex federal litigation "trigger[s] the highest billing rates," as opposed to "straightforward" and "less expense-driven forms of lawyering").

"[A] fee applicant must produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015) (cleaned up; citing authorities).  The "similar services" with respect to the non-litigation phase of this case involved exclusively non-litigation work – not complex federal litigation – and Plaintiffs have presented nothing that justifies the use of their proposed ninth-decile litigation rates for that non-litigation work.  *See id.* at 104-5 (district court abused its discretion by "relieving [plaintiff] of her burden" to offer adequate evidence that requested rates were "in line with those prevailing in the community for *similar* services;" emphasis added by *Eley* Court).  There is thus no basis on which the Court can award attorney fees for the non-litigation phase over and above the fees class counsel have already

received for that phase of the case.  *See Lee v. District of Columbia*, 298 F. Supp. 3d 4, 12-15

(D.D.C. 2018).

### 3.    No Further Enhancement of the Lodestar Fees is Appropriate

In his Report on Plaintiffs' First Petition, the Special Master recommended that Mr.

Fredrickson and Ms. Brackshaw "should receive a 25% enhancement on the lodestar rates

applicable to them for the years 1980 – 1990."  R. 126 at 73.  The Special Master explained why

he limited the enhancement to that 10-year period as follows:

> Fairness requires that the enhancement apply only for the years 1980 – 1990.  In
> these years, Mr. Fredrickson alone or with Ms. Brackshaw carried the laboring
> oar in this complex class action and achieved success that is remarkable for two
> lawyers who had begun their work on the case early in their careers.  Before 1980,
> Mr. Fredrickson benefitted from supervision by more senior lawyers who also
> billed for their time.  After 1990, other law firms joined the Plaintiffs for the relief
> aspect of the case, and it is difficult to say that the efforts of Mr. Fredrickson and
> Ms. Brackshaw in the post-1990 years are exceptional when compared to the
> work of the additional counsel who joined them.

*Id.* at 75; *accord* R. 177 [Special Master's January 17, 1995 Report] at 41.  The Court approved

the Special Master's recommendation in its opinion resolving Plaintiffs' motion for final

resolution of the First and Second Petitions.  973 F. Supp. at 202.[13]  In considering Plaintiffs'

request for a 25% quality enhancement, both the Special Master and the Court relied on

*McKenzie v. Kennickell*, 875 F.2d 330 (D.C. Cir. 1989), which was then and remains today "the

only case where the D.C. Circuit has upheld a multiplier for quality of representation."  Pl. Mem.

at 37; *see* R.126 at 4, 73-75; 973 F. Supp. at 202.

Since *McKenzie*, the Supreme Court has reaffirmed its direction that enhancements to a

lodestar fee award must be limited to "rare" and "exceptional" circumstances, and has indicated

---

[13]  Plaintiffs incorrectly attribute this opinion to Judge Richey, who had passed away
several months earlier.  *See* Pl. Mem. at 38.  The opinion was actually issued by Judge
Robertson.  *See* 973 F. Supp. at 200.

that lower courts should be more hesitant to grant such enhancements, not more liberal.  *See Perdue v. Kenny A.*, 559 U.S. 542 (2010) (reversing enhancement of lodestar fee award for superior attorney performance); *Burlington v. Dague*, 505 U.S. 557 (1992) (holding that "enhancement for contingency is not permitted" under fee-shifting statute).

In *Perdue*, the Supreme Court concluded that there are "a few" circumstances in which superior attorney performance is not adequately taken into account in the lodestar calculation, "but that these circumstances are indeed 'rare' and 'exceptional,' and require specific evidence that the lodestar fee would not have been adequate to attract competent counsel." *Perdue*, 559 U.S. at 554; *see* Pl. Ex. 1 [Rubenstein Declaration] at 28-29 & n. 65 (Supreme Court has "authoriz[ed] upward adjustments [to lodestar] in three specific circumstances").

One such circumstance arises when the lodestar fee does not adequately measure an attorney's "true market value."  In those cases, "an enhancement may be appropriate so that the attorney is compensated at the rate that the attorney would receive in cases not governed by the federal fee-shifting statutes." *Perdue* 559 U.S. at 554-55.  Plaintiffs rely heavily on this justification for an enhancement to their attorneys' lodestar fees.  *See* Pl. Ex. 1 at 29-34.  As shown above, however, Plaintiffs' argument in this respect is unconvincing.  Because the hourly rates used to compute Plaintiffs' interim attorney fees for the litigation phase of the case were the same as or very close to the then-prevailing market rates for complex federal litigation in the District of Columbia, see pp. 23-31 above, those rates were commensurate with market value, and so provide no basis to further enhance the lodestar for that phase of the case.  *Cf.* Pl. Mem. at 40; Pl. Ex. 1 at 29.

Similarly, although the rates used to compute class counsel's compensation during the non-litigation phase of the case may have eventually diverged from the market rates paid for

complex federal litigation, counsel should not be compensated with the latter rates for non-litigation work, and Plaintiffs have presented no persuasive justification for awarding more compensation to class counsel than counsel have already been paid for the work counsel performed during the non-litigation phase of the case.  See pp. 31-34 above.

Other circumstances in which an enhancement might be appropriate would arise if "the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted," or if "the attorney's performance involves exceptional delay in the payment of fees."  *Perdue*, 559 U.S. at 555-56.  In those circumstances "an enhancement may be appropriate where the attorney assumes these costs in the face of unanticipated delay, particularly where the delay is unjustifiably caused by the defense."  *Id.* at 556.

Plaintiffs' reliance on "delay in payment" as grounds for an enhancement, *see* Pl. Ex. 1 at 34-35, is meritless.  Although class counsel did not receive their first interim fee award until 18 years after this case began, *see* Pl. Mem. at 4, this delay is not attributable to the government.  On several occasions in open court the Court encouraged class counsel to submit an application for interim fees and costs, and ultimately admonished them "for having waited all these years" before they did so.  R. 179 [Order filed January 24, 1995] at 2.  Thus, the delay in reimbursement of class counsel's expenses and their receipt of interim attorney fees was neither unanticipated nor unjustified because that delay was due to class counsel's own choice, and so cannot justify rewarding counsel with an enhancement to the lodestar.

Other potential reasons for an enhancement to the lodestar over and above what class counsel have already received are equally without merit.  In *Dague*, the Supreme Court expressly disapproved enhancements for contingency under fee-shifting statutes.  505 U.S. at 567.  And as early as 1984 the Supreme Court "specifically held in *Blum* that the novelty and complexity of

the issues, the special skill and experience of counsel, and the results obtained from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award." *Delaware Valley I*, 478 U.S. at 565 (cleaned up; discussing *Blum v. Stenson*, 465 U.S. 886 (1984)).  "Moreover, when an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests."  *Id.* "The matter may have been difficult, wearing, and time consuming, but that kind of effort has been recognized in the lodestar award."  *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air* ("*Delaware Valley II*"), 483 U.S. 711, 730 (1987) (plurality opinion).  Indeed, doing high-quality legal work, even under challenging conditions, does not require any "specialized skills or knowledge beyond what lawyers use on a regular basis."  *Role Models America, Inc. v. Brownlee*, 353 F.3d 962 (D.C. Cir. 2004).  And there is no precedent that justifies awarding a lodestar enhancement to spare Plaintiffs' counsel from the consequences of their decision to forgo a "classic" common fund percentage fee award that would have been many times greater than their reasonable lodestar fees.  See pp. 21-23 above.  *Cf. Newberg on Class Actions* § 15.53 (issues such as "multiplied fee awards" are "treated differently" under common fund and lodestar regimes).

The Special Master's recommendation to award Mr. Fredrickson and Ms. Brackshaw a 25% enhancement to their lodestar fees for the period between 1980 – 1990 (which were computed using Plaintiffs' requested historic market rates), and the Court's approval of that recommendation, is consistent with *McKenzie* and is no longer contested by the government. The Special Master's and the Court's limitation of that enhancement is also consistent with *McKenzie* and with applicable Supreme Court precedent, both then and now.  There has been no

intervening development, either in the course of this case or in the law, that warrants revisiting the enhancement that has already been awarded, or for awarding any additional enhancement. *See* Def. Ex. 8 [Van Horn Declaration] ¶¶ 6-12 at 4-8.  Therefore, Plaintiffs' request for an additional lodestar enhancement should be denied.

### 4. Plaintiffs' Attorneys Have Been Appropriately Compensated for Delay

One of Plaintiffs' fee counsel has expended considerable effort to calculate a lodestar fee award for class counsel that is purportedly based on current (i.e., 2019) market rates for complex federal litigation in the District of Columbia.  *See* Pl. Ex. 6 [Lang Declaration].  Whatever merit her end-product may have, counsel's exertions in this respect were misguided.  Although current rates have been used to compute the lodestar as a means of compensating counsel for delay in receipt of their attorney fees, *see* Pl. Mem. at 42 (*citing Missouri v. Jenkins*, 491 U.S. 274, 282 (1989)), sovereign immunity precludes resort to that methodology here.

Under the well-established "no interest" rule, interest may not be awarded against a Federal defendant unless expressly authorized by statute or contract.  *See, e.g., Library of Congress v. Shaw*, 478 U.S. 310, 314-17, 320-21 (1986); *Brown v. Sec'y of the Army*, 78 F.3d 645, 651 (D.C. Cir. 1996).  Consequently, interest is not subsumed within the "reasonable attorneys' fees, expenses, and costs" authorized by the Consent Decree [R. 866 ¶ 8 at 6-7] and, because the Consent Decree contains no provision that expressly allows prejudgment interest on Plaintiffs' attorney fee awards, Plaintiffs may recover prejudgment interest only as permitted by Title VII.  *See, e.g., Tillson v. United States*, 100 U.S. 43, 47 (1879) (no interest on delayed payments under government contract "except it is in some way specially provided for"); *Blake v. Califano*, 626 F.2d 891, 893-94 (D.C. Cir. 1980).

In *Trout v. Secretary of the Navy*, 317 F.3d 286 (D.C. Cir. 2003), the Court of Appeals held that prejudgment interest may not be awarded on back pay or attorney fees in Title VII cases for periods prior to November 21, 1991, the effective date of the amendments to Title VII which waived sovereign immunity to allow "the same interest to compensate for delay in payment [as is available] in cases against nonpublic parties." Pub. L. No. 102-166, § 114(2), 105 Stat. 1071, 1079, *codified as an amendment to* 42 U.S.C. § 2000e-16(d). As this Court (per Judge Robertson) recognized when ruling on Plaintiffs' motion for final resolution of the First and Second Petitions, "[i]f the Civil Rights Act of 1991 does not permit an award of prejudgment interest on fees, neither does it permit the use of current market rates as an adjustment or a proxy for prejudgment interest." 973 F. Supp. at 201.

Judge Robertson's ruling was based on his initial determination that sovereign immunity precluded any award of prejudgment interest in this case, a decision that Judge Robertson later reconsidered. His observation about using current market rates as a proxy for prejudgment interest, however, remains valid. Because class counsel's lodestar fees span the period from 1977 – 2018, calculating the lodestar using current rates would impermissibly award counsel with *de facto* prejudgment interest for that entire period, contrary to *Trout*, which limits any prejudgment interest award in this case to periods after November 21, 1991. *See* Pl. Mem. at 5 n.8 (current rates are used "to compensate for delay in payment from the beginning of the case").

Judge Robertson ultimately allowed prejudgment interest on back pay and attorney fees beginning on November 21, 1991, and the government has paid prejudgment interest to the class members and to their counsel consistent with those decisions. Judge Robertson decided that prejudgment interest in this case would be calculated using the 1-year Treasury bill rate rather than the prime rate as Plaintiffs requested. *See* R. 506 at 4-5; R. 550 at 3-5 [8 F. Supp. 2d at 3].

This decision was a permissible exercise of the Court's discretion under D.C. Circuit law, and is not challenged by Plaintiffs in their current fee motion.  *See Frederick Cnty. Fruit Growers Ass'n v. Martin*, 968 F.2d 1265, 1275 (D.C. Cir. 1992); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 265 (D.D.C. 2008); *Griffin v. Washington Convention Center*, 2000 WL 1174967, *6 (D.D.C.); *Jefferson v. Milvets System Technology, Inc.*, 986 F. Supp. 6, 9 (D.D.C. 1997).  Moreover, the prejudgment interest payments to class members are now final and no longer subject to appeal, reconsideration, or review.  Having acceded to the use of Judge Robertson's chosen methodology for the calculation of prejudgment interest on the payments to their clients, Plaintiffs' counsel should not now be heard to complain about the use of that same methodology to compute prejudgment interest on their attorney fees.

In short, Plaintiffs' counsel have already been appropriately compensated for delay in receipt of their attorney fees.  No additional compensation on account of delay is supportable.

### 5. Professor Rubenstein's Declaration Contributes Nothing to the Resolution of Plaintiffs' Fee Motion

Plaintiffs have proffered a declaration by Professor William B. Rubenstein as expert testimony in support of their fee request.  *See* Pl. Ex. 1 [Rubenstein Declaration].  However, although Professor Rubenstein is a very distinguished legal scholar, his declaration does not qualify as "expert testimony" within the meaning of Fed. R. Evid. 702.  Under that rule, an expert may testify only if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Professor Rubenstein's declaration, by contrast, merely repeats and amplifies the arguments presented in Plaintiffs' memorandum in support of their fee motion, and so effectively serves as an extension of that memorandum.  Further, Professor Rubenstein's "expert opinion" consists of facts that, "if found, support the conclusion that the requested fee is reasonable."  Pl.

Ex. 1 at 1. As such, Professor Rubenstein is merely replicating the role of this Court. But the Court is equally or better qualified than Professor Rubenstein to analyze the facts and the law. Just because Professor Rubenstein's advocacy for the Plaintiffs is cloaked in the garb of "expert opinion" does not alter its essential character or entitle it to any deference or elevated status. *See Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("[e]ach courtroom comes equipped with a 'legal expert,' called a judge").

Moreover, Professor Rubenstein omits or is unaware of several important points that undermine the value of his testimony. First, although Professor Rubenstein offers a lengthy discussion of the so-called "*Lorazepam* factors" that are used to evaluate whether a percentage-of-the-fund fee award is reasonable in common fund cases, he skips over the predicate question whether the common fund doctrine applies here. *See* Pl. Ex. 1 at 9-28. The answer to that predicate question is "No" – the common fund doctrine does not apply to Plaintiffs' fee request. See pp. 16-23 above. Indeed, Professor Rubenstein's writings elsewhere support that conclusion. *See Newberg on Class Actions* §§ 15.53 – 15.61.

Accordingly, whether Plaintiffs' requested percentage-of-the-fund award would be reasonable if Plaintiffs were seeking that award from the now-distributed $508 million *Hartman* settlement fund is a moot point. Professor Rubenstein has not identified a single case where the common fund doctrine has been applied under a statutory or contractual fee-shifting provision to compute a contested fee award as a percentage of a previously distributed common fund, which is the outcome Plaintiffs seek in their current motion.

Fee awards under fee-shifting provisions are properly computed using the lodestar formula prescribed by the Supreme Court. See p. 23 above. Adoption of the percentage-of-the-fund methodology to award fees under a fee-shifting provision based on a percentage of a

previously distributed common fund would be both unprecedented and unsupported by any relevant case law or other authority.

Second, Professor Rubenstein opines that the Court may award an enhancement to class counsel's lodestar fee award if the Court finds that the lodestar was computed using "hourly rates not commensurate with market value." Pl. Ex. 1 at 29. But such a finding is unwarranted because it is not supported by the record. Professor Rubenstein is apparently unaware that class counsel's lodestar fees for all work done during the first 17 years of this case were computed based on hourly rates that Plaintiffs requested, and that the Special Master expressly found were prevailing market rates at the time when those services were rendered. See pp. 23-27 above. Professor Rubenstein similarly fails to acknowledge the evidence indicating that any significant divergence between the market rates paid for complex federal litigation in the District of Columbia and the U.S. Attorney's Office *Laffey* matrix rates did not occur until after the litigation phase of this case had ended. See pp. 27-31 above. And Professor Rubenstein expresses no opinion as to what facts, if found, would justify using the high-end rates paid for complex federal litigation to compensate Plaintiffs' counsel for their non-litigation work during the 18-year non-litigation phase of the case. See pp. 32-34 above.

No enhancement for underpayment is appropriate here. The hourly rates used to compute Plaintiffs' interim attorney fees for the period during which the litigation in this case took place were commensurate with the then-prevailing market rates for complex federal litigation in the District of Columbia. And, although the hourly rates used to compute class counsel's compensation during the non-litigation phase of the case may eventually have diverged from the market rates for complex federal litigation, class counsel should not be compensated with the latter rates for non-litigation work, and Plaintiffs have presented no persuasive justification for

- 43 -

awarding more compensation to class counsel than they have already been paid for their work during the non-litigation phase.

Finally, Professor Rubenstein opines that class counsel's delayed receipt of attorney fees "supports the conclusion that the Supreme Court's 'delay' exception [to the general rule prohibiting lodestar enhancements] is triggered."  Pl. Ex. 1 at 35.  This opinion, however, is flawed because it is based on an incomplete understanding of the record.  Professor Rubenstein was apparently not informed about the Court's January 24, 1995 Order in which the Court admonished Plaintiffs "for having waited all these years to file an interim application for attorneys' fees and costs after being encouraged to do so in open Court on several occasions."  R. 179 at 2.  And Professor Rubenstein seems not to realize that Plaintiffs' counsel have never been required to accept the use of the U. S. Attorney's Office's fee matrices for their prior fee awards, and could have requested higher hourly rates at any time, but chose instead to defer that request until now.  *See* Pl. Ex. 2 [Fredrickson Declaration] ¶ 63 at 23-24.

The delay in reimbursement of class counsel's receipt of interim attorney fees was due to class counsel's own choices, and so cannot justify rewarding counsel with an enhancement to the lodestar.  Moreover, Plaintiffs' counsel have already been paid compensation for delay in accordance with the Court's ruling on prejudgment interest, and no additional compensation for delay is supportable.  See pp. 39-41 above.

Professor Rubenstein's testimony cannot help the Court "to understand the evidence or to determine a fact in issue."  His irrelevant and misinformed opinions contribute nothing to the resolution of Plaintiff's pending fee motion and should be disregarded.

#   #   #

## CONCLUSION

As Plaintiffs recognize, "[t]he essential goal of fee awards is to do rough justice" by "roughly approximat[ing] the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case."  Pl. Mem. at 44 (internal quotation marks omitted; citing authorities).  This goal has been achieved. Class counsel have received reasonable attorney fees.  No further fee award, enhancement, or compensation for delay is justified.  Plaintiff's requests for such additional payments should be denied.  A proposed Order is submitted herewith.

Respectfully submitted,

JESSIE K. LIU, D.C. Bar 472845
United States Attorney

/s/ *Daniel F. Van Horn*
DANIEL F. VAN HORN, D.C. Bar 924092
Chief, Civil Division

/s/ *Peter C. Pfaffenroth*
PETER C. PFAFFENROTH, D.C. Bar 496637
Assistant United States Attorney

U.S. Attorney's Office
Civil Division – Room E4226
555 4th Street, N.W.
Washington, D.C. 20530

(202) 252-2506
(202) 252-2513

daniel.vanhorn@usdoj.gov
peter.pfaffenroth@usdoj.gov

January 16, 2020

- 45 -