**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAROLEE BRADY HARTMAN, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 77-2019 (APM) |
| | ) |
| ANTONY BLINKEN, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
A LODESTAR ENHANCEMENT**

Roger E. Warin
rwarin@steptoe.com
Lindsey Bishop Lang
llang@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

## TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ................................................................................. 4

ARGUMENT ................................................................................................... 8

I.     SUPREME COURT JURISPRUDENCE AFFIRMS THE AVAILABILITY OF
LODESTAR ENHANCEMENTS ................................................................. 8

     A.     This Case Achieved Exceptional, Unequaled Success ......................... 10

     B.     Class Counsel Exhibited Superior Lawyering Throughout the Litigation ........... 11

II.    THE RECORD INCLUDES EXTENSIVE SPECIFIC EVIDENCE SUPPORTING
ENHANCEMENT ..................................................................................... 12

     A.     Achieving Extraordinary Success by Mastering Voluminous and Complex
Documentary Proof Can Support Enhancement .................................... 13

     B.     Exceptional Success Achieved Despite Monumental Resistance Can Support
Enhancement ........................................................................................... 17

     C.     Exceptional Success Achieved Under Extraordinary Time Limitations Can
Support Enhancement ............................................................................ 22

     D.     Exceptional Results in Controversial or Undesirable Cases Can Support
Enhancement ........................................................................................... 28

     E.     Exceptional Success in Societally Significant Cases Warrant Enhancement ....... 31

     F.     Comparisons with Awards in Similarly Exceptional Cases Support
Enhancement to Achieve Adequate Compensation. ............................. 32

     G.     Enhancements Help Induce Competent Attorneys to Represent Victims of
Discrimination ........................................................................................ 34

III.   THIS RARE CASE MEETS ALL THE REQUIREMENTS FOR A LODESTAR
ENHANCEMENT ..................................................................................... 36

     A.     Two Contemporaneous Cases Point the Way to Enhancement ............ 37

     B.     Voluminous Evidence Supports Enhancement ..................................... 40

     C.     The Court Has Discretion to Award a Multiplier Based on the Specific
Evidence Before It .................................................................................. 42

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adolph Coors Co. v. Truck Ins. Exch.*,
   383 F. Supp. 2d 93 (D.D.C. 2005) ................................................................................2

*Akron Center for Reproductive Health v. City of Akron*,
   604 F. Supp. 1275 (N.D. Ohio 1984) .........................................................................29

*Allen v. Freeman*,
   694 F. Supp. 1554 (S.D. Fla. 1988) ...............................................................16, 18, 42

*Berry v. Schulman*,
   807 F.3d 600 (4th Cir. 2015) .........................................................................31, 32, 37

*Blanchard v. Bergeron*,
   489 U.S. 87 (1989) .....................................................................................................42

*Blum v. Stenson*,
   465 U.S. 886 (1984) ........................................................................................ *passim*

*Borum v. Brentwood Vill., LLC*,
   No, 16-1723 (RC), 2020 WL 5291982 (D.D.C. Sept. 4, 2020) ..................................2

*Campbell v. District of Columbia*,
   202 F. Supp. 3d 121 (D.D.C. 2016) .......................................................................2, 43

*City of Burlington v. Dague*,
   505 U.S. 557 (1992) ...........................................................................................8, 9, 29

*Copeland v. Marshall*,
   641 F.2d (D.C. Cir. 1980) ..........................................................................................35

*DeLoach v. Phillip Morris Cos.*,
   No. 1:00CV01235 U.S. Dist. LEXIS 23240 (M.D.N.C. Dec. 19, 2003) ...........8, 37, 38

*DeMedina v. Reinhardt*,
   686 F. 2d 997 (D.C. Cir. 1982) ...................................................................................5

*In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*,
   204 F. Supp. 3d 962 (S.D. Ohio 2016) .....................................................................20

*Eley v. District of Columbia*,
   793 F.3d 97 (D.C. Cir. 2015) ......................................................................................2

*Gen. Tel. Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982) ................................................................................6, 7, 23, 24

*Guam Society of Obstetricians & Gynecologists v. ADA*,
    100 F.3d 691 (9th Cir. 1996) ..................................................................................29

*Hartman v. Duffey*,
    158 F.R.D. 525 (D.D.C. 1994) ...............................................................................25

*Hartman v. Duffey*,
    19 F.3d 1459 (D.C. Cir. 1994) ...............................................................................23

*Hartman v. Duffey*,
    88 F.3d 1232, *reh'g & suggestion for reh'g en banc denied* (D.C. Cir. 1996),
    *cert. denied*, 520 U.S. 1240 (1997) ......................................................................25

*Hartman v. Duffey*,
    973 F. Supp. 199 (D.D.C. 1997) .............................................................................12

*Hartman v. Wick*,
    600 F. Supp. 361 (D.D.C. 1984) ..................................................................*passim*

*Hartman, Liberales v. Daniel*,
    619 F. Supp. 1016 (N.D. Ill 1985) ...................................................................33, 34

*Heller v. District of Columbia*,
    2011 WL 6826278 (D.D.C. 2011) ..........................................................................28

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ...........................................................................1, 9, 10, 36

*Hollowell v. Gravett*,
    723 F. Supp. 107 (E.D. Ark. 1989) ..................................................................22, 36

*In re Home Depot, Inc.*,
    931 F.3d 1065 (11th Cir. 2019) ................................................................................8

*Hyatt v. Apfel*,
    195 F.3d 188 (4th Cir. 1999) .......................................................................17, 18, 36

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ..............................................................................9, 10

*Knop v. Johnson*,
    712 F. Supp. 571 (W.D. Mich. 1989) ...............................................................30, 36

*Mueller v. Land O'Lakes, Inc.*,
    617 F. Supp. 1370 (D. Minn. 1985) ........................................................................35

*Newman v. Piggie Park Enters., Inc.*,
    390 U.S. 400 (1968)....................................................................................................31, 34

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air*,
    478 U.S. 546 (1986)............................................................................................................35

*Perdue v. Kenny A.*,
    559 U.S. 542 (2010)..................................................................................................... *passim*

*Porter v. U.S. Agency for Int'l Dev.*,
    293 F. Supp. 2d 152 (D.D.C. 2003) ..................................................................................30

*Roberts v. Texaco, Inc.*,
    979 F. Supp.185 (S.D.N.Y. 1997)................................................................................ *passim*

*Salazar v. District of Columbia*,
    809 F.3d 58, 61 (D.C. Cir. 2015) .......................................................................................2

*Shakman v. Democratic Organization of Cook County*,
    677 F. Supp. 933 (N.D. Ill. 1987) .................................................................31, 32, 33, 37

*Smiley v. Blasingame, Burch, Garrard & Ashley, P.C.*,
    835 S.E.2d 803 (Ga. App. 2019) ......................................................................................20

*In re Sumitomo Copper Litig.*,
    74 F. Supp. 2d 393 (S.D.N.Y 1999).............................................................13, 18, 31, 36

*Swedish Hosp. Corp. v. Shalala*,
    1 F.3d 1261 (D.D.C. 1993) ...............................................................................................42

*In re Vioxx Prods. Liab. Litig.*,
    802 F. Supp. 2d 740 (E.D. La. 2011) ...............................................................................20

*Wing v. Asarco*,
    114 F. 3d 986 (9th Cir. 1997) ...............................................................................8, 37, 39

**Other Authorities**

https://tvnews.vanderbilt.edu/broadcasts/191216? ........................................................40

https://tvnews.vanderbilt.edu/broadcasts/392499? ........................................................40

https://tvnews.vanderbilt.edu/broadcasts/633890 .........................................................40

https://www.publicjustice.net/who-we-are/mission.........................................................41

https://www.usagm.gov/work-with-us/equal-employment/ ........................................32

J. Wesley Smith, *Fighting for Public Justice* ...............................................................42

Judith J. Johnson, *Rebuilding The Barriers: The Trend In Employment Discrimination Class Actions*, 19 Colum. Hum. Rts. L. Rev. 1, 27 (1987)..........................23

Kevin M. Clermont et al., *How Employment-Discrimination Plaintiffs Fare in the Federal Courts of Appeals* ...........................................................................................5

Kevin M. Clermont, & Stewart J. Schwab, *How Employment Discrimination Plaintiffs Fare in Federal Court* ..........................................................................4, 5

*Newburg on Class Actions*, § 3:47 .......................................................................23

*U.S. Agrees to Pay Over $508 Million to Settle Sex-Bias Case, Wall St. J.,* Mar. 23, 2000, at B2. ................................................................................................41

**TABLE OF EXHIBITS**

Exhibit 1:     Declaration of Bruce A. Fredrickson In Support of a Lodestar Enhancement,  May
               4, 2022

Exhibit 2:     Declaration of Susan L. Brackshaw In Support of a Lodestar Enhancement, May
               4, 2022

Exhibit 3:     Declaration of Jonathan C. Puth In Support of a Lodestar Enhancement, May 4,
               2022

Exhibit 4:     Declaration of Stephen Z. Chertkof In Support of a Lodestar Enhancement, May
               4, 2022

Exhibit 5:     Declaration of Thomas P. Gies In Support of a Lodestar Enhancement, May 4,
               2022

Exhibit 6:     Affidavit of Bruce A. Fredrickson in Support of Webster & Fredrickson's
               Attorneys' Fees and Expenses Sought in Plaintiffs' Second Motion for Attorneys'
               Fees and Expenses, February 16, 1996

Exhibit 7:     *New York Times*, March 23, 2000, Section A, Page 1, 22

## INTRODUCTION

After decades of hard-fought litigation and unsurpassed results, it is clear that this is the rare and exceptional case which unambiguous Supreme Court precedent firmly establishes as appropriate to compensate plaintiffs' counsel for superior lawyering by awarding an enhancement above their lodestar fees.  Along with the *record-breaking $508 million* agreement to settle most of the sex discrimination claims of the 1,100 women in the class, counsel worked diligently to ensure that each claimant who prevailed in individual *Teamsters* hearings received all relief to which she was entitled, which added *$42 million* to the total class recovery.[1]  This result -- distribution of over half a billion dollars to the class as a whole, and payment to every class member of more than half a million dollars each – is simply astounding and beyond compare with *any* employment discrimination case in the history of the Civil Rights Act.

The law is clear:  a court may grant a lodestar enhancement in appropriate cases where counsel has, through exceptional quality of services, achieved exceptional results.  *Perdue v. Kenny A.,* 559 U.S. 542, 546 (2010) (affirming rule that increase above the lodestar is permitted); *Blum v. Stenson,* 465 U.S. 886, 901 (1984) (upward adjustment of the lodestar is available in the rare case with superior quality of service and exceptional success); *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983) (exceptional results may justify an enhanced award).  In this Circuit, multipliers are part of "the three-part framework used to evaluate the reasonableness of fee

---

[1]The government agreed in 2000 to pay $508,000,000 ($462,660 per class member) in settlement of class-wide claims.  After reaching agreement in principle, class counsel had the foresight to demand that the Consent Decree include a provision requiring that the government pay interest on the settlement amount until it was paid.  After a lengthy court challenge by third parties and applying the agreed-upon interest, in 2002 the government paid $565,301,848 for distribution, raising the *minimum* payment received by every woman in the class to $532,663 each. Additional awards to the 46 women prevailing at *Teamsters* hearings totaled $41,796,285 (on average, $889,000), bringing the total recovery to $607,098,133.

awards: (1) determination of the number of hours reasonably expended in litigation; (2) determination of a reasonable hourly rate or 'lodestar'; and (3) the use of multipliers as merited*."* *Salazar v. District of Columbia*, 809 F.3d 58, 61 (D.C. Cir. 2015); *Adolph Coors Co. v. Truck Ins. Exch.,* 383 F. Supp. 2d 93, 95 (D.D.C. 2005); *see also* **Campbell v. District of Columbia**, 202 F. Supp. 3d 121, 126 (D.D.C. 2016) (courts may apply a multiplier in exceptional circumstances when justified); *Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015); *Borum v. Brentwood Vill., LLC*, No, 16-1723 (RC), 2020 WL 5291982 (D.D.C. Sept. 4, 2020).

The facts here are equally clear and largely undisputed.  This Court plainly stated that "[t]his case is in all respects extraordinary." ECF No. 1098, at 1 ("Mem. Op.").[2]  The long arc of the case, the size of the class, the complete mastery of the untold numbers of pages of documents leading to the resounding success in the *Teamsters* Hearings, the dedication of Mr. Fredrickson and his team for over forty years, the brilliant strategy decisions and successful implementation of these strategies throughout the case, including the final one of cross-appealing the interest rate issue to put settlement pressure on the government, and the record-breaking settlement itself are all well documented in the record, and establish the truly exceptional nature of this case.

On October 10, 2019 plaintiffs filed their final fee petition for the merits of the case. Plaintiffs sought additional fees based either on a percentage of the recovery theory or an enhancement to the interim fee lodestar.  After full briefing and oral argument, this Court issued

---

[2]This Court is a relative newcomer to this long-running case, assigned in 2019 to resolve whether class counsel were entitled to additional fees as described above.  In concluding that the case before it was extraordinary, the Court reviewed and relied on the extensive record, both in the docket itself and the specific evidence submitted by both plaintiffs and the government in support of or in opposition to the Memorandum in Support of Plaintiffs' Motion for Final Determination of Attorneys' Fees, ECF No. 1081, filed October 10, 2019.  To avoid a duplicative recitation of facts, those pleadings are incorporated by reference in this Memorandum, with additional facts included where necessary due to the requirement for specific evidence in the record to support this motion.

a Memorandum Opinion and Order,[3] holding that the percentage of the recovery theory was not available based on what it concluded was the intent of the parties when entering the 2000 Consent Decree, but, in dismissing the motion without prejudice, the Court held that the arguments for an increase to the lodestar had merit.  After a status conference on November 13, 2020, the plaintiffs were ordered to submit briefing on additional fees consistent with the Court's Memorandum Opinion.

Plaintiffs submitted a brief on December 14, 2020, ECF No. 1099 that set forth: 1) calculations for a revised lodestar to correct for sub-market *Laffey* Matrix rates; 2) calculations to correct the insufficient prejudgment interest rate used in interim fee petitions; and 3) argument supporting a multiplier or enhancement to the lodestar fees in recognition of the unprecedented success plaintiffs had achieved as a result of extraordinary lawyering.  Plaintiffs included analysis concerning the few rare and exceptional cases that had awarded lodestar enhancements, demonstrating a lodestar multiplier range of 1.25 through 5.5 having been awarded in cases bearing similarities to this case.  Thereafter, the parties negotiated a settlement of the amounts due for the submarket rates and incorrect interest rate, leaving the question of a lodestar enhancement to a later date.  As in the twenty joint stipulations on interim fees that preceded this agreement, this settlement was "without prejudice to either party's position with respect to enhancement of the lodestar for superior attorney performance and exceptional results."  Joint Stipulation, ECF No. 1108, filed 10/1/2021.

Prior to the 2000 class-wide settlement, the parties litigated seven interim fee petitions, and since 2000 have negotiated an additional twenty-two interim fee petitions.  The basic lodestar fees from the inception of the case through October 2021 have been paid.   The only

---

[3]ECF No. 1098, filed 11/03/2020.

question left to be decided is whether this is the "rare and exceptional case" justifying a lodestar enhancement to reflect superior lawyering and outstanding results.[4]  If ever such a case for enhancement was presented, it is this one where, through superior lawyering and incredible determination, counsel was able to achieve – by far – the largest class-wide recovery and largest individual class member recoveries for employment discrimination in the history of the Civil Rights Act.

## FACTUAL BACKGROUND

In 1977 Carolee Brady Hartman met with attorneys at Hudson, Leftwich & Davenport seeking representation for her claim of discrimination based on sex by the United States Information Agency.  Bruce Fredrickson, a brand-new associate fresh out of law school, was assigned to the case.  He has remained with it to this day –forty-five years later.  He drafted the complaint and then filed a motion to certify a class of women discriminated against by the Agency early in 1978.  Conditional certification was granted, and four additional women joined the case as named plaintiffs.  Mr. Fredrickson, then a third-year associate, became lead counsel and tried the liability issue in 1979.

Plaintiffs lost.  That normally would have been the end of the case.  Employment discrimination cases are inherently difficult to prove; reversing an adverse finding on liability next to impossible.[5]  Not unexpectedly, Hudson, Leftwich & Davenport declined to pursue an

---

[4]The parties have stipulated a $19 million base lodestar for the purposes of this motion.  The stipulated lodestar represents the parties' agreement that if an enhancement is appropriate in this case, it would be for the services required to secure the settlement, excluding the time required to resolve the individual relief of claimants with judgments.  The fees that were previously enhanced (the 1980-1990 time for Mr. Fredrickson and Ms. Brackshaw) were also excluded. The $19 million stipulated lodestar represents the parties' agreement that for the purposes of this motion, this is be the figure to be enhanced.

[5]*See* Kevin M. Clermont, & Stewart J. Schwab, *How Employment Discrimination Plaintiffs Fare in Federal Court*, I J. EMPIRICAL LEGAL STUD. 429 (2004).  In 1979, the year of the first

appeal.  Finding counsel for plaintiffs at this point would have been well-nigh impossible.

Taking a civil rights case in this posture would be highly undesirable for any firm.  Pursuing it

against the United States government would significantly increase the reluctance of anyone to

agree to represent the class.

Mr. Fredrickson, however, was convinced that the claims of discrimination had merit and

were widespread throughout the Agency.  Undaunted by the extremely slim odds of obtaining a

reversal, he refused to give up and dedicated himself to achieving justice for these women.

Declaration of Bruce A. Fredrickson in Support of a Lodestar Enhancement ("Fredrickson May

2022 Decl."), executed May 4, 2022, at ¶¶ 9-13.  This tenacity became a hallmark of counsel's

approach to litigating this case against the government.  Mr. Fredrickson pursued the appeal on

his own time and at his own expense, working nights and weekends while also carrying a full

workload at the firm.  In 1982, when the demands of *Hartman* became too great, he left the

comfort of a secure position with an established firm to form a new firm where he could give

*Hartman* the attention it needed to be successful.[6]

His perseverance paid off.  *DeMedina v. Reinhardt*, 686 F. 2d 997 (D.C. Cir. 1982)

(vacating adverse liability determination and remanding to the district court); *Hartman v. Wick,*

---

liability trial, the win rate for plaintiff employment discrimination cases was 16.5%.  *Id.* at 441.
This study only includes appellate data commencing in 1988, six years after the D.C. Circuit's
decision in this case.  Nevertheless, the 7.1% success rate for plaintiffs seeking a reversal of an
adverse liability decision in the federal courts of appeals is illustrative of the odds facing Mr.
Fredrickson after the trial loss.  The figures for the District of Columbia Circuit are even worse.
Between 1988 and 2000, plaintiffs seeking reversal of an adverse employment discrimination
decision at trial in the District of Columbia succeeded only 1.79% of the time.  Kevin M.
Clermont et al., *How Employment-Discrimination Plaintiffs Fare in the Federal Courts of
Appeals*, 7 EMP. RTS. & EMP. POL'Y. J. 547, 561 (2003).

[6]*See,* Declaration of Bruce A. Fredrickson, ECF No. 1081-2, filed October 10, 2019, at ¶¶ 11- 25
("Fredrickson Decl.").

600 F. Supp. 361 (D.D.C. 1984) (finding discrimination in hiring by the Agency after the remand). *Hartman* went on to become the most successful employment discrimination case in history. While ultimately requiring additional lawyers engaged in decades of hard work and the resources of additional firms to achieve this result, it was Mr. Fredrickson, with his commitment to excellence, his brilliant strategic decisions, his tenacity in facing off against the best-financed defendant that obstinately refused to accept the judgment of liability, and his sheer perseverance that made this extraordinary success possible.

Lodestar enhancements for exceptional results due to superior lawyering are highly fact-driven. Plaintiffs must present specific evidence of superior lawyering to rebut the presumption that the lodestar achieves the reasonable fee that success on the merits commands. Class counsel committed over 100,000 hours to the successful prosecution of this case, but hard work alone is not enough. Other circumstances, reflecting factors not subsumed in the lodestar, are necessary to support enhancement. As shown and examined in more detail below, many such factors exist in this case.[7] First among them is the leadership of Mr. Fredrickson, combined with brilliant strategic decisions throughout the litigation and tenacity in face of monumental opposition by the government that distinguish this case, and led to the exceptional results obtained. Critical successful strategies include:

- Quickly and deftly responding to the change in the law concerning class certification announced in *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S.

---

[7] *See* Declaration of Bruce A. Fredrickson In Support of a Lodestar Enhancement ("Fredrickson May 2022 Decl.") executed May 4, 2022, attached as Exhibit 1; Declaration of Susan L. Brackshaw In Support of a Lodestar Enhancement ("Brackshaw May 2022 Decl.") executed May 4, 2022, attached as Exhibit 2; Declaration of Jonathan C. Puth In Support of a Lodestar Enhancement ("Puth May 2022 Decl.") executed May 4, 2022, attached as Exhibit 3; Declaration of Stephen Z. Chertkof In Support of a Lodestar Enhancement ("Chertkof May 2022 Decl.") executed May 4, 2022, attached as Exhibit 4; and Declaration of Thomas P. Gies In Support of a Lodestar Enhancement ("Gies May 2022 Decl.") executed May 4, 2022, attached as Exhibit 5.

147 (1982).  Based on *Falcon*, the government successfully appealed Judge
Richey's conditional certification of the class.  Class counsel promptly acted
to preserve the case by finding additional class members to satisfy Rule 23's
commonality and typicality requirements, satisfying the "rigorous review"
mandated by the new Supreme Court precedent.  Change in the law during the
pendency of a case is a ground for awarding an enhancement.[8]

- Successfully advocating for court-appointed damages experts (paid for by the
  government) in the Order of Reference, thereby avoiding an ongoing and
  repetitive battle of competing experts in the *Teamsters* hearings, and rendering
  the backpay awards to class members almost incontestable.  Strategies to
  pursue efficient and economic methods during the litigation that lower the
  cost, rendering the lodestar unreasonably low can support enhancement.[9]

- Successfully advocating for damages based on the compensation and salary
  histories of the men actually hired for the jobs class members were denied
  because they were women, thereby affording class members the benefits of
  the career progression of these male applicants, in contrast to back-pay
  calculations based upon hypotheticals and salary schedules, common in most
  employment discrimination cases and advocated for by the government.
  Creative lawyering can reduce costs and support a lodestar enhancement.[10]

- Bringing a cross-appeal on the pre-judgment interest rate issue (worth millions
  of dollars) when the government appealed nine adverse *Teamsters* hearing
  judgments to put pressure on the government to settle the case.[11]

- Creatively instituting a "defense busters" project whereby defenses common
  to many class members' claims were identified and then selecting the order of
  *Teamsters* hearings based on the number of defenses that could be defeated
  categorically, rather than seeking to try the cases with the highest potential for
  damages first, as might be expected in other class actions.  Efficiently
  defending the *Teamsters* hearings by eviscerating government defenses was
  an effective response to the government's massive opposition.[12]

- Devising, and devoting substantial off the clock hours to, a "trial school" to
  bring the junior attorneys with little or no actual trial experience from Crowell
  & Moring up to the level needed to assume major responsibilities in the
  grueling *Teamsters* schedule for individual claimants.  Fostering younger
  lawyers' trial skills before giving them responsibilities in the hearings

---

[8] *See*, section II. F. *infra* and Puth May 2022 Decl. at ¶¶ 6 -16.
[9] Conte, Alba, Attorney Fee Awards, 3rd Edition, 2004 at 594, §4:31.
[10] *Id.*; Chertkof May 2022 Decl. at ¶ 6.
[11] Fredrickson May 2022 Decl. at ¶¶ 44-45, 53-54.
[12] *See* section II. B. *infra;* Declaration of Susan L. Brackshaw In Support of a Lodestar
Enhancement ("Brackshaw May 2022 Decl."), executed May 4, 2022, attached as Exhibit 2, at
¶¶ 19-40; Amended Declaration of Thomas P. Gies, ECF No. 1082-1, at 10-11, ¶¶ 20-21

promoted efficiency and guaranteed consistently superior results, in further response to the government's massive opposition.[13]

Facts surrounding these critical decisions will be further discussed in connection with the legal arguments supporting an enhancement.[14]

## ARGUMENT

## I.  SUPREME COURT JURISPRUDENCE AFFIRMS THE AVAILABILITY OF LODESTAR ENHANCEMENTS

The Supreme Court's most recent opinion on lodestar enhancement affirms their availability.  *Perdue,* 559 U.S. at 546.[15]  In *Blum v. Stenson*, 465 U.S. 886, 899 (1984), the Court

---

[13] *See* section II. B. *infra*; Fredrickson May 2022 Decl. at ¶ 25; Gies May 2022 Decl. at ¶¶ 1-17; Declaration of Susan L. Brackshaw, ECF No. 1081-3 at ¶¶ 47-50; Amended Declaration of Thomas P. Gies, ECF No. 1082-1 at ¶ 22.

[14] The cases cited often use terms like "multiplier" and "enhancement" to describe situations when an amount greater than the lodestar is being awarded.  This brief uses the term enhancement in a generic sense to describe the circumstances courts have found sufficient to support increased fees above the lodestar.  Courts often use the term "multiplier" when quantifying the total fee deemed appropriate.  So, for example, a "multiplier" of 2 applied to a lodestar fee of $150,000 means that the total fee award is $300,000 (the lodestar fee of $150,000 plus an additional $150,000).  In most cases the lodestar fees and the amount in addition to the lodestar are determined at the same time and counsel receives the lodestar plus any enhancement together.  In this case, the lodestar fees have already been decided and paid, and the parties have agreed to a stipulated lodestar of $19,000,000.  By seeking an "enhancement," plaintiffs are seeking additional fees.  Using the multiplier terminology described above, a multiplier of 1.5 when applied to the stipulated lodestar of $19 million would mean additional fees of $9.5 million and a multiplier of 2 would yield an additional $19 million.

[15] The fee award in this case is fully supported and governed by the Consent Decree.  ECF No. 1098 at 14.  As this Court recognized, "simply because parties agree to a contractual fee-shifting arrangement does not mean that the law concerning statutory fee shifting automatically applies." Mem. Op., ECF No. 1098, at 17 n.8.  Thus, the Supreme Court jurisprudence is not binding on the court's exercise of discretion to award a multiplier.  *Id.* at 17.  *See also In re Home Depot, Inc.,* 931 F.3d 1065, 1082 (11th Cir. 2019); *Wing v. Asarco,* 114 F. 3d 986, 989 (9th Cir. 1997) (restrictions in *Dague* inapplicable as the fee-shifting is voluntary and contractual rather than statutorily-mandated); *DeLoach v. Phillip Morris Cos.,* No. 1:00CV01235 U.S. Dist. LEXIS 23240 (M.D.N.C. Dec. 19, 2003) (use of lodestar does not convert case into pure statutory fee-shifting when fees are sought pursuant to private agreement among the parties).  Nevertheless, the Supreme Court jurisprudence on lodestar enhancements is helpful in assessing whether it is appropriate here.

first articulated the view that prevails today—that an enhancement to the lodestar is appropriate "only in the rare case where the fee applicant offers specific evidence to show that the quality of services rendered was superior to what one reasonably should expect in light of the hourly rates charged and that the success was exceptional." This is that rare and exceptional case.

The lodestar approach was first adopted by the Court in *Hensley*: "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably worked multiplied by a reasonable hourly rate." 461 U.S. at 433. *Hensley* also announced that "in cases of exceptional success an enhanced award may be justified." 461 U.S. 424, 435 (1983). The bases for such enhancements have been the subject of litigation ever since.

*Hensley* recognized that many of the so-called *Johnson* factors, which were previously the guidelines for a court deciding a fee petition, are subsumed within the hours or rates used in the lodestar.[16] Since *Hensley*, the Court has stated that in most cases the lodestar enjoys a "strong presumption" that it is sufficient to induce a capable attorney to take a case, and thus represents the reasonable fee contemplated by the statute. The lodestar may not be enhanced due to a factor that is already adequately subsumed in the lodestar calculation, and "the lodestar figure includes most, if not all, of the relevant factors." *Perdue,* 559 U.S. at 553.

---

[16]*Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717-719 (5th Cir. 1974). The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client: and (12) awards in similar cases. The fifth and eleventh factors have not proved to be relevant in most cases, and the sixth factor has been removed from consideration by *City of Burlington v. Dague,* 505 U.S. 557 (1992).

But not *all* factors are fully reflected in the lodestar.  One, perhaps the most important, factor not subsumed in the lodestar calculation is the *results* obtained.  *Hensley,* 461 U.S. at 434. Other *Johnson* factors not subsumed in the hours or rate components of the lodestar include: (1) the preclusion of other employment by committing both human and capital resources to the case; (2) the duration of the case (either strict time limitations imposed by the client or circumstances or an exceedingly long duration); (3) the "undesirability" of the case; and (4) awards in similar cases.  Additional factors not articulated by *Johnson* have also been recognized, as discussed below.

Enhancement is available where the plaintiff satisfies the burden of "identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified."  *Perdue*, 559 U.S. at 546.  The fact that there are few cases where courts have awarded enhancements in recent years demonstrates that they are indeed reserved for the rare case that meets the standards.  These few cases, however, elucidate several circumstances, beyond any factor subsumed in the lodestar, that can provide the evidence of case-specific superior lawyering sufficient to support an enhancement.  Rather than exemplifying just one or two such factors, class counsel's performance here includes most of the special circumstances that have justified enhancement in those cases.

## A.    This Case Achieved Exceptional, Unequaled Success

The initial prerequisite for a lodestar enhancement is exceptional success.  In shattering the record for a Title VII recovery, both overall and *per capita*, there is no doubt that this case clearly satisfies the prerequisite.  The $508 million settlement was the largest by far for a Title VII discrimination case and the awards for the 1100 class members – ultimately over a half million each with eighteen individual awards over $1million -- is still the largest *per capita* recovery in a case of its kind.  Mem. Op., ECF No. 1098 at 1.  The country's leading expert on

class actions described *Hartman* as "relief of an epic proportion."  Expert Report of William B.

Rubenstein, ECF No. 1081-1, at 25.  Class Counsel achieved remarkable success despite

squaring off against the United States government itself: "they did so through arduous, contested,

adversarial litigation that lasted for a quarter of a century (before settlement) and that

encompassed nearly 50 pre-settlement individual relief hearings."  *Id.* at 3.  Such outstanding

results under such difficult circumstances are truly extraordinary.

Perdue explained, however, that the results obtained, even when exceptional, are a

justification for enhancement only when it is also shown that the superior results were a product

of superior lawyering, not factors of chance or an inferior defense.[17]   559 U.S. at 554.

Exceptional success opens the door to an enhancement, but evidence of superior lawyering is

what merits an enhancement.

### B.    Class Counsel Exhibited Superior Lawyering Throughout the Litigation

Superlatives are common when describing aspects of this case, whether by the Special

Master or the Court.  This Court found that Mr. Fredrickson's perseverance for the duration of

the case – over forty years – was "remarkable."  Mem. Op., ECF No. 1098 at 1.  Class counsel

exhibited "extraordinary dedication to their clients' cause."  *Id.* at 3.  Long *before* the exceptional

monetary success in this case was achieved, the Court had already recognized the superior

---

[17]*Perdue* emphasized that the extraordinary results cannot be the result of "inferior performance by defense counsel, unanticipated defense concessions, unexpectedly favorable rulings by the court, an unexpectedly favorable jury or simple luck."  559 U.S. at 553.  *Hartman's* success cannot be attributed to any of these factors.  Judge Robertson praised the efforts of defense counsel: "Mr. Van Horn and his colleagues . . . have fulfilled the highest calling of government counsel, which is not necessarily to win but to be right."  Transcript of Fairness Hearing, at 55. Nor was there any fortuitous mistake by the defendant, such as occurred in *Roberts v. Texaco, Inc.,* 979 F. Supp.185 (S.D.N.Y. 1997).  *Roberts* settled quickly after taped conversations of Texaco executives surfaced showing not only racial bias, but also intent to impede discovery. Texaco's Chairman and CEO said, "Once the taped conversations were revealed, there was no question in my mind that settlement was the right step to take."  *Id.* at 190-91.

lawyering of class counsel, earning them a quality enhancement of their fees in the initial interim

petition.[18]   In 1994, the Special Master recommended a 25% enhancement to the fees of Mr.

Fredrickson and Ms. Brackshaw for the period from 1980 to 1990 because they "performed at

levels well beyond the standards of attorneys with such limited experience," and the Court

adopted his recommendation over the objections of the government.  ECF No. 490; *Hartman v.*

*Duffey,* 973 F. Supp. 199 (D.D.C. 1997).

Counsel's "extraordinary dedication" persisted, ECF No. 1098, Mem. Op. at 3.  Counsel

overcame setbacks that might have derailed the case but for the tenacity and leadership of Mr.

Fredrickson, which resulted in favorable rulings by the Special Master, the District Court, the

D.C. Circuit, the Supreme Court, and ultimately the "staggering $508,000,000 settlement fund

for the class." ECF No. 1098 at 8.  With the threshold requirement of exceptional success

beyond question, there are multiple examples of superior lawyering throughout the case that

support the application of a lodestar enhancement here. As demonstrated in detail below,

plaintiffs have satisfied their burden of showing entitlement to enhancement.

## II.   THE RECORD INCLUDES EXTENSIVE SPECIFIC EVIDENCE SUPPORTING ENHANCEMENT

Supreme Court cases articulating the availability enhancement, and the lower courts'

interpretation of those standards, emphasize that the fee applicant should present "specific

evidence" that supports the conclusion that a multiplier is appropriate to afford full and fair

compensation.  *Perdue*, 559 U.S. at 553; *Blum*, 465 U.S. at 899.  While there are several such

factors, the overriding demonstration of superior lawyering in this case is the leadership of Mr.

---

[18]Mem. Op. at 3, ECF No. 1098, *citing Hartman v. Duffey*, 973 F. Supp. 199 (D.D.C. 1997)
(awarding a twenty-five percent enhancement on fees incurred between 1980 and 1990), and at
5, *citing* Decl. of Lindsey B. Lang, ECF No. 1081-6, ¶ 15 (Lang Decl.).

Fredrickson, his strategy of building a team that could effectively and efficiently counter the massive opposition mounted by the government, and their sheer tenacity and perseverance for the decades required to achieve such exceptional results.

### A.   Achieving Extraordinary Success by Mastering Voluminous and Complex Documentary Proof Can Support Enhancement

One factor that can support enhancement is the need to master voluminous and complex documents to prove the case.  The Special Master in this case marveled at class counsel's ability to master the documents produced by the government.  "Plaintiffs' counsel have demonstrated a complete mastery of the facts surrounding each claim."  Special Master's May 29, 1997 Report and Recommendations Regarding Plaintiffs' Fourth Motion for Attorneys' Fees and Expenses ("4th R &R") at 6-7.  *See, e.g., In re Sumitomo Copper Litig.,* 74 F. Supp. 2d 393 (S.D.N.Y 1999).[19]  As in *Hartman,* the *Sumitomo* documentary proof involved "inspection, digestion, review, and translation of a staggering quantity of data . . . to marshal the facts and the issues into manageable form realistically suitable for a trial."  *Id*. at 395.  The *Sumitomo* court could have been talking about the *Hartman* team when it held that "the unprecedented effort of Counsel exhibited in this case led to their successful settlement efforts and its vast results."  *Id.* at 396.  The Special Master here found that it "would have been impossible for Plaintiffs' counsel to have met their duty to their clients to have properly exercised their professional responsibility without going through all of the documents, analyzing them, organizing them, understanding

---

[19]Although *Sumitomo* was a common fund case, the court analyzed the fee award on a lodestar basis and awarded a 2.5 multiplier.  The litigation bears many similarities to *Hartman*.  Like *Hartman, Sumitomo* was the largest class action recovery in a case of its kind (Commodity Exchange Act) and was "outstandingly successful."  74 F. Supp. 2d at 399.  Like *Hartman's* employment discrimination claims, CEA claims are "notoriously difficult to prove, and the case was initially greeted with widespread skepticism."  *Id*. at 395.  *See also Roberts v. Texaco, Inc*., 979 F. Supp. 185 (S.D.N.Y. 1997) (case was "fraught with problems of proof, being largely dependent on statistical data.").

them, and deciding which were relevant to particular claims before a single claim had been presented."  4th R&R 33.

To successfully manage the voluminous and complicated evidence was a Herculean task calling for superior skill.  Each *Teamsters* hearing required documentary proof to rebut defenses. Class counsel were dependent on the records produced by the government.[20]  Yet everyone agreed that the government's document production was a nightmare.  The government likened the in-house document review process to find responsive documents to "an archeological expedition."  Declaration of Daniel F. Van Horn, ECF No. 1083-8, at 3.  "It was necessary to sift through the agency's often frustratingly fragmentary records to attempt to locate some reference to a claimant, other individuals who might have knowledge relevant to her claim, and other facts that might be pertinent to the claim or defense.  The agency's efforts in that respect were greatly hampered by the unavailability of many contemporaneous documents pertaining to the hiring decisions at issue."  *Id.*  Furthermore, the government had destroyed many documents, and most that survived were from 1984-1985, while the class period was from 1974 to 1984.

The Special Master noted that "the production arrived as a massive whole rather than as an organized, computerized, easily searchable set of materials." 4th R&R at 31.  "Not only were there thousands of pages, but many of the documents are thick, complicated and technical."  *Id.* at 33.  Class counsel had to create their own computerized database—a painstaking but critical

---

[20]Consider that in litigation now, documents are produced electronically and reviewed by a team of attorneys and paralegals with the aid of search engines that did not exist when the government dumped over a million pages of documents on class counsel.  Here class counsel, most notably Susan Brackshaw, mastered the documents through painstaking manual review of each document not only for substance, but also for anomalies in the documents that enabled highly effective cross-examinations.  Brackshaw May 2022 Decl. generally.

effort necessary to identify claims and identify each potential defense.  Declaration of Susan L. Brackshaw, ECF No. 1081-3, at 11; Brackshaw May 2022 Decl. at ¶¶ 3-6.

Plaintiffs' success was dependent on efficient and effective mastery of these documents. But in order to use them, reviewing them at face value as produced by the government was not enough.  A document in litigation is typically reviewed and coded, noting who the document was to and from, the date, and an indication of topics relevant to the litigation.  Class counsel did more.  In addition to the customary review of the document, they examined every aspect— looking carefully at stray markings and other indicia of possible alteration.  These document anomalies were so significant that class counsel demanded the right to examine the originals of suspicious documents.  Erasures, white outs, and plain old manipulated entries were confirmed. Brackshaw May 2022 Decl. at ¶¶ 10-18.  This enabled plaintiffs to not only prevail in an individual hearing, but also to destroy many of the government's pervasive defenses based on assertions that, for example, the class member failed to score high enough on a test to qualify for the position sought.  *Id.* at ¶¶ 30-34.

"Plaintiffs' counsel had to read, to understand and to master the contents of these documents.  Simply reading them would have been an enormous task.  Understanding them would have been a tremendous challenge.  Mastering them would have been the most daunting task of all." 4th R&R at 31-33.  But master them they did.  The Special Master noted class counsel were "extraordinarily well prepared, both with respect to the documents they have selected to use during Teamsters hearings and the examination and cross-examination of witnesses." *Id*. at 6-7.

In fact, class counsel knew the documents better than the government.  In the hearing on one claim, after the government claimed no knowledge of a highly relevant document, class

counsel searched their files and produced the document back to the government the next day.
Brackshaw May 2022 Decl. at 7-8.  The Special Master praised class counsel, noting that "[a]s a
result of Plaintiffs' counsel's diligence, good faith and integrity, Defendant was able to rely upon
copies of documents which Defendant did not know existed when the hearing began."  Final
Report Of Special Master Regarding 1980 Claim Of Jahanara Hasan at 13 n.8.

Not only was the government's production a chaotic mess, but the Special Master
characterized the case itself as "an extraordinarily complicated case involving complex
statistics." 1st R&R at 74.  To succeed, class counsel had to display extraordinary skill—
understanding not only what was in the documents, but also what had been altered, and what was
missing or destroyed.  All of these tasks had to be completed under the strict deadlines imposed
by the Order of Reference.

Furthermore, massive documentary demands can place an extraordinary burden on a
small firm.  *Allen v. Freeman*, 694 F. Supp. 1554, 1556 (S.D. Fla. 1988) (in awarding multiplier,
court noted that plaintiff's counsel's acceptance of this case "limited his small firm's ability to
accept other employment.").  Mr. Fredrickson has testified to the burden of litigating this case
solo, on top of his regular workload, for two years, and then committing the vast majority of his
new firm's resources to the case, precluding acceptance of cases that promised more immediate
monetary compensation.  Declaration of Bruce A. Fredrickson, ECF No. 1081-2, ¶ 25; Affidavit
of Bruce A. Fredrickson in Support of Webster & Fredrickson's Attorneys' Fees and Expenses
Sought in Plaintiffs' Second Motion for Attorneys' Fees and Expenses, February 16, 1996 at 19,
¶ 42 (Mr. Fredrickson and Ms. Brackshaw turning down an average of ten new cases each week
due to time constraints of *Hartman*), attached as Exhibit 6.  *Hartman* involved the additional
burden of fronting the expenses involved in litigating against an obstinate defendant when – the

days before Skype -- many of the claimants were overseas.  A small firm might resist taking on *Hartman* on that basis alone.

Developing a mastery of the staggering amount of material produced by the government required meticulous and time-consuming efforts.  4th R&R at 34; Brackshaw May 2022 Decl. at ¶¶ 3-5.  "It is a remarkable achievement that Plaintiffs were able to take the mass of documents they were provided, to organize them and be able to present them as they did.  No words that I write here will do justice to the enormity of the task Plaintiffs' counsel confronted."  4th R&R at 35.  The superior lawyering exhibited by class counsel in marshalling the proof in *Hartman,* especially under extreme time pressure, justifies enhancement.

### B.    Exceptional Success Achieved Despite Monumental Resistance Can Support Enhancement

Achieving extraordinary success in the face of monumental resistance is another factor recognized as specific evidence of extraordinary lawyering by plaintiff's counsel, *Hyatt v. Apfel*, 195 F.3d 188 (4th Cir. 1999) (enhancement based on specific findings of unprecedented benefit to the class in the face of monumental resistance).  Compared to *Hartman*, *Hyatt* lasted a mere sixteen years.  Interim fees had been awarded, and the final fee was before the court.  Recognizing the presumption afforded the initial lodestar calculation, the *Hyatt* court found that, for "certain 'rare' and 'exceptional' cases, supported both by 'specific evidence' on the record and detailed findings by the lower court," enhancement of the lodestar survives.  195 F.3d at 191.  The Fourth Circuit affirmed the enhancement based on the specific findings of the district court.  The *Hyatt* district court found undisputed exceptional results:

> Plaintiffs have succeeded in forcing the Social Security Administration to halt application of a secret, unlawful policy to its determination of hundreds of thousands of disability claims. . . . The financial benefits conferred on the . . . class as a result of this case are unprecedented . . . and obtained in the face of monumental resistance.  Plaintiffs have

17

> succeeded in bringing about a fundamental change to a recalcitrant
> agency which brought all the power of the federal government to bear on
> Plaintiffs and their counsel.

*Id.* Extraordinary success in the face of the government'st relentless effort, vigor, and skill—

facts easily matched by the superior lawyering of *Hartman* class counsel—has resulted in

multipliers in *Sumitomo*, *Allen*, *Roberts*, and *Hyatt* and should do the same for *Hartman*.

Here, the very agency charged with promoting U.S. values overseas (including equality

and respect for law) flagrantly ignored these values at home.  Rather than upholding the law, the

agency engaged in rampant discrimination against highly qualified women.  Rather than

acknowledge the validity of even one claim, the government "made the choice to concede no

claims."  7th R&R at 7.  "Plaintiffs could have made a similar decision, but chose to do what the

Order of Reference mandated—i.e. to make a good faith effort to winnow out claims that should

be abandoned as early in the process as possible.  This was a complex task."  Special Master's

May 16, 1977 Report and Recommendation Regarding Plaintiffs' Third Motion for Interim

Attorneys' Fees and Expenses ("3rd R&R"), ECF No. 379, at 20.

As in *Hartman,* the government defendant in *Hyatt* "resisted Plaintiffs' efforts to enforce

the orders of this court and the Fourth Circuit each step of the way."  195 F.3d at 191.  "[A]

multiplier of 1.33 was justifiably applied to the fees on account of the exceptional success

obtained by the plaintiffs' attorneys."  *Id*.

Similarly, the plaintiffs in *Texaco v. Roberts* overcame monumental resistance by the

Texaco legal juggernaut.  Texaco denied all claims of wrongdoing and liability and twenty-five

separate mediation efforts failed.  Texaco opposed class certification and showed every intent of

fighting the case tooth and nail to the bitter end.  Then came the "fortuitous and significant

advantage to plaintiffs" of the recorded Texaco statements manifesting racial bias and

obstruction of discovery.  979 F. Supp. at 197.  Nevertheless, because Texaco waged "a

relentless defense on all fronts prior to the advent of the Lundwall tapes," the court found that the victory "involved extraordinary skill and effort on the part of plaintiffs' counsel, particularly in view of the relentless effort, vigor and skill employed by Texaco's experienced and able counsel in pursuing a defensive strategy that maximized burden and left no litigation tactic unexplored." *Id.* at 196.  The court approved a 5.5 multiplier to the lodestar.  Prior to settlement, *Roberts* had been pending for less than three full years.  A mere three years provides a marked contrast to the twenty-three years of government opposition in *Hartman.* Special Master's January 17, 1995 Report ("1995 Report"), ECF No. 171, at 6 (noting the government sought to relitigate liability), 19 (government responsible for delay by failing to recognize the clear requirements of the Order of Reference and challenging the plain language of the Order of Reference at every turn).  The *Hartman* docket shows countless government requests for extensions of time.

Delay is a strong instrument of resistance.  By dragging out litigation, well-funded defendants prolong discovery or other trial work, outspend, and hope to eventually outlast the plaintiff.  In the initial stages of *Hartman*, one man was up against the resources of the United States government.  The odds that the government could outlast Mr. Fredrickson were high. Realizing the need for additional resources to produce such results as the class deserved, Mr. Fredrickson brought in attorneys from Crowell & Moring and Heller Huron.  Even with additional human capital added to plaintiffs' team, the government still possessed the financial resources to persist in hopes of wearing down the class.

By raising every conceivable defense and argument, the government engaged in tactics that resulted in substantial unnecessary delay that increased the cost of the litigation.  The Special Master articulated that "delay is for the most part to be laid at the Defendant's door.  The Defendant failed to recognize the clear requirements of the Order of Reference and as a result

19

has challenged the plain language of the Order of Reference at every turn."  1995 Report at 19.

He ruled that the government "could not be permitted to slow the process down any more."  *Id.*

at 25.  The government's delays added years to the case.

The government's failure to concede even one claim and insistence on individualized

hearings for each claimant, which would have taken decades and outlast the lifespan of many

claimants, demonstrates the government's plan to drag the case into the next century.

Notwithstanding the government's efforts, class counsel tenaciously persisted.  While the

remedial phase of *Hartman* contemplated individual relief hearings, it did not necessarily follow

that each claim would need a full-blown trial.  Commonly large class actions conduct bellwether

cases to assess the value of the case to facilitate settlement.  A few trials, perhaps as many as ten,

might be conducted.  *See, e.g.*, *In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 204

F. Supp. 3d 962 (S.D. Ohio 2016) (six bellwether trials); *In re Vioxx Prods. Liab. Litig.*, 802 F.

Supp. 2d 740 (E.D. La. 2011) (four bellwether trials); *Smiley v. Blasingame, Burch, Garrard &*

*Ashley, P.C.*, 835 S.E.2d 803 (Ga. App. 2019) (four bellwether trials).

But the government insisted on *Teamsters* hearings for all 1100 class members.  Plaintiffs

designated the first flight of 25 hearings, went to hearings, and in large part crushed the

government's defenses.  A second designated flight met with similar success.  Plaintiffs

prevailed in 46 out of 48 hearings, and the average recovery per claimant was close to $500,000.

The government then required that "a random sampling" of claimant cases be processed through

the damages model.  That demand merely confirmed the validity of the results in the cases

plaintiffs had selected to try first.  Here, the government pressed forward through forty-eight

claimant hearings and another fifty random damages analyses.  Unheard of in litigation against a

private defendant, this level of resistance demonstrates the extent of the government's massive

opposition to the finding of liability through its unlimited resources. The endurance of class counsel through this grueling four-year process alone demonstrates superior lawyering, and produced exceptional results.

A similar example of the government using its enormous resources to oppose the case arose in the construction of the damages model. The Order of Reference, proposed by plaintiffs and approved by the Court in 1991, contemplated neutral, court-appointed damages experts to create a model to establish the back-pay awards for successful claimants in the *Teamsters* hearings. The process contemplated full and fair opportunities for each side to participate, object to aspects of the model, and receive a fair hearing. The process was designed to prevent repetitive and costly battles of experts in each hearing. But the government's tactics obstructed every step of the process. Declaration of Stephen Z. Chertkof In Support of a Lodestar Enhancement ("Chertkof May 2022 Decl.") executed May 4, 2022, attached as Exhibit 4, at ¶¶ 4, 9, 11-13. Rather than working with the court-appointed experts, the government hired its own experts who produced 16 volumes of statistical analysis to support a remedial methodology that would undercompensate the class for the damages due to the government's discrimination. *Id.* Mr. Fredrickson had wisely anticipated the government's opposition to the computation of damages and added Mr. Huron, experienced in federal pay issues, and Mr. Chertkof, experienced in economics and statistical analysis to assume responsibility for the entire damages issue. Fredrickson May 2022 Decl. at ¶¶ 38-42. From working with the court-appointed experts in the creation of the model, to briefing the merits of the model in the face of government attacks, to cross-examining the government's experts in the hearings, the damages team efficiently and effectively destroyed the government's challenges to the damages model. Adding Mr. Huron

and Mr. Chertkof to the team was an example of superior lawyering that drove the remarkable success in the hearings while also reducing costs.

C.   **Exceptional Success Achieved Under Extraordinary Time Limitations Can Support Enhancement**

Achieving exceptional success under unusually severe time constraints supports the award of a multiplier.  In *Hollowell v. Gravett*, 723 F. Supp. 107 (E.D. Ark. 1989), plaintiff's counsel was appointed on a Friday for a case set for trial on Monday.  Counsel took the case blind and had to familiarize himself with the complexities of the case and the extensive documents over the weekend.  He had to interview witnesses and prepare for a trial that lasted a week.  Despite these time constraints, he secured exceptional results for his client.  *Id*. at 109.  The court found that the "'emergency circumstances' of the case, and [counsel's] superb representation under the most adverse circumstances justify an enhancement." *Id*.

Here, class counsel overcame numerous circumstances when time pressure exacerbated the difficulty of their task. [21]  Initially, consider that one man did *all* the work *Hartman* required between October 24, 1979 (when Judge Richey ruled against the class on liability) and February 1, 1982 (when the new firm of Webster & Fredrickson opened its doors) *by himself*, outside the regular work week.  This meant 500 additional hours for Mr. Fredrickson and included two individual claimant trials, plus briefing the appeal of the liability loss.  Such a commitment is extraordinary and surely demonstrates superior lawyering.

Consider also the resources committed by the entire *Hartman* legal team when the government moved to decertify the class.  The District Court had conditionally certified the class

---

[21] Mr. Fredrickson was provided with the data underlying the government's expert statistical report in the liability trial *mere hours* before the testimony.  Fredrickson May Decl. at ¶¶ 17-18.

in 1978,[22] but the most significant opinion on class certification, *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982), was issued while *Hartman* was pending and caused class counsel to scramble to survive the newly announced "rigorous analysis" process for class certification. 457 U.S. at 161.  Professor Rubenstein describes *Falcon* as "a notoriously dense decision." *Newburg on Class Actions*, § 3:47.  It tightened significantly the showing required under Rule 23(a) for certification by requiring that Title VII class action cases must strictly comply with the commonality and typicality representation requirements of Rule 23, which "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Id.* at 156.  Prior to *Falcon*, a class could allege discriminatory practices across the board even if the named plaintiffs hadn't suffered each alleged instance of discrimination as long as they were "typical." *Falcon* obliterated the validity of this approach to typicality and commonality.  Judith J. Johnson, *Rebuilding The Barriers: The Trend In Employment Discrimination Class Actions*, 19 Colum. Hum. Rts. L. Rev. 1, 27 (1987).

Relying on *Falcon* and other authorities, the D.C. Circuit found that the *Hartman* record failed to reflect commonality and typicality required under Rule 23, especially by inclusion of both Civil Service and Foreign Service applicants, notwithstanding completely separate hiring and personnel systems. *Hartman v. Duffey,* 19 F.3d 1459, 1471 (D.C. Cir. 1994).  No named class representatives had applied to a Foreign Service Officer position nor was any an applicant to the other three occupational categories at issue, thereby raising significant concern these claims for hiring under different systems in different job categories may not be "fairly

---

[22]At the time of the original certification, the named representatives of the class covered only three of the six job categories ultimately included in the Court's liability decision: Writer Editor (Carolee Brady Hartman), Foreign Language Broadcaster (Luba Medina, Rose Kobylinski, and Toura Kem), and Production Specialist (Josephina Martinez and Luba Medina).  Puth May 2022 Decl. at ¶ 8.

encompassed by the named plaintiff's claims." *Falcon*, 457 U.S. at 156.  *See* Puth May 2022 Decl. at ¶ 8.  Remanding the case, the Court found that the plaintiffs bore the "considerable burden to make a particularized showing of a broad policy of discrimination with common characteristics cutting across job categories."  *Falcon,* 451 U.S. at 471-74.  The government's efforts to decertify the class and thereby obtain dismissal of the entire matter threatened all that class counsel had achieved.[23]

Acting swiftly, and deftly rising to the challenge, plaintiffs' counsel immediately worked to expand class representation to assure all job categories were covered.  In particular, class counsel promptly prepared a strategy to demonstrate, from the trial records, the government used common methods to discriminate against women, while counsel also secured additional class representatives.  Puth May 2022 Decl. at ¶¶ 11-13.  Between April 5, 1994, when the D.C. Circuit remanded the case for reconsideration of class certification, and the end of June 1994 when the briefing was complete, class counsel devoted over 1600 hours to the class certification issue.[24]

Just **twenty-five days** after the D.C. Circuit's decision, on April 30, 1994, class counsel filed a Motion to Intervene under Rule 24, a motion detailing discrimination in all six job categories, including three applicants to International Radio Broadcaster positions, three Radio

---

[23]In 1992 the government had taken an interlocutory appeal of the class certification order and sought decertification and dismissal of the entire case.

[24]Webster & Fredrickson committed over 1000 hours; Crowell & Moring over 600; Heller Huron committed 26, primarily in drafting and editing the briefs.  The work involved "required extensive research and briefing. Review of individual claims and preparation of claimant declarations to be appended to the pleadings was required, involving significant time for interviews and drafting of declarations, in addition to preparation of the pleadings."  Affidavit of Laurel Pyke Malson, submitted in support of Plaintiffs' Second Motion for Attorneys' Fees and Expenses at 11, ¶ 8.

Broadcast Technicians, two Writer Editors, two Production Specialists, one Electronic

Technician, and eight applicants to the Foreign Service, each of whom alleged discrimination in

ways that dovetailed with the evidence developed at the original trial.  *Id*. at ¶ 13.

The following month, counsel submitted their Memorandum in Support of Class

Certification, a *tour de force* -- seventy-seven pages detailing, in methodical fashion, the

Agency's consistent patterns of discrimination against women in all six job categories covering

the Civil Service and Foreign Service.  In addition to references to the exhaustive trial record,

counsel had secured declarations from thirty-two class members documenting four devices

common to the job categories and Civil and Foreign Service as follows:  (1) overt discrimination

and explicit limitations on females in the Agency; (2) gender-biased evaluations and disparate

application of subjective selection criteria; (3) discouragement of female applicants; and (4)

preselection of male applicants and the use of discriminatory recruiting devices.  *Id.* at ¶¶ 14-15.

Following a hearing, the plaintiff class prevailed on all counts before the District Court,

which granted intervention, rejected numerous challenges by the government, and found the

class properly certified as modified in 1979 and as then currently constructed in 1994.  *See

Hartman v. Duffey*, 158 F.R.D. 525 (D.D.C. 1994).  Following further government challenge,

briefing and argument, the D.C. Circuit affirmed the propriety of class certification and denied

rehearing, denied rehearing *en banc,* and the Supreme Court denied the government's petition for

*certiorari.  See Hartman v. Duffey*, 88 F.3d 1232, *reh'g & suggestion for reh'g en banc denied*

(D.C. Cir. 1996), *cert. denied*, 520 U.S. 1240 (1997).  The Special Master found that the "quality

of effort expended is demonstrated in the result obtained – a unanimous opinion issued on July

19, 1996 affirming the Court's class certification and refusal to reopen the issue of liability. 3d

R&R at 3.  Such success in such a short time frame is a compelling example of superior

lawyering under intense time pressure.[25]

Notably this resolution of the class representation issue was occurring at the same time

class counsel were preparing and conducting *Teamsters* hearings.  Class counsel were constantly

juggling competing demands.  The Special Master noted that 1995 was "a year in which

Plaintiffs had to decide whether to concede claims and which ones to concede, to participate in

extensive settlement efforts, to designate 25 out of 2,000 claims to be heard first, to oppose

another appeal challenging the class certification and seeking to reopen the liability issue, and to

make all arguments about the damages model or waive them forever . . ."  3d R&R at 21.

Similar time constraints challenged class counsel throughout the *Teamsters* process.  The

Special Master found it "remarkable that Plaintiffs' counsel could be so prepared to deal with so

many documents and so much detail without asking for continuances."  4th R&R at 39.

*Hartman* class counsel had to prepare for and conduct forty-eight hearings that were "as

adversarial as any trial."  3rd R&R at 9.  While averaging more than one hearing a month, in

many cases the hearings came one after the other within days; some lasting more than a week.  In

the thirty-eight months between June 20, 1996 and October 28, 1999, class counsel faced forty-

eight hearings.  The Special Master noted that "several of these claims are among the most

complicated that I have heard."  Special Master's Draft Report and Recommendations Regarding

Plaintiffs' Fifth Motion for Interim Attorneys' Fees and Expenses, March 30, 1998 ("5th R&R")

at 5.  Not only were the cases complicated, but they were conducted without the benefit of

---

[25] The painstaking review of the government's documents and creation of the database starting in the fall of 1992, discussed above as demonstrating superior lawyering of class counsel in the document review stage, contributed to class counsel's ability to quickly respond to the demands of the certification proceedings in the spring of 1994.

depositions to help plan for the trials. "Both sides seem to have recognized that the preparation required for these hearings is substantial."  3rd R&R at 9.

Due to the strict deadlines in the Order of Reference, class counsel had to prepare for each hearing in a fraction of the time customary for a single plaintiff discrimination case.  They often worked round the clock.  The Special Master recognized the extraordinary burden imposed by the hearing schedule and the other concurrent tasks class counsel had to complete.  Once the *Teamsters* hearings began, "many of [counsel's] responsibilities—*e.g.,* drafting proposed findings of fact and conclusions of law, filing objections to Initial Reports, filing objections to Final Reports, and responding to each other's objections—would fall due at the same time that they were preparing for and presenting evidence at additional *Teamster's* hearings."  3rd R&R at 10.  Yet class counsel knew that successful completion of each step was critical to securing victory for a just finished hearing, even when another hearing was scheduled to begin within days.  "Plaintiffs' counsel bore a heavy burden . . . of completing claims heard in earlier Teamsters hearings and conducting hearings on additional claims."  Special Master's Report and Recommendations Regarding Plaintiffs' Sixth Motion for Interim Attorneys' Fees and Expenses, May 19, 1999 ("6th R&R"), ECF No. 737, at 3.  Notwithstanding the time pressure, their mastery of the documents and preparation for each hearing allowed class counsel to "simply destroy the defense offered by the Defendant.  4th R&R at 35.

> The pressure continued, but class counsel persisted in successfully juggling their many competing responsibilities.  It is impossible to reflect on the efforts made by Plaintiffs' counsel during 1996 and not to observe that they have been required to do a number of difficult and time-consuming things, and to do them simultaneously—opposing Defendant's appeal with respect to class certification and liability, examining documents in preparation for the Teamsters hearings already conducted, preparing to examine and cross-examine witnesses at the Teamsters hearings already conducted, presentation of evidence and argument at the 1996 Teamsters hearings, reviewing transcripts after

27

Teamsters hearings, filing of post-hearing proposed findings of fact and conclusions of law, examining Initial Reports, filing objections and comments to Initial Reports, examining Final Reports and making and preserving objections to those Reports, opposing Defendant's motions to reverse my decisions, defending the damages model, examining documents relevant to claims to be heard in future Teamsters hearings, and preparing to examine and cross-examine witnesses at future Teamsters hearings. These tasks have not only been overlapping, but they also have had to be completed under fairly strict time limitations.

*Id.* at 12.

Despite the severe time crunches, the Special Master praised class counsel for producing "the same high-quality work product that I have seen in all of their proposed findings of fact and conclusions of law." *Id.* at 8. These instances of class counsel routinely rising to the challenge of difficult litigation tasks under persistent time pressure are prime examples of superior lawyering.

### D. Exceptional Results in Controversial or Undesirable Cases Can Support Enhancement

Taking on a controversial or undesirable case can have lasting effects. A case can be undesirable because it involves representing an "unpopular" party or issue, or because of factors entirely divorced from the identity of the party or the issues at stake such as cost, time limitations, or other burdens. The impact of the commitment to an undesirable case has been recognized as a factor not subsumed in the lodestar that can support an enhancement. An "unpopular," and therefor undesirable, case might be representing gun rights activists as in *Heller v. District of Columbia*, 2011 WL 6826278 (D.D.C. 2011), or abortion rights activists as in *Guam Society of Obstetricians & Gynecologists v. ADA*, 100 F.3d 691 (9th Cir. 1996). *Hartman* was undesirable not because representing women seeking equal opportunity was "unpopular," but because it was considered "unwinnable" after the initial trial loss, was

28

extremely burdensome because of the evidentiary demands, and because of the massive opposition of the United States government.

In *Guam,* a post-*City of Burlington v. Dague*, 505 U.S. 557 (1992) case, the Ninth Circuit upheld a 2.0 multiplier applied by the district court even without reliance on the risk of not prevailing.  "[T]he more important considerations . . . were the extreme undesirability of the case, the likelihood that no other attorney on the island would have accepted the case, and the rare and exceptional nature of the case, particularly in the small island community of Guam."  100 F.3d at 697.[26]  Taking the case was an act of courage and commitment for counsel in a small, predominantly Catholic area.  As described more fully below, for Mr. Fredrickson to shoulder the burden of this class action on his own, during off-work hours was an extraordinary act of courage and commitment.

Similarly, in *Akron Center for Reproductive Health v. City of Akron,* 604 F. Supp. 1275 (N.D. Ohio 1984), plaintiffs' counsel undertook a case in a controversial atmosphere in a condensed time frame -- a document intensive litigation effort over 16 months.  Awarding an enhancement to the lodestar, the court found it "particularly appropriate in those situations where the lawyers undertake difficult issues in a civil rights setting where compensation payable to the lawyer is directly related to success or lack of success." *Id*. at 1293.  Fees must be sufficient to convince counsel to forego fees they could have earned from their regular clients to take on the unpopular or "unwinnable" cases.

---

[26]The Ninth Circuit rejected the defendants' argument that *Dague* precluded the use of multipliers, noting that *Dague* left undisturbed earlier Supreme Court case law allowing a fee applicant to recover more than the lodestar figure where the applicant has met "the burden of showing that such an adjustment is necessary to the determination of a reasonable fee."  100 F.3d at 697.

While not carrying the same stigma as representing the NRA or implicating political controversy as in abortion rights cases, undertaking representation of a large class of women from across the globe in a demanding, all-consuming and complicated case against the federal government is an undesirable representation. Sticking with it for decades is undesirable. Congress provided that attorneys for successful Title VII plaintiffs would be compensated by unsuccessful defendants, notwithstanding the "American Rule" on attorney's fees, because it recognized that incentives would be needed to bring lawyers into a controversial field, where recoveries might not otherwise warrant substantial fees, in order to vindicate newly enacted civil rights. *Porter v. U.S. Agency for Int'l Dev.,* 293 F. Supp. 2d 152, 157 (D.D.C. 2003). What is required is a huge commitment to the principles of equality coupled with a willingness to work tirelessly to eradicate discrimination to base a career on civil rights litigation.

The potential for lodestar fees under a fee-shifting statute is not always sufficient inducement for counsel to take on a major difficult, time-consuming, or unpopular case. *See Knop v. Johnson,* 712 F. Supp. 571 (W.D. Mich. 1989) (1.3 multiplier). In *Knop*, a multiplier was necessary because plaintiffs' counsel, a national civil rights organization, was unable to find local counsel to prosecute the case notwithstanding the potential for fees. "Given the complexity of the issues involved, the potential for protracted litigation and the massive expenses counsel would have to advance in order to properly litigate this case, it is not surprising that the ACLU was unsuccessful in its effort to find private attorneys willing to handle more than one aspect of the case." *Id.* at 584. Mr. Fredrickson was the only attorney willing to undertake a litigation of this magnitude and stay with it for his entire career. As hereinafter described, when his original employer declined to pursue the case after the initial trial loss, he pursued the appeal on his own

time and at his own expense for two years.  He then dedicated the scant resources of his fledgling

firm to pursuing the case. Fredrickson May 2022 Decl. at ¶¶  9-12.

Mr. Fredrickson faced the stark reality head on: "Had I not done so—and had I not

represented the class on my own time for over two years—there was virtually no chance for the

plaintiffs to obtain other representation, given the posture of the case and the expense involved in

overturning an adverse decision on liability.  Mr. Webster and I recognized that, in the near term,

representation of the *Hartman* class would eat away scarce resources, both by precluding

remunerative work and by requiring significant expenses."  Declaration of Bruce A. Fredrickson,

ECF No. 1081-2, at ¶ 25.  Notably, other women ultimately joined the *Hartman* class when their

individual cases with separate counsel failed to progress.  *Id.* at ¶¶ 14-18.  In October 1990—

thirteen years into the litigation—Mr. Fredrickson was finally able to enlist additional counsel to

assist with discrete aspects of the case after liability had been established.

### E.      Exceptional Success in Societally Significant Cases Warrant Enhancement

The civil rights statutes were enacted in furtherance of policies that "Congress considered

of the highest priority."  *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968).  The

significance of these statutes has changed the fabric of every aspect of American life.  In

*Shakman v. Democratic Organization of Cook County,* 677 F. Supp. 933, 944 (N.D. Ill. 1987),

the court pronounced that "in the twenty-four years during which I have served as a judge, I have

never presided over a case with greater significance or more wide felt impact in the area of civil

rights than *Shakman.*"  Courts consider the social impact of a case, as well as the economic value

of class actions, in considering what constitutes a reasonable fee.  Courts recognize the need to

encourage experienced and able counsel to undertake such socially significant litigation.

*Sumitomo,* 74 F. Supp. at 399.  *See also Berry v. Schulman,* 807 F.3d 600 (4th Cir. 2015).  In

*Berry,* the court awarded an enhancement of a $3,349,379.95 lodestar, citing the "excellent result

in [a] large and complex action" that brought about a 'sea change' in business practices."  *Id.* at

618.  Such a "serious advancement of consumer rights by a dominant member of the data broker

industry" supported the success enhancement.  *Id.*

The United States Agency for Global Media, the successor agency to the USIA, now

"strongly promotes the full realization of equal opportunity in employment through a continuing

affirmative program to identify and eliminate discriminatory practices."

https://www.usagm.gov/work-with-us/equal-employment/.  It recognizes that "[a]s the Nation's

largest employer, the Federal Government has an obligation to lead by example. Seeking to

attain a diverse, qualified workforce is a cornerstone of the merit-based civil service."  USAGM

Diversity and Inclusion Policy Statement.[27]  But it was *Hartman* that made Voice of America an

Equal Opportunity Employer.  The societal impact of the case cannot be overstated.  That impact

fully supports a multiplier to the lodestar for superior lawyering.

### F.      Comparisons with Awards in Similarly Exceptional Cases Support Enhancement to Achieve Adequate Compensation.

When counsel achieves exceptional (here unparalleled) results, the compensation should

reflect the results obtained.  In *Shakman*, the court found the results obtained "sufficiently

extraordinary to place this case in the class of rare and exceptional cases for which success

enhancements are reserved."  677 F. Supp. at 947.  In addition to the enormous political and

social impact of the case, the court found significant economic benefits produced by the

plaintiffs' victory as well.  Savings to the city of Chicago, and thereby the taxpayers, were

estimated to be well in excess of $150,000,000.  "An upward adjustment is proper where the

---

[27] chrome-
extension://efaidnbmnnnibpcajpcglclefindmkaj/viewer.html?pdfurl=https%3A%2F%2Fwww.usa
gm.gov%2Fwp-content%2Fuploads%2F2021%2F01%2FUSAGM-Diversity-and-Inclusion-
Plan-2020-2024.pdf&clen=4275148&chunk=true.

lodestar is significantly lower than the results would warrant, given fee awards in cases where equally successful results were achieved." *Id.* (*citing Delaware Valley I,* 478 U.S. at 568).  The court compared the lodestar to the size and nature of the benefits the case produced and concluded that, "while not small in absolute terms, the lodestar is comparatively modest in relation to fee awards involving similarly large economic benefits." *Id.* at 948.  Looking to multipliers applied in similar large cases, the court applied a 1.33 multiplier to the lodestar based on the significance of the results.[28]  The enhancement to the lodestar will "produce a reasonably compensatory fee in light of the success achieved in this case and serve as sufficient inducement for competent attorneys to accept cases of a similar import in the future." *Id.*

While no case is truly comparable to *Hartman, Liberales v. Daniel*, 619 F. Supp. 1016 (N.D. Ill 1985), comes close.  Like *Hartman*, *Liberales* was an early Title VII case.  As with *Hartman* for sex discrimination, *Liberales* produced the largest race discrimination money judgment in history.  While the eleven-year arc of *Liberales*, by itself, did not justify enhancement, the "rapid and significant changes in Title VII law during the pendency of this suit threatened at various points to obliterate the case." *Id.* at 1019.  Similarly, *Hartman* counsel had to deal with changing standards of liability in the law under Title VII, significantly when a change in the law of class certification threatened, as in *Liberales*, to obliterate the entire case. *See* discussion *infra* Section II. C. above.

Another similarity between *Hartman* and *Liberales* is the "significant gaps in defendants'' records concerning who had taken and passed hiring tests." *Liberales*, 619 F. Supp. at 1019.  The court found that the "quickly changing body of Title VII law coupled with the

---

[28]The court found multipliers in similarly successful and significant cases ranging up to 3.35. *Shakman*, 677 F. Supp at 948.

testing information missing from defendants' records presented 'unusually difficult circumstances' above and beyond the novelty or complexity of the case."  *Id*.  As demonstrated above, *Hartman* certainly exhibited more than its share of unusually difficult circumstances.

Like *Hartman*, the *Liberales* plaintiffs claimed "total victory."  In addition to securing a record-breaking judgment, like *Hartman*, the *Liberales* "class received every single dollar to which it claimed it was legally entitled, including prejudgment interest."  *Id.* at 1020.  To achieve 100 cents on the dollar in settlement is exceptional.  And like *Hartman,* the *Liberales* class members were elevated in their job positions and received increased pensions. The court concluded that "plaintiffs' victory indeed is total."  *Id.*  "If the totality of victory or establishment of new law may ever properly be considered elements of 'exceptional success,' then they should be so considered in this case."  *Id.*  The class "truly achieved an 'exceptional success," if that term is to have any meaning."  *Id.* at 1022.  The court awarded a multiplier of 1.5.[29]  *Hartman* also achieved exceptional success however it is defined, and this success was due to countless examples of superior lawyering.

### G.    Enhancements Help Induce Competent Attorneys to Represent Victims of Discrimination

Civil rights enforcement has been entrusted to private attorneys general.  *Newman v. Piggie Park Enters., Inc.,* 390 U.S. 400, 402 (1968).  The civil rights statutes include *both* the private cause of action *and* attorneys' fees for the prevailing plaintiff.  Fee-shifting encourages victims to bring private actions, but just as importantly, it also encourages counsel to accept the representation.  "The point applies with equal force to counsel, as it does to the individual

---

[29]This 1985 case was post-*Hensley* and *Blum*, but pre-*Dague*.  While the court considered risk of loss as one factor supporting a multiplier, this was not the exclusive justification.  The court undertook a thorough review of *Blum's* "exceptional success" rationale before concluding that a multiplier was appropriate.

plaintiffs.  After all, it is the skill, ingenuity, effort and risk of counsel that, in the final analysis, produces the result." *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (5.5 multiplier awarded).  No one knows at the beginning of a case that it will be one of the rare cases that requires exceptionally high performance under exceptionally difficult circumstances, but the possibility of a lodestar enhancement if that happens fulfills the fee-shifting goal of ensuring the availability of competent counsel.

The only objective of fee-shifting is "to ensure that federal rights are adequately enforced." *Perdue,* 559 U.S. at 550; *Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564 (1986) (primary purpose of fee-shifting is to induce attorneys to take on civil rights cases to assure competent representation to victims of discrimination).  Recovery of lodestar fees that reflect the value of counsel's time is usually sufficient.  The knowledge that they will be paid if successful often will be sufficient to attract counsel to represent victims of discrimination.  But extreme circumstances like those described in the cases above and as occurred here exceed the normal expectations of plaintiff's counsel when agreeing to the commitment of time and resources to a case.

"Counsel for class plaintiffs are not required to be motivated by altruism.  Representation of a class of injured persons is not a *pro bono* act." *Mueller v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1377 (D. Minn. 1985).  The plaintiff's attorney in a Title VII case performs a public interest role that includes, but is greater than, that of officer of the court.  Fee awards are intended to provide "an incentive to competent lawyers to undertake Title VII work." *Copeland v. Marshall,* 641 F.2d, 880, 890 (D.C. Cir. 1980).  Adequate compensation allows public interest motivated attorneys to fill this role.  "[N]o fee is reasonable unless it would be adequate to induce other attorneys to represent similarly situated clients seeking relief comparable to that

achieved in the case at hand."  *Hensley,* 461 U.S. at 449, Brennan J., concurring in part and dissenting in part.

The potential for enhancement encourages counsel to take on difficult cases. Extraordinary success achieved under exceptionally difficult circumstances requiring superior lawyering skills justifies an enhancement to the lodestar.  "That the lodestar figure also reflects the complexity and length of this particular case does not detract from the need for an enhancement to attract competent local counsel to this type of litigation."  *See Knop v. Johnson,* 712 F. Supp. 571, 584 (W.D. Mich. 1989) (1.3 multiplier awarded in complex, lengthy prison reform case).  Multipliers are reasonable in extraordinarily difficult cases with record-breaking results.  "Lawyers are entitled to be paid more than their normal hourly charges when outstandingly successful in a case such as this."  *Sumitomo,* 74 F. Supp. 2d at 399.  As with counsel in these cases, *Hartman* class counsel are entitled to be paid more than the lodestar based on normal hourly charges.

## III.   THIS RARE CASE MEETS ALL THE REQUIREMENTS FOR A LODESTAR ENHANCEMENT

Here counsel persisted for decades in asserting claims of discrimination by a group of highly talented women.  Mr. Fredrickson was eventually joined by others also willing to commit themselves to seeking justice for the class, agreeing to share the burden of pursuing a case against the full resources of the United States Government.  Together they brought the case over the finish line for 1100 women.  The time has come to pay appropriately for the superior lawyering that produced the exceptional results for the class.

Cases of exceptional results require a plus factor to warrant a lodestar enhancement.  In *Hyatt,* monumental resistance alone supported enhancement; in *Hollowell,* severe time pressure alone supported enhancement; in *Guam* the undesirability of the case alone supported

enhancement; in *Shakman* and *Berry*, the immense social significance of the case alone supported enhancement.  In *Hartman*, each of these factors was present, to a degree greater than in those cases.  Additional factors described in the cases cited throughout this memorandum and also present in *Hartman*, while not the sole factor, supported enhancement.  Class counsel's quiver is full of arrows, each one supporting enhancement.  The extraordinary results achieved in this case – not just the stunning settlement at top dollar for each claimant, but the successful strategies along the way – were attributable to the superior attorney performance that has been documented specifically in the record throughout the case.

### A.    Two Contemporaneous Cases Point the Way to Enhancement

Reference to fee awards in similar cases is one method courts consider when deciding what multiplier is reasonable.  Fees awarded in two cases decided in the same general time frame as the *Hartman* settlement are instructive.  Both cases settled and in both cases the fee award was governed by contract.  In both cases the defendant agreed to pay the fees above the settlement amount.  In both cases the only limit on the court's discretion was that the fee be reasonable.  Both cases initially used a lodestar method to decide the fee.  A multiplier was then awarded in each case.  *Wing v. Asarco,* 114 F.3d 986 (9th Cir. 1997) (two-year case; 2.0 multiplier); *Deloach v. Phillip Morris Cos.,* No. 1:00CV01235 U.S. Dist. LEXIS 23240 (M.D.N.C. Dec. 19, 2003) (four-year case; 4.5 multiplier).

The *Wing* trial judge "spoke in awe of class counsel's performance." 114 F.2d at 989.  The district court noted the first-rate job the lawyers did, their sheer endurance in the face of high-quality opposition by Asarco's counsel, and the exceptional results achieved.  The court applied a 2.0 multiplier of to the stipulated lodestar.  The multiplier was appropriate because the case was "clearly one of those exceptional cases."  *Id.*  The Ninth Circuit Court of Appeals affirmed the multiplier.  While quality, complexity, and results are ordinarily reflected in the

lodestar, "the Supreme Court has recognized that in exceptional cases, quality of representation and exceptional results can, in fact, warrant an adjustment to the lodestar." *Id.*

Similarly, in *Deloach,* the court praised "the superior professionalism and art of advocacy exhibited by the lawyers." U.S. Dist. LEXIS 23240, at *7. As in *Hartman*, the *Deloach* court found that "facing the dedicated and diligent opposition of the Defendants, Plaintiffs' Co-Lead Counsel achieved a remarkable result for the class." *Id.* at *35-36. Also, as in *Hartman*, that court recognized the "daunting task" facing counsel. *Id.* at *37. After the loss in the first liability trial, *Hartman* was considered an unwinnable case. Similarly, in *Deloach,* the legal community in North Carolina "thought this case against these defendants was unwinnable." *Id.* Rejecting the 1-2 range of multipliers, argued for by the defendants, the court awarded a multiplier of 4.5. "First and foremost, this fee properly compensates Plaintiffs' Co-Lead Counsel for the exceptional result they achieved for the class. In addition, it recognizes the difficulties faced by Plaintiffs' Co-Lead Counsel in pursuing the litigation." *Id.* at *38.

Comparing the *Hartman* results obtained with these similar contemporaneous cases demonstrates that additional fees should be awarded to fulfill the "reasonable fee" contemplated by the Consent Decree. *Hartman* produced a significantly larger total recovery than either

case.[30]



Individual recoveries in *Hartman* dwarf the individual recoveries in either case.[31]



Class counsel in this case not only faced vigorous opposition by highly experienced and competent defense counsel, but they took an "unwinnable" case involving massive and complex documentary demands, unrelenting time pressure, painstaking attention to detail, astute legal acumen, and perseverance for twenty-three years before they achieved outstanding, record-

---

[30] The *Hartman* recovery was $608 million, roughly three times the size of the *Deloach* cash recovery of $212 million, and almost ten times the size of the *Wing* $67.5 million.

[31] The *Hartman* $561,000 individual recovery is roughly sixteen times the size of the *Deloach* individual cash recovery of $35,000, and a whopping thirty-three times the $17,500 individual recovery in *Wing*.

breaking results.  Well over a million civil rights cases have been filed during the forty plus years

this case has been pending.[32]  *Hartman* still holds the record for recovery in a sex discrimination

case, both total and *per capita*.  Truly, *Hartman* is one in a million.

**B.    Voluminous Evidence Supports Enhancement**

Justice Kennedy warned that "when immersed in a case, lawyers and judges find within it

a fascination, an intricacy, an importance that transcends what the detached viewer sees."

*Perdue,* 559 U.S. at 560 (Kennedy J., concurring in part and dissenting in part).  Here, Special

Master Stephen Saltzburg witnessed the superior lawyering skills of class counsel repeatedly

during the period devoted to document production and the *Teamsters* hearings.  His description

of class counsel's extraordinary skill deserves great weight.  Judge Robertson, himself a relative

newcomer to the case at the time of settlement, stated "[i]n five and a half years, I've seen a lot

of lawyers present cases.  I don't think I have ever seen a lawyer who is more prepared, more

ready to offer precise detail, more ready to respond to questions from the Court, and more dead

on accurate than Mr. Fredrickson has been."  Transcript of Fairness Hearing, June 24, 2000, at

54.  These words also carry great weight.  Forty-six successful *Teamsters* results in thirty-eight

months carry great weight.  And the ultimate results—still dwarfing the results in similar cases

decades later—carry great weight.  Not only has the Court recognized the exceptional nature of

the case, but outside sources have also recognized the success.[33]

---

[32]The Department of Justice Bureau of Justice Statistics publishes detailed statistical tables of
federal case filings, broken down by subject matter.  Data from 1993 through half of 2020 show
1,055,420 civil rights cases filed in federal district courts nationwide.

[33]*See, e.g.,* https://tvnews.vanderbilt.edu/broadcasts/191216? (Justice Department settlement of
the long- running sex discrimination case against the Voice of America section of the United
States Information Agency reviewed; details given of the 1984 ruling that the government had
since fought, reported by Bob Woodruff, ABC News);
https://tvnews.vanderbilt.edu/broadcasts/392499? (The proposed settlement of a sex
discrimination lawsuit brought against the federal government agencies the United States

On March 23, 2000, *Hartman's* record-breaking settlement was front page news in the *New York Times*. The Times reported the $508 million recovery represented "the largest settlement ever recorded in a federal sex-discrimination case." N.Y. Times Article, March 23, 2000, Section A, Page 1, 22 (attached as Exhibit 7). "It dwarfs the next largest settlement, $176 million awarded in 1996 to 1400 Texaco employees in a race discrimination suit." *Id.* There were stories across the U.S., from major cities like New York, Washington, D.C., and Los Angeles, but also from small communities in every corner of the country. The settlement was reported widely in Canada and Britain, as well as Australia and Germany. The reports universally emphasized the record-breaking award, and the dogged determination of plaintiffs' counsel for the twenty-three years it took for the government to see that "the handwriting was clearly on the wall."[34]

The truly extraordinary nature of the case, and the Herculean efforts needed to achieve victory have been recognized by organizations dedicated to eradicating discrimination. Trial Lawyers for Public Justice (TLPJ), an organization dedicated to and inspired by a pledge to further equity and equality, end systemic oppression, and protect and expand access to justice for all,"[35] awarded Bruce Fredrickson and the entire legal team at Webster & Fredrickson the 2000 Trial Lawyer of the Year award for their work on behalf of the *Hartman* class. The award is presented to "the trial attorney or legal team who made the greatest contribution to the public

---

Information Agency and Voice of America by over 1000 women, reported by Dan Rather, CBS News.); https://tvnews.vanderbilt.edu/broadcasts/633890 (A proposal to settle a sex discrimination suit filed by 1000 women against the federal government, reported by Brian Williams, NBC News.)

[34]Statement of Channing Phillips, spokesman for the U.S. Attorney's Office, *U.S. Agrees to Pay Over $508 Million to Settle Sex-Bias Case*, *Wall St. J.,* Mar. 23, 2000, at B2.

[35] https://www.publicjustice.net/who-we-are/mission.

interest within the past year by trying or settling a socially significant case."  The *greatest*

contribution.  First among the criteria considered for the winner is "the dedication, tenacity, and

skill of the trial lawyer(s) involved."  The length of the case, the strategic and tactical skill

involved, the obstacles and pitfalls overcome, the difficulty of the procedural hurdles, and trial

strategy all played a role in the award.  These attributes were recognized by Professor Saltzburg

year after year in his assessment of the value of the work done by class counsel during the period

covered by each interim fee petition.  Here they were confirmed by an independent organization,

considering the *Hartman* case against several others.[36]

C.      **The Court Has Discretion to Award a Multiplier Based on the Specific Evidence Before It**

The decision to award a multiplier is firmly vested in the Court's discretion.  *Blanchard*

*v. Bergeron,* 489 U.S. 87, 96 (1989); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.D.C.

1993).  This discretion is limited only by the requirement that it be based on facts in the record

and be adequately explained so a reviewing court can understand the decision.[37]

When specific evidence in the record demonstrates that the case is extraordinary due to

superior legal services *and* that those superior services produced exceptional results, a lodestar

---

[36]*Hartman* was one of eight cases considered for the award in 2000.  "The finalists for the 2000 Trial Lawyer of the Year Award fought for automobile safety, exposed brutality by prison guards, protected foster children, uncovered public corruption, held an HMO accountable for refusing to provide necessary and reasonable medical care to a child, and won compensation for victims of the Holocaust.  The winners battled gender discrimination by the U.S. Information Agency and its 'Voice of America' program for 23 years and achieved a record settlement—the largest ever in an employment discrimination case."  J. Wesley Smith, *Fighting for Public Justice*, 2001, at 373.

[37]The cases discussed above report multipliers ranging from 1.12 to acknowledge exceptional results despite the burden on a small firm (*Allen v. Freeman,* 694. F. Supp. 1554 (S.D. Fla. 1988)) to 5.5 to recognize the extraordinary skill of counsel in the face of relentless opposition, and the exceptional results – record-breaking at that time—that "captured national attention." (*Roberts v. Texaco, Inc.,* 979 S. Supp.185 (S.D.N.Y. 1997)).

multiplier is warranted.  This Court's conclusion that this was a truly extraordinary case is a factual conclusion supported by the voluminous and specific evidence submitted with plaintiffs' Final Fee Petition.  Plaintiffs have submitted additional specific evidence with this motion.  In a sense, this Court is Justice Kennedy's "detached observer," removed in time by two decades from the superior lawyering that is the subject of this motion, and able to see the specific evidence in the record objectively.  The Court is in a perfect position to decide the enhancement question before it.

Blum rejected the notion "that an upward adjustment to an attorney's fee is never appropriate under § 1988."  465 U.S. at 901.  Perdue rejected "any contention that a fee determined by the lodestar method may not be enhanced in any situation. The lodestar method was never intended to be conclusive in all circumstances."  559 U.S. at 553.  This Court recently affirmed that "in exceptional circumstances" an "enhanced award may be justified."  Campbell v. District of Columbia, 202 F. Supp. 3d 121, 126 (D.D.C. 2016).  The legal question is decided: enhancement "is permitted in extraordinary circumstances."  Perdue, 559 U.S. at 546.

The factual question is before the Court.  The most important fact – the achievement of exceptional results—is beyond question.  What remains to be decided is whether the evidence of counsel's skill, diligence, and winning strategy manifested throughout this case, attested to by both the Special Master and the Court, and recognized by professional organizations in the field constitutes superior lawyering.  The answer has to be yes.  If not this case, what circumstances could ever present facts warranting a multiplier?  To deny enhancement in this case would say that, contrary to the Supreme Court's statement in Perdue, the lodestar is, in fact, conclusive in all circumstances.

For the reasons discussed above, plaintiffs request this Court to exercise its discretion and award additional fees in a range from 1.0 to 4.5 times the stipulated $19 million lodestar.  None of the cases that were awarded multipliers in that range approach *Hartman* in terms of overall success or *per capita* success.  Nor do any of those cases approach *Hartman* in terms of the other factors on which multipliers have been awarded.  This range is easily justified by the exceptional quality of legal services and outstanding results achieved for over 1000 women.  The greatest result in the history of Title VII deserves nothing less.

Respectfully submitted,

/s/
Roger E. Warin
rwarin@steptoe.com
Lindsey Bishop Lang
llang@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.:  (202) 429-3000
Fax:  (202) 429-3902

Dated:  May 5, 2022