UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CAROLEE BRADY HARTMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 77-2019 (APM) |
| | ) | |
| ANTONY BLINKEN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR A LODESTAR ENHANCEMENT**

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

PETER C. PFAFFENROTH, D.C. Bar #496637
Assistant United States Attorney
U.S. Attorney's Office, Civil Division
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-2513
peter.pfaffenroth@usdoj.gov

*Attorneys for Defendants*

TABLE OF CONTENTS

Table of Defendants' Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      The "reasonable attorneys' fees" permitted by the *Hartman* Consent Decree
        should be determined pursuant to the lodestar methodology used in statutory
        fee-shifting cases in the D.C. Circuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     Plaintiffs' proposed across-the-board multiplier and lump sum award are
        unreasonable because this methodology would be overly broad and would
        permit compensation unrelated to the quality of an attorney's performance . . . . . . . . . . 8

III.    A "Contingency" Enhancement is not available in this case . . . . . . . . . . . . . . . . . . . . . 13

IV.     A "Success" Enhancement is not available in this case . . . . . . . . . . . . . . . . . . . . . . . . . 19

V.      No further enhancement may be awarded based on Mr. Fredrickson's
        and Ms. Brackshaw's work from 1980 through 1990 . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.     The examples proffered by plaintiffs do not demonstrate the rare and
        exceptional circumstances required to warrant a "Quality" Enhancement . . . . . . . . . . . 28

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## TABLE OF DEFENDANTS' EXHIBITS

"R. __" denotes the corresponding numbered entry (where available) on the District Court's electronic civil docket for this action for record materials that were originally filed in hard-copy paper format.  Because many of the record materials pertinent to plaintiffs' motion pre-date the electronic docket, defendants have submitted electronic copies of those materials as exhibits.

Defendants' Exhibits (cited as "DEX") 10-17, 10-18, and 11 are submitted herewith.  The remaining exhibits were submitted with Defendants' Opposition to Plaintiffs' Motion for Final Determination of Attorneys' Fees [R. 1083] or with Defendants' Unopposed Motion for Leave to File Supplementary Exhibits [R. 1084].

"ECF" citations herein refer to the electronic document at the corresponding numbered link in the docket.  ECF citations to the record materials submitted as Defendants' Exhibits therefore do not correspond to the numbered entry on the docket for the original paper filing made in hard-copy format.

DEX 1:       1994 Affidavit of Laurel Pyke Malson and 1993 Affidavit of Thomas P. Gies [ECF 1083-1]

DEX 2:       1994 Affidavit of Peter H. Doyle [ECF 1083-2]

DEX 3:       Memorandum in Support of Plaintiffs' Second Motion for Interim Attorneys' Fees and Expenses, dated February 16, 1996 [ECF 1083-3]

DEX 4:       1996 Affidavit of Laure Pyke Malson [ECF 1083-4]

DEX 5:       1996 Affidavit of Peter H. Doyle [ECF 1083-5]

DEX 6:       1995 Declaration of Douglas B. Huron [ECF 1083-6]

DEX 7:       1999 Declaration of Laurel Pyke Malson and related Tables submitted by Plaintiffs' Fee Counsel with Seventh Interim Fee Petition [ECF 1083-7]

DEX 8:      2020 Declaration of Daniel F. Van Horn [ECF 1083-8]

DEX 9:      2020 Declaration of Elizabeth A. Parish [ECF 1083-9]

DEX 10:     Selected Record Materials

    10-1:   Order of Reference to Special Master, filed October 1, 1991 [not entered on docket; ECF1083-10]

    10-2:   Special Master's Report on Motion by Plaintiffs for Interim Attorney's Fees, dated February 18, 1994 [R. 126; ECF 1083-11]

    10-3:   Plaintiffs' Reply to Special Master's Report on Motion by Plaintiffs for Interim Attorney Fees and to Defendant's Objections Thereto, dated March 15, 1994 [R. 129; ECF 1083-12]

    10-4:   Plaintiffs' Memorandum in Support of an Interim Award of Attorneys' Fees and Costs Without Requiring Plaintiffs to Post a Surety Bond, dated March 23, 1994 [R. 133; ECF 1083-13]

    10-5:   Special Master's January 17, 1995 Report, with Substitute Pages, dated January 18, 1995 [R. 177, 181; ECF 1083-14]

    10-6:   Order re Interim Fee Award, filed January 24, 1995 [R. 179; ECF 1083-15]

    10-7:   Special Master's May 15, 1996 Report and Recommendations Regarding Plaintiffs' Second Motion for Interim Attorneys' Fees and Expenses [R. 218; ECF 1083-16]

    10-8:   District Court's Memorandum re Foreign Service Positions, filed June 24, 1997 [not entered on docket; ECF 1083-17]

    10-9:   Memorandum Order re Prejudgment Interest, filed February 5, 1998 [R. 506; ECF 1083-18]

    10-10:  Special Master's Report and Recommendations Regarding Plaintiffs' Fifth Motion for Interim Attorneys' Fees and Expenses, dated April 15, 1998 [R. 523; ECF 1083-19]

    10-11:  Memorandum Order, filed June 17, 1998 [R. 567; ECF 1083-20]

10-12:  Special Master's Report and Recommendations Regarding Plaintiffs' Seventh Motion for Interim Attorneys' Fees and Expenses, dated December 6,1999 [R. 849; ECF 1083-21]

10-13:  Consent Decree, filed March 24, 2000 [R. 866; ECF 1083-22]

10-14:  Joint Pre-Hearing Brief in Support of Consent Decree, filed June 22, 2000 [R. 904; ECF 1083-23]

10-15:  Memorandum in Support of Plaintiffs' Seventh Motion for Interim Attorneys' Fees and Expenses, filed with Special Master on May 25, 1999 [ECF 1084-1]

10-16:  1999 Declaration of Douglas B. Huron and related Tables submitted by Plaintiffs' Fee Counsel with Seventh Interim Fee Petition [ECF 1084-2]

10-17:  Special Master's Order Regarding Discovery dated April 25, 1996 [submitted herewith]

10-18:  Special Master's March 11, 1997 Report Recommending Approval of the Damages Model Prepared by Court-Appointed Experts [submitted herewith]

DEX 11:    2022 Declaration of Daniel F. Van Horn [submitted herewith]

TABLE OF AUTHORITIES

**Federal Cases**

*Allen v. Freeman*,
    694 F. Supp. 1554 (S.D. Fla. 1988) ......................................................................... 15
*Berry v. Schuman*,
    807 F.3d 600 (4th Cir. 2015) ............................................................................. 19, 20
*Blum v. Stenson*,
    465 U.S. 886 (1984)................................................. 6, 18, 20, 23, 34, 35, 41, 45
*Burlington v. Dague*,
    505 U.S. 557 (1992)........................................................................................ 6, 14, 34
*Campbell v. District of Columbia*,
    202 F. Supp. 3d 121 (D.D.C. 2016) .......................................................................... 31
*Copeland v. Marshall*,
    641 F.2d 880 (D.C. Cir. 1980) ................................................................................. 36
*De Medina v. Reinhardt*,
    1979 WL 39 (D.D.C. 1979) ...................................................................................... 21
*DeLoach v. Philip Morris Cos.*,
    2003 WL 23094907 (M.D.N.C. 2003)......................................................... 9, 10, 19
*DeMedina v. Reinhardt*,
    686 F.2d 997 (D.C. Cir. 1982) ................................................................................. 17
*Donnell v. United States*,
    682 F.2d 240 (D.C. Cir. 1982) ................................................................................... 5
*General Tel. Co. v. Falcon*,
    457 U.S. 147 (1982) ................................................................................................. 40
*Hartman v. Duffey*,
    19 F.3d 1459 (D.C. Cir. 1994) ................................................................................. 31
*Hartman v. Duffey*,
    8 F. Supp. 2d 1 (D.D.C. 1998) ................................................................................. 33
*Hartman v. Duffey*,
    88 F.3d 1232 (D.C. Cir. 1996) ........................................................................... 39, 40
*Hartman v. Duffey*,
    973 F. Supp. 189 (D.D.C. 1997) ....................................................................... 37, 38
*Hartman v. Duffey*,
    973 F. Supp. 199 (D.D.C. 1997) .............................................................................. 26
*Hartman v. Duffey*,
    158 F.R.D. 525 (D.D.C. 1994).................................................................................. 31
*Hartman v. Pompeo*,
    2020 WL 6445873 (D.D.C. 2020) ................................................ 1, 4, 10, 13, 23, 42
*Hartman v. Wick*,
    1988 WL 39856 ....................................................................................................... 38
*Hartman v. Wick*,
    678 F. Supp. 312 (D.D.C. 1988)................................................... 22, 27, 33, 36, 37
*Hensley v. Eckerhart*,
    461 U.S. 424 (1983).............................................................................................. 6, 36

*Hollowell v. Gravett*,
   723 F. Supp. 107 (E.D. Ark. 1989) ..................................................................... 32

*Hyatt v. Apfel*,
   195 F.3d 188 (4th Cir. 1999) ........................................................................... 19

*In re Home Depot, Inc.*,
   931 F.3d 1065 (11th Cir. 2019) ............................................................... 4, 7, 14

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999) ............................................................. 9, 10

*In re Vioxx Products Liability Litigation*,
   802 F. Supp. 2d 740 (E.D. La. 2011) ............................................................... 12

*Johnson v. Georgia Highway Express*,
   488 F.2d 714 (5th Cir. 1974) ........................................................................... 18

*King v. Palmer*,
   950 F.2d 771 (D.C. Cir. 1991) ............................................................... 7, 17, 18

*Knop v. Johnson*,
   712 F. Supp. 571 (W.D. Mich. 1989) ............................................................... 30

*Landgraf v. USI Film Products*,
   511 U.S. 244 (1994) ........................................................................................ 22

*Liberles v. Daniel*,
   619 F. Supp. 1016 (N.D. Ill. 1985) .................................................................. 14

*McKenzie v. Kennickell*,
   875 F.2d 330 (D.C. Cir. 1989) .................................................... 11, 13, 17, 20

*Miller v. Holzmann*,
   575 F. Supp. 2d 2 (D.D.C. 2008) .............................................................. 32, 33

*Murray v. Weinberger*,
   741 F.2d 1423 (D.C. Cir. 1984) .................................................................. 7, 11

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley I)*,
   478 U.S. 546 (1986) ............................................................... 6, 18, 36, 43

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley II)*,
   483 U.S. 711 (1987) ................................................................................. 6, 33

*Perdue v. Kenny A.*,
   559 U.S. 542 (2010) .................................... 5, 6, 7, 8, 12, 13, 20, 34, 35, 41

*Pont de Nemours & Co. C-8 Pers. Injury Litig.*,
   204 F. Supp. 3d 962 (S.D. Ohio 2016) ........................................................... 42

*Roberts v. Texaco, Inc.*,
   979 F. Supp. 185 (S.D.N.Y 1997) ................................................................... 10

*Role Models America, Inc. v. Brownlee*,
   353 F.3d 962 (D.C. Cir. 2004) ........................................................................ 31

*Salazar v. District of Columbia*,
   809 F.3d 58 (D.C. Cir. 2015) ............................................................................ 8

*Save Our Cumberland Mountains v. Hodel*,
   826 F.2d 43 (D.C. Cir. 1987) ...................................................... 7, 11, 23, 34

*Shakman v. Democratic Organization of Cook County*,
   677 F. Supp. 933 (N.D. Ill. 1987) ...................................................... 12, 15, 19

*Smyth ex rel. Smyth v. Rivero*,
   282 F.3d 268 (4th Cir. 2002) ............................................................................ 5

*Swedish Hospital Corp. v. Shalala,*
  1 F.3d 1261 (D.C. Cir. 1993) ............................................................................ 23
*Thompson v. Kennickell,*
  836 F.2d 616 (D.C. Cir. 1988) ........................................................... 7, 10, 20, 45
*United States v. Volvo Powertrain Corp.,*
  758 F.3d 330 (D.C. Cir. 2014) ............................................................................ 5
*Wing v. Asarco Inc.,*
  114 F.3d 986 (9th Cir. 1997) .............................................................................. 9
*Winston & Strawn LLP v. FDIC,*
  894 F. Supp. 2d 115 (D.D.C. 2012) ............................................................ 5, 7, 34

## State Cases

*Smiley v. Blasingame, Burch, Garrard & Ashley, P.C.,*
  835 S.E.2d 803 (Ga. App. 2019) ....................................................................... 42

## Federal Statutes

42 U.S.C. § 2000e-5(k) ....................................................................................... 4

## Federal Rules

Fed. R. Civ. P. 23(h) ........................................................................................... 4
Fed. R. Civ. P. 24(a) .......................................................................................... 31

## Other Authorities

5 NEWBERG ON CLASS ACTIONS ........................................................................ 23

## INTRODUCTION

By Memorandum Opinion and Order dated November 3, 2020, the Court denied without prejudice Plaintiffs' 2019 Motion for Final Determination of Attorneys' Fees. *Hartman v. Pompeo*, 2020 WL 6445873 (D.D.C. 2020).  The Court held that the Consent Decree entered in this case in 2000, which entitles plaintiffs' counsel to receive "reasonable attorneys' fees" paid by the government, establishes a fee-shifting arrangement that requires use of the lodestar method to calculate plaintiffs' final fee award. *Id.* at *1, *9.  The Court further ruled that plaintiffs' "total interim fee award, or interim lodestar, falls short of a 'reasonable' fee for two reasons, and a possible third."  In particular, the Court found: (1) that "below market USAO *Laffey* Matrix rates were used to calculate interim fee awards for over 20 years;" (2) that "there has been a delay in receiving whatever amount is appropriate to compensate [plaintiffs] for the shortfall" caused by those below-market rates, and (3) that "the interest thus far received on interim fee awards arguably has been inadequate to compensate for delay." *Id.* at *17.

Although finding that an adjustment to the interim lodestar is necessary, the Court concluded that plaintiffs had failed to propose a method that is "reasonable, objective, and capable of being reviewed on appeal" to calculate the appropriate adjustment.  Accordingly, the Court sent plaintiffs "back to the drawing board" so they could have another chance to carry their burden to "identify[] a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Id.* at *19 (internal quotation marks omitted).

Following the Court's 2020 decision, the parties entered three stipulations:

- On September 30, 2021, the parties stipulated that defendants would pay plaintiffs $9,033,600 to resolve any issues concerning the use of below-market USAO *Laffey* Matrix rates to calculate interim fee awards, to compensate for the delay in receiving the shortfall caused by the use of those rates, and to address the difference between the interest paid on

plaintiffs' interim fee awards computed at the 1-year Treasury bill rate and such interest calculated using the prime rate.  *See* ECF 1107.[1]

- On March 16, 2022, the parties stipulated that the "base lodestar" for merits litigation in this case is $19,000,000.  *See* ECF 1112.

- In a separate stipulation also entered on March 16, 2022, defendants agreed to pay plaintiffs' fee counsel $400,000 to settle plaintiffs' claims for attorneys' fees and costs for the period from November 1, 2017, through October 7, 2021.  In this stipulation, the parties further agreed that "they have completely and finally resolved any claim for fees or costs based on a contention (1) that Plaintiffs' receipt of fees was unreasonably delayed, (2) that the lodestar fees Plaintiffs have been paid did not reflect counsel's true market value, and (3) that the interest paid on interim fee awards in this litigation was insufficient." *See* ECF 1113.

Each of those three stipulations was subsequently approved by the Court and entered separately as a Court Order.  *See* ECF 1108; ECF 1116; ECF 1117.

Those three stipulations fully resolved the issues that caused the Court to conclude in 2020 that plaintiffs' interim lodestar fell short of a reasonable fee award.  The stipulations also eliminated from this case any of the three circumstances under which the Supreme Court has expressly authorized an upward adjustment to the lodestar fee.  *See* ECF 1081-1 [Rubenstein Decl.] at 28-29 & n.65.  As a result of the stipulations, the total amount of fees, expenses, and interest that the government has paid plaintiffs' counsel on account of this litigation to date exceeds $35.9 million.  *See* ECF 1085-1 [Defs.' Corrected Opp. to Pls.' Mot. for Final Determination of Attorneys' Fees (hereafter cited as "Def. Final Fee Opp.")] at 10-15 (tabulating attorneys' fees paid by the government through calendar year 2018).  In each of the stipulations entered by the parties after the Court's 2020 decision, plaintiffs reserved the right to seek an

---

[1] "ECF" denotes the corresponding numbered document in the Court's electronic PACER docket for this civil action.  Page citations to ECF documents herein refer to the original page numbering in the cited document, not to page numbers assigned by the Court's ECF system.

enhancement of the lodestar for superior attorney performance and exceptional results. Plaintiffs have now filed their motion for such an enhancement.

As noted above, in the March 16, 2022, stipulation entered at ECF 1112, the parties agreed that only a portion of the total lodestar fees that plaintiffs' counsel have received to date are eligible for an enhancement. Pursuant to this agreement, class counsel's non-litigation activities during the post-Consent Decree period have been excluded from the stipulated $19 million "base lodestar." *See generally* ECF 1083-8 [DEX 8] at 8-9 ¶¶ 13-15; ECF 1083-9 [DEX 9] at 2-6 ¶¶ 4-15 (describing non-litigation work following Consent Decree).[2] In addition, "[t]he fees that were previously enhanced (the 1980-1990 time for Mr. Fredrickson and Ms. Brackshaw) were also excluded" for purposes of plaintiffs' instant motion. ECF 1119-1 [Pls.' Mem. of Law in Supp. of a Lodestar Enhancement (hereafter cited as "Pl. Mem.")] at 4 n.4.

Defendants, by undersigned counsel, hereby oppose plaintiffs' motion for enhancement of the stipulated $19 million base lodestar.[3] As demonstrated below, the across-the-board, lump sum enhancement that plaintiffs seek is legally unsupportable because such a fee award would be neither reasonable nor objective and would not be capable of being reviewed on appeal. Moreover, the specific examples that plaintiffs proffer of their counsel's supposed "superior lawyering" are all grounded in factors subsumed in the lodestar calculation, and so do not present rare and exceptional circumstances under which a lodestar fee enhancement may be awarded.

---

[2] "DEX" refers both to the exhibits previously submitted by defendants with their opposition to Plaintiffs' Motion for Final Determination of Attorneys' Fees and to the additional exhibits submitted herewith. The exhibits submitted herewith have been numbered in sequence with the exhibits previously submitted by defendants.

[3] The history of this case is summarized in ECF 1085-1 [Def. Final Fee Opp.] at 2-10. Familiarity with that history is assumed so we will not repeat it herein.

Plaintiffs have failed to carry their burden of proving that an enhancement to the stipulated base lodestar is warranted.  Plaintiffs' motion should be denied, and because plaintiffs have been given a full and fair opportunity to justify a fee enhancement but have now fallen short on their second attempt, this time the Court should deny plaintiffs' motion with prejudice.

**ARGUMENT**

## I. The "reasonable attorneys' fees" permitted by the Hartman Consent Decree should be determined pursuant to the lodestar methodology used in statutory fee-shifting cases in the D.C. Circuit.

The relevant fee-shifting arrangement for purposes of plaintiffs' instant motion was established by the *Hartman* Consent Decree, and so is a contractual arrangement, not a statutory one.[4]  Accordingly, precedents involving fee-shifting statutes do not directly control here.  But "just because precedent is not technically binding does not mean we should blithely disregard it.  To promote consistency in the law, we should adhere to precedent where its reasoning applies." *In re Home Depot, Inc.*, 931 F.3d 1065, 1085 (11th Cir. 2019).

Plaintiffs concede that "the Supreme Court jurisprudence on lodestar enhancements is helpful in assessing whether it is appropriate here."  ECF 1119-1 [Pl. Mem.] at 8 n.15.  The Court, however, should not restrict its purview to Supreme Court caselaw.  Because the *Hartman* Consent Decree requires the Court to use the lodestar method to calculate plaintiffs' final fee award, *Hartman v. Pompeo*, 2020 WL 6445873 at *8 & n.8, *9, it is logical to presume that the parties intended to employ the lodestar methodology used by federal courts in the District of

---

[4]  The statutory fee-shifting provision in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(k), also empowers the Court to award reasonable attorney's fees.  Plaintiffs do not invoke this statute in their instant motion so we presume that plaintiffs have abandoned any reliance on statutory fee-shifting in seeking a lodestar enhancement. *See* Fed. R. Civ. P. 23(h) ("[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement").  In any event, the reasons why a lodestar enhancement is unwarranted under the *Hartman* Consent Decree would be equally applicable in a statutory fee-shifting context.

Columbia, the venue for this case.  Indeed, the settlement agreement embodied in the *Hartman* Consent Decree was entered as an Order of this Court, so the enforcement and administration of that Order should be governed by relevant D.C. Circuit precedent absent a clear statement in the Consent Decree to the contrary.  *See United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 336 (D.C. Cir. 2014) (citing *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 280-81 (4th Cir. 2002)).  For these reasons, the out-of-Circuit cases on which plaintiffs rely are of limited value because there is no assurance that the enhancements awarded in those cases would pass muster under the rigorous and demanding standards applicable to fee enhancement requests in the D.C. Circuit. *See generally Donnell v. United States*, 682 F.2d 240, 254 (D.C. Cir. 1982) ("We have found it all too common for the district courts to adjust the lodestar upward to reflect what the courts view as a high level of quality of representation.  This trend should stop.").

Plaintiffs suggest that the Court should interpret the Consent Decree as limiting the Court's consideration to the then-existing caselaw when the Consent Decree was negotiated in 2000.  *See* ECF 1119-1 [Pl. Mem.] at 37-40 (discussing two "contemporaneous" out-of-Circuit cases that purportedly "point the way to enhancement"); ECF 1118-3 [Fredrickson Decl.] at 2 (Mr. Fredrickson's belief that a quality enhancement would be awarded "based on the state of the law when we negotiated the Consent Decree in 2000").  Interpreting the Consent Decree in this way would compel the Court to improvidently disregard the Supreme Court's 2010 decision in *Perdue v. Kenny A.*, 559 U.S. 542 (2010).

*Perdue* did not break any new legal ground.  *See Winston & Strawn LLP v. FDIC*, 894 F. Supp. 2d 115, 130 (D.D.C. 2012) (*Perdue* "confirms a trend that had been taking place long before that decision in 2010").  In *Perdue*, the Supreme Court articulated "six important rules" based on the Supreme Court's prior decisions concerning federal fee-shifting statutes.  Those

rules are: (1) a reasonable fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case; (2) there is a strong presumption that the lodestar method yields a fee sufficient to achieve this objective; (3) enhancements may be awarded only in "rare" and "exceptional" circumstances; (4) the lodestar includes most, if not all, of the relevant factors constituting a reasonable attorney's fee, and an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation; (5) the burden of proving that an enhancement is necessary to yield a reasonable fee is borne by the fee applicant; and (6) a fee applicant seeking an enhancement must produce specific evidence that supports the award. The prior Supreme Court decisions from which those rules were derived were all issued long before the *Hartman* Consent Decree was entered in 2000.  *See Perdue*, 559 U.S. at 552-53 (citing *Burlington v. Dague*, 505 U.S. 557 (1992); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley II)*, 483 U.S. 711 (1987) (plurality opinion); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley I)*, 478 U.S. 546 (1986); *Blum v. Stenson*, 465 U.S. 886 (1984); *Hensley v. Eckerhart*, 461 U.S. 424 (1983)).

The six rules set forth in *Perdue* are also consistent with D.C. Circuit precedents in statutory fee-shifting cases that pre-date the *Hartman* Consent Decree.  For example, in 1984 the Court of Appeals observed that "the lodestar figure should produce a fully compensatory fee in any case in which a plaintiff has obtained excellent results," and endorsed the rule that "only rare and exceptional circumstances can justify an upward adjustment of the lodestar."  The D.C. Circuit stressed that a fee applicant seeking an enhancement bears a "heavy burden . . . to justify any increase in the lodestar figure," and must offer "specific evidence of the need for an enhancement of the lodestar."  The Court also cautioned that a district court must "explain with particularity exactly why an upward adjustment was essential" and "clearly explain the reasons

for any upward adjustment" so that "meaningful review" of a fee award's reasonableness is not impaired. *Murray v. Weinberger*, 741 F.2d 1423, 1428–29 (D.C. Cir. 1984) (internal quotation marks and footnotes omitted); *accord Thompson v. Kennickell*, 836 F.2d 616, 622–23 (D.C. Cir. 1988); *Save Our Cumberland Mountains v. Hodel*, 826 F.2d 43, 52–53 (D.C. Cir. 1987).

The upshot of *Perdue* and similar earlier decisions by the Supreme Court and the D.C. Circuit is that most of the factors lower courts have used to justify an enhancement are already included in the lodestar, and so it would result in a windfall to count them again with a multiplier or other lodestar enhancement. Because it is just as unreasonable to double-count in a contractual fee-shifting case as it is in a statutory fee-shifting case, *Home Depot*, 931 F.3d at 1085, and because the *Perdue* rules are consistent with long-established Supreme Court and D.C. Circuit caselaw, *Perdue* is an important precedent for purposes of plaintiffs' motion. *See Winston & Strawn*, 894 F. Supp. 2d at 130 ("*Perdue* is instructive not only for its holding, but for its discussion of lodestar calculations more generally.").

*Perdue* and earlier D.C. Circuit precedents also confirm that although the determination of "reasonable attorneys' fees" is a matter committed to the sound discretion of the district court, the court's discretion is not unlimited. *Perdue*, 559 U.S. at 558; *see, e.g., Murray*, 741 F.2d at 1425 ("the district court abused its discretion in this case by awarding an enhancement of the presumptively reasonable rate based on quality of representation"); *see also King v. Palmer*, 950 F.2d 771, 776 n.2 (D.C. Cir. 1991) (en banc) ("If the overall reasonableness of a statutory attorney's fees award were always a matter for the trial judge's discretion, unguided by a legal structure, the Supreme Court certainly has wasted a good deal of time and effort attempting to develop uniform rules."). That is why a district court must explain a fee award in a manner that is sufficiently specific to permit appellate review of the award and thereby prevent situations

where "awards may be influenced (or at least appear to be influenced) by a judge's subjective opinion regarding particular attorneys or the importance of the case." *Perdue*, 559 U.S. at 558; *see id.* at 559 & n.8 (warning against "the danger of allowing a trial judge to award a huge enhancement not supported by any discernable methodology").

Thus, the comments by Judge Robertson comparing Mr. Frederickson's performance in this case with the performance of unidentified attorneys in unnamed prior cases − comments on which plaintiffs place "great weight" (ECF 1119-1 [Pl. Mem.] at 40) − in fact have no weight at all. A reviewing court would be in no position to assess the accuracy of Judge Robertson's comments, and awarding an enhancement on such impressionistic grounds would not provide an "objective and reviewable basis for fees," thereby undermining "a major purpose of the lodestar method." *Perdue*, 559 U.S. at 558. *See also id.* at 560 (concurring opinion by Justice Kennedy) ("When immersed in a case, lawyers and judges find within it a fascination, an intricacy, an importance that transcends what the detached observer sees. So the pending or just completed case will often seem extraordinary to its participants.").

## II.  Plaintiffs' proposed across-the-board multiplier and lump sum award are unreasonable because this methodology would be overly broad and would permit compensation unrelated to the quality of an attorney's performance.

The D.C. Circuit has "developed a three-part analysis to assess appropriate fee awards under fee-shifting statutes in cases involving complex federal litigation." *Salazar v. District of Columbia*, 809 F.3d 58, 61 (D.C. Cir. 2015) (citing authorities and following methodology without question or objection by parties in contractual fee-shifting case). Specifically, "[a] court must (1) determine the number of hours reasonably expended in litigation, (2) set the reasonable hourly rate, and (3) use multipliers as warranted"). *Id.* (cleaned up). Plaintiffs' instant motion

involves Step 3 of the D.C. Circuit's lodestar methodology.  The question the Court must resolve is whether a multiplier is warranted here.

Plaintiffs ask the Court to "award additional fees in the range from 1.0 to 4.5 times the stipulated $19 million lodestar."  ECF 1119-1 [Pl. Mem.] at 44.  This request equates to an additional fee award somewhere between $19 million and $85.5 million to be paid as a lump sum.[5]  *See* ECF 1118-2 [Pls.' Proposed Order].  Plaintiffs rely primarily on two out-of-Circuit decisions to support their proposed multiplier.  *See* ECF 1119-1 [Pl. Mem.] at 37-38.  Those cases, however, provide scant support for plaintiffs' request.

In *Wing v. Asarco Inc.*, 114 F.3d 986 (9th Cir. 1997), the court approved the use of a multiplier based on "class counsel's continuing obligations to the class," even assuming that the defendant's objections to the multiplier were meritorious.  *Id.* at 989; *see In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 398 (S.D.N.Y. 1999) (fee petitioners agreed to commit the "extensive service time remaining in this case" without additional charge).  This rationale is inapplicable here because plaintiffs' counsel have previously been compensated at historic market rates, plus interest to compensate for delay, for all the work counsel did to effectuate the terms of the *Hartman* Consent Decree, and all of this post-Consent Decree work has been excluded from the base lodestar on which plaintiffs now seek an enhancement.

In *DeLoach v. Philip Morris Cos.*, 2003 WL 23094907 (M.D.N.C. 2003), the court followed Fourth Circuit precedent which treats "the results obtained for the plaintiff" as "the

---

[5]  Plaintiffs' math is a bit fuzzy.  In their memorandum, plaintiffs explain that under their proposed methodology "a multiplier of 1.5 when applied to the stipulated lodestar of $19 million would mean additional fees of $9.5 million and a multiplier of 2 would yield an additional $19 million."  *See* ECF 1119-1 [Pl. Mem.] at 8 n.15.  Based on this explanation, the 1.0 multiplier that plaintiffs state they will accept would equate to <u>no</u> additional fee award.  We therefore assume, consistent with plaintiffs' definition of "multiplier," that plaintiffs actually seek a multiplier in the range of <u>2.0</u> to 4.5.

single most important factor" in awarding attorney's fees.  *Id.* at *10.  Treating the results

obtained as a standalone enhancement factor, however, is contrary to long-established D.C.

Circuit precedent under which "results obtained" is not an independent enhancement factor but is

instead "one element in the enhancement factor for 'quality of representation.'" *Thompson*, 836

F.2d at 622 & n.5; *see infra* at 20-21.  Furthermore, the *DeLoach* court was motivated by the fact

that "no additional firms" assisted the plaintiffs' co-lead counsel in that case, and so counsel

"reached this result without the benefit of assistance from numerous other law firms," 2003 WL

23094907 at *10, a factor that is not present here because plaintiffs' requested multiplier would

apply to the fees of many individual timekeepers across multiple law firms.

Plaintiffs also rely on out-of-Circuit cases where a lodestar multiplier was used as a

cross-check for fee awards in common fund situations.  *See* ECF 1119-1 [Pl. Mem.] at 13 &

n.13, 18-19 (citing *In re Sumitomo Copper Litigation*, 74 F. Supp. 2d 393 (S.D.N.Y. 1999), and

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y 1997)).  Cases of this type are likewise

unhelpful to plaintiffs.  A lodestar cross-check in a common fund case is not a full-blown

lodestar inquiry and is intended only as an approximation against which the reasonableness of a

common fund fee award can be assessed.  As such, the lodestar cross-check methodology is not

precise enough to satisfy D.C. Circuit standards governing requests for a lodestar enhancement.

*See Hartman v. Pompeo*, 2020 WL 6445873 at *19.

In addition to lacking support in the caselaw, plaintiffs' requested multiplier is

unwarranted for at least two reasons:

*First*, using a multiplier as a quality enhancement in this case would be overly broad.

Plaintiffs' fee counsel have reported that plaintiffs were represented by a legal team that

ultimately consisted of "over 120 individuals in seven firms."  *See* ECF 1081 [Pls.' Mem. in

Supp. Of Mot. for Final Determination of Attorneys' Fees] at 6.  By requesting an across-the-board multiplier applied to the entire $19 million base lodestar, plaintiffs seek an enhancement for every one of those individual timekeepers.  Every partner, every associate, every paralegal, every legal assistant, and every law clerk who billed time for the merits litigation would be awarded additional fees equal to a multiple of the timekeeper's historic market rate.

Plaintiffs ask the Court to award those extensive multiplied fees based on examples of work performed by a relatively small number of named attorneys in only a few firms.  The work performed by Arter & Hadden attorneys, for example, is nowhere mentioned in plaintiffs' submission even though the Arter & Hadden attorneys' fees are included in the $19 million base lodestar.  *See* ECF 1083-2 [DEX 2]; ECF 1083-5 [DEX 5].  Plaintiffs seek enhancement of the fees paid to the Arter & Hadden attorneys, as well as the fees paid for work by scores of other individual timekeepers, based solely on plaintiffs' assurance that the examples they proffer are representative of the work performed by all of those timekeepers.

Even if plaintiffs' examples could warrant a fee enhancement for the attorneys who did the work described (they do not, as we will show below), those examples do not satisfy plaintiffs' "heavy burden of proof to present well-documented claims" for an upward adjustment to the fees for other work by those attorneys, or for the work of different members of plaintiffs' large legal team.  Similarly, citing only those examples would fail to fulfill this Court's corresponding duty "to explain with particularity why an increase in the presumptively reasonable lodestar figure is necessary in order to provide reasonable attorney's fees" for all the work done by each and every individual who billed time for the merits litigation.  *Murray*, 741 F.2d at 1428; *see generally McKenzie v. Kennickell*, 875 F.2d 330, 338 (D.C. Cir. 1989) (awarding enhancement to "two junior associates"); *Save Our Cumberland Mountains*, 826 F.2d

at 46, 52-53 (rejecting multiplier for work by four attorneys to prepare a rehearing petition); *Shakman v. Democratic Organization of Cook County*, 677 F. Supp. 933, 935 n.2 (N.D. Ill. 1987) (noting that "[p]laintiffs only seek fee enhancements for four of their attorneys").

*Second*, plaintiffs' proposed lump sum award is unwarranted because there would be no necessary correlation between whatever work justifies the enhanced fees and the distribution of those fees. A quality enhancement compensates an attorney for the attorney's exceptional performance that the lodestar does not adequately take into account. *Perdue*, 559 U.S. at 553-54. Accordingly, it would be a manifest abuse of discretion if a district court ruled that Attorney Smith's exceptional performance merited a quality fee enhancement but then awarded all the additional fees to Attorney Jones without making any findings about Attorney Jones's performance. Plaintiffs' Proposed Order [ECF 1118-2] would permit just such irrational results because the Proposed Order would allow plaintiffs to distribute any additional fees in their sole discretion. Plaintiffs could potentially distribute tens of millions of dollars to anyone for any reason, without regard for the basis of the fee award or any other constraint. Attorneys who did the work for which an enhancement was awarded may receive nothing, while other attorneys who had nothing to do with that work could receive substantial payments.

"It is essential that the judge provide a reasonably specific explanation for *all* aspects of a fee determination, including any award of an enhancement." *Perdue*, 559 U.S. at 558 (emphasis added). Because a quality enhancement rewards an attorney's exceptional performance, a quality enhancement would be subject to meaningful appellate review only if the district court specifies not only what work justifies the enhancement, but also how much additional compensation will be awarded to the attorney or attorneys who performed that work and the reasons why that additional compensation is necessary to produce a reasonable fee award. *Cf. In*

12

*re Vioxx Products Liability Litigation*, 802 F. Supp. 2d 740, 775-825 (E.D. La. 2011) (allocating

fees among more than 100 firms and individual attorneys in multi-district litigation).  Without all

those elements, similarly situated attorneys could receive widely disparate compensation and

meaningful appellate review of the fee award would be impossible.

In short, plaintiffs have again failed to propose "a method that is reasonable, objective

and capable of being reviewed on appeal." *Hartman v. Pompeo*, 2020 WL 6445873 at *19

(quoting *Perdue*, 559 U.S. at 551).  Plaintiff's motion should be denied for this reason alone.

### III.  A "Contingency" Enhancement is not available in this case.

The stated grounds for plaintiffs' motion are "the exceptional results achieved due to the

superior lawyering exhibited by class counsel throughout the litigation."  ECF 1118 [Pls.' Mot.].

At various places in their supporting memorandum, however, plaintiffs advocate for

enhancement factors that are unrelated to "superior lawyering."  For example, plaintiffs urge the

Court to award enhanced fees based on the loss of employment opportunities by Mr. Fredrickson

and his firm due to the demands of this case; class counsel's willingness to take on a supposedly

"unwinnable" case; and the need for a fee enhancement to induce competent attorneys to accept

cases like this one.  *See, e.g.*, ECF 1119-1 [Pl. Mem.] at 16 (the burden of litigating this case

precluded "acceptance of cases that promised more immediate monetary compensation"), 30

("[t]he potential for lodestar fees under a fee-shifting statute is not always sufficient inducement

for counsel to take on a major difficult, time-consuming, or unpopular case"), 34-36

("enhancements help induce competent attorneys to represent victims of discrimination"), 38

("[a]fter the loss in the first liability trial, *Hartman* was considered an 'unwinnable' case").

Factors such as these are embodied in a "contingency" enhancement, which compensates

counsel for the risk of losing the case and which is separate and distinct from a "quality"

enhancement for exceptional performance.  *See, e.g., McKenzie*, 875 F.2d at 332-39 (separately

analyzing contingency enhancement and quality enhancement); *Liberles v. Daniel*, 619 F. Supp. 1016, 1021-22 (N.D. Ill. 1985) (holding that "risk is a proper basis for applying a multiplier" and awarding a 1.5 multiplier because "petitioners faced a significant risk of working without compensation" and achieved "exceptional success").  In this connection, Mr. Gies testifies that the prospect of receiving a fee enhancement "based on the degree of risk the case posed" was a "material factor in our firm's decision" to join plaintiffs' legal team, and that without the prospect of a contingency enhancement Crowell & Moring "may well have declined" Mr. Fredrickson's invitation.  ECF 1118-7 [Gies Decl.] at 3 ¶ 6.

The Supreme Court disapproved the use of contingency enhancements in statutory fee-shifting cases in *Burlington v. Dague*, 505 U.S. 557 (1992).  *Dague*, of course, is not binding in a contractual fee-shifting case, but it should not be rejected merely for that reason.  Rather, the Court should follow *Dague* if its reasoning applies to contractual fee-shifting.

> The Eleventh Circuit addressed this precise issue, and its analysis is instructive:
>
> The Supreme Court forbade adjusting for risk for a number of reasons.  To start, the Court said that risk was partly reflected in the lodestar.  For the part of risk that is not reflected in the lodestar, the Court gave one reason for not using it to justify an enhancement that is specific to statutes – subsidizing losing claims contrary to the prevailing-party requirement found in most fee-shifting statutes.  But the Court gave other reasons that apply equally in contractual fee-shifting settings, such as incentivizing meritless claims and making fees less predictable.  Thus, on the whole, we find that the Court's prohibition on enhancements for risk applies to contractual fee-shifting cases when courts use the lodestar method.

*Home Depot*, 931 F.3d at 1085-86.  Based on this finding, the Eleventh Circuit held that the district court in *Home Depot* abused its discretion by using a multiplier to account for counsel's litigation risk.  *Id.*  This Court should follow *Home Depot* and hold that contingency enhancements are not available in contractual fee-shifting cases.

Alternatively, even if the Court deems that it may be permissible to award contingency enhancements in contractual fee-shifting cases, the Court should decline to award such an enhancement in this case. In light of the particular circumstances presented here, awarding enhanced fees for litigation risk would be unwarranted and unreasonable.

Although Mr. Fredrickson and his firm lost the opportunity to pursue other cases because of their responsibilities in *Hartman*, there is nothing to indicate that *Hartman* caused any materially adverse impact on their law practice. To the contrary, the *Hartman* litigation provided substantial and steady work for Mr. Fredrickson and his firm for more than 20 years, and continued to provide fee-paying business for almost another 20 years during the post-Consent Decree phase of the case. Furthermore, the favorable publicity generated by the *Hartman* settlement elevated Mr. Fredrickson's stature and reputation within the legal community and among the public, thereby helping him attract additional business for his firm. *See* ECF 1119-1 [Pl. Mem.] at 40-42 & nn. 33-36. It is difficult to imagine that any of the opportunities foregone because of *Hartman* would have been as lucrative or as professionally beneficial for Mr. Fredrickson as the *Hartman* case has been. *Cf. Allen v. Freeman*, 694 F. Supp. 1554, 1556 (S.D. Fla. 1988) (counsel risked "a real potential economic impact on his practice" by taking the case); *Shakman v. Democratic Organization of Cook County*, 677 F. Supp. at 944 (rejecting upward lodestar adjustment because case provided counsel with work for more than 17 years and arguably enhanced counsel's reputation).

Mr. Fredrickson did face significant litigation risk when he decided to pursue an appeal after plaintiffs lost the liability trial in 1979, but the $19 million base lodestar fees on which plaintiffs now seek an enhancement were incurred after defendant's initial trial victory had been set aside by the Court of Appeals and Judge Richey had issued a new liability decision in

15

plaintiffs' favor.  Indeed, by the time Crowell & Moring and other firms started work on plaintiffs' behalf, the contingency risk presented by this case was virtually eliminated.  Under Judge Richey's Order of Reference to the Special Master, defendant was required to "pay all attorneys' fees and expenses incurred by the Plaintiffs with regard to the individual hearings . . . except with respect to any claim which the Special Master determines, and the Court confirms, to be vexatious, frivolous, or in bad faith." *See* ECF 1083-10 [DEX 10-1] at 9 § VII.  Accordingly, the government was required to pay plaintiffs' attorneys' fees for all the work attributable to the *Teamsters* hearings, including the fees incurred with respect to the two hearings in which defendant prevailed and the claim was denied.  *See* ECF 1083-19 [DEX 10-10] at 17-19, *adopted in pertinent part* ECF 1083-20 [DEX 10-11].

Plaintiffs contend that their counsel continued to face significant litigation risk until Judge Richey's class certification decision was affirmed on appeal.  *See* ECF 1118-5 [Puth Decl.] at 3 ¶ 9 ("[t]he government's effort to decertify the class posed a considerable threat to the entire case"); ECF 1118-7 [Gies Decl.] at 2 ¶ 5 (*Hartman* "carried significant risk" because "[p]laintiffs could not be considered the 'prevailing party' for purposes of Title VII's attorneys' fees provisions until the defendant had fully exhausted its appeals of the class certification and liability").  This contention, however, is belied by the contemporaneous statements of plaintiffs' counsel, which heavily discounted the litigation risk presented by the class certification issue:

> Even if plaintiffs lose the class certification appeal, plaintiffs will still be prevailing parties.  In light of the issues pending on appeal, if the decision is unfavorable to plaintiffs in any respect, realistically the worst case scenario would be for the U.S. Court of Appeals to determine that the class was improperly certified, or certified overly broadly, to include the Foreign Service Officer positions.  In that event, the matter would be remanded to the District Court for either a redetermination of that issue or the addition of named plaintiffs to represent that portion of the class. . . .  [S]hould the FSO job series ultimately be dismissed by the District Court from the suit . . . individual suits on behalf of each individual plaintiff could be filed immediately, or another class action suit could

16

be brought on behalf of this portion of the class.  Consequently, not a single claim would be lost, although some portion of the claims would return to a preliability posture.

Moreover, the Court of Appeals previously found "the base data here to be sufficiently precise and consistent with statistical norms to permit an inference of discrimination if statistically significant disparities exist."  DeMedina v. Reinhardt, 686 F.2d 997, 1011 (D.C. Cir. 1982) (emphasis in original).  Since one of the greatest disparities – 13.56 standard deviations – was in the Foreign Service Officer series, plaintiffs would quickly be able to once again establish a prima facie case on behalf of these individual class members.

In sum, absent a determination from the Court of Appeals that complete, final judgment on all issues currently on appeal should be immediately entered in favor of defendant Duffey, an outcome even the government concedes is impossible, no appellate decision would result in a judgment in which the plaintiffs were not the prevailing party.  At worst, the outcome would be neutral: plaintiffs would not be determined to be the prevailing party on issues of liability and/or remedy.  In such circumstances, the issue of "prevailing party" as to those issues would be a determination which would await additional future decisions at the District Court.

ECF 1083-13 [DEX 10-4] at 6-7.  Indeed, even while class certification was still subject to appeal plaintiffs' counsel were already projecting that the monetary relief in this case would be a "huge amount" that "will be well into the many millions of dollars."  ECF 1083-12 [DEX 10-3] at 10.

Mr. Gies's claim about Crowell & Moring's fee expectations when the firm joined plaintiffs' legal team is also dubious.  Although Mr. Gies correctly points out that *Dague* was decided after Crowell & Moring began its work on *Hartman*, he is seemingly unaware that in 1984, years before Crowell & Moring agreed to join forces with Mr. Fredrickson, the Supreme Court's fragmented decision in *Delaware Valley II* raised serious questions about "the circumstances in which contingency enhancements may be awarded." *King v. Palmer*, 950 F.2d 771, 776 (D.C. Cir. 1991) (en banc).

In 1989, the majority of a divided D.C. Circuit panel in *McKenzie*, 875 F.2d at 337-38, interpreted *Delaware Valley II* as establishing a regime in which "contingency

enhancements would be routinely available in statutory fee-shifting cases." *King v. Palmer*, 950 F.2d at 774.  But *McKenzie* was tenuous precedent.  On September 12, 1990, the D.C. Circuit granted rehearing en banc in *King v. Palmer* "to reconsider the holding on contingency enhancements in *McKenzie*," and then overruled that decision in 1991, holding, pre-*Dague*, "that contingency enhancements will not be available in this Circuit."  *King v. Palmer*, 950 F.2d at 773, 784.[6]

Mr. Gies testifies that Crowell & Moring "agreed to become involved in 1990 and began work in 1991." ECF 1118-7 [Gies Decl.] at 4 ¶ 6.  Given the unsettled state of the law on contingency enhancements at that time, no knowledgeable attorney could then have had a reasonable expectation of receiving a contingency enhancement in a federal fee-shifting case in the District of Columbia.

Furthermore, *King v. Palmer* and *Dague* were established law when the *Hartman* Consent Decree was negotiated in 2000.  By that time Mr. Gies and his partners at Crowell & Moring knew (or should have known) that contingency enhancements were no longer part of the lodestar methodology used in the D.C. Circuit.  Accordingly, if the availability of a contingency enhancement was of critical importance to Crowell & Moring, plaintiffs should have established such an enhancement contractually, by negotiating a Consent Decree that expressly allowed class counsel to seek a fee enhancement for litigation risk notwithstanding the contrary rule in statutory fee-shifting cases.  Plaintiffs did not do so, and the absence of such a proviso in the

---

[6]  In this connection, the Court of Appeals noted that "[t]he Supreme Court has, on several occasions, indicated that it does not regard factors listed separately in *Johnson* [*v. Georgia Highway Express*, 488 F.2d 714, 717-19 (5th Cir. 1974),] as appropriate enhancements to the lodestar." *King v. Palmer*, 950 F.2d at 784 n.8 (citing *Blum*, 465 U.S. at 898-99; *Delaware Valley I*, 478 U.S. at 564, 566).  Therefore, plaintiffs are mistaken to the extent they invoke those so-called *Johnson* factors to support their motion.  *See* ECF 1119-1 [Pl. Mem.] at 9-10 & n.16.

*Hartman* Consent Decree is strong evidence that the parties entered the Consent Decree with the understanding that a contingency enhancement would not be available in this case.

## IV.    A "Success" Enhancement is not available in this case.

Precedent from the Fourth Circuit and some other jurisdictions outside the D.C. Circuit recognize "success" as an independent enhancement factor, similar to a "contingency" enhancement, to reward counsel for achieving outstanding results in a case.  For example, in *Berry v. Schuman*, 807 F.3d 600 (4th Cir. 2015), the Fourth Circuit, relying on an earlier Fourth Circuit case stating that the "most critical factor in calculating a reasonable fee award is the degree of success obtained," upheld a fee enhancement based on the district court's terse explanation that counsel had "expended large amounts of time and labor, and achieved an excellent result in this large and complex action." *Id.* at 617-18 (internal quotation marks omitted); *accord Hyatt v. Apfel*, 195 F.3d 188, 192 (4th Cir. 1999) ("a multiplier of 1.333 was justifiably applied to the fees on account of the exceptional results obtained by the plaintiffs' attorneys"); *DeLoach*, 2003 WL 23094907 at *10 ("the Fourth Circuit has instructed that the single most important factor is the results obtained for the plaintiff"); *see Shakman v. Democratic Organization of Cook County*, 677 F. Supp. at 944-48 (analyzing "successful results" as a standalone enhancement factor and concluding that "a 1.333 multiplier will produce a reasonably compensatory fee in light of the success achieved in this case").

Throughout their memorandum, plaintiffs, relying chiefly on *Hensley v. Eckerhart*, seemingly argue that the Court should award multiplied fees here based on a "success" enhancement.  *See, e.g.,* ECF 1119-1 [Pl. Mem.] at 1 ("exceptional results may justify an enhanced award" (citing *Hensley*)), 9 ("*Hensley* also announced that 'in cases of exceptional success an enhanced award may be justified'"), 10 ("[o]ne, perhaps the most important factor not subsumed in the lodestar calculation is the *results* obtained" (plaintiffs' emphasis; citing

*Hensley*)), 32 ("[w]hen counsel achieves exceptional (here unparalleled) results, the compensation should reflect the results obtained" (citing *Shakman*)), 40 ( "the ultimate results – still dwarfing the results in similar cases decades later – carry great weight"), 43 ("[t]he most important fact – the achievement of exceptional results – is beyond question").

In *Perdue*, the Supreme Court confirmed that "the quality of an attorney's performance" and the "results obtained" should be treated "as one," not as separate enhancement factors.[7]  The Court explained that "superior results are relevant only to the extent that they are the result of superior attorney performance," and so a court need only consider whether a fee enhancement is justified due to superior performance.  *Perdue*, 559 U.S. at 554.  This principle follows from *Blum v. Stenson*, where the Court reformulated its earlier opinion in *Hensley v. Eckerhart* by subsuming "results obtained" under the "quality of representation" factor.  *Blum*, 465 U.S. at 903; *see Thompson*, 836 F.2d at 622 n.5 (discussing *Blum* and *Hensley*).

The unitary standard described in *Perdue* is consistent with the preexisting D.C. Circuit precedent under which "results obtained" is considered "under the rubric of 'quality of representation.'" *Thompson*, 836 F.2d at 622.  Thus, regardless how courts in other circuits may treat "results obtained" for purposes of lodestar enhancement, the lodestar methodology long since used in the D.C. Circuit does not incorporate an independent enhancement factor of this kind.  In fact, it is reversable error for a district court in our Circuit to treat an "exceptional victory as an independent factor warranting enhancement *per se*."  *Id.* at 623; *accord McKenzie*,

---

[7]  The Fourth Circuit distinguished *Perdue* from the situation presented in *Berry v. Schulman* because the fee award in the latter case did not "require the expenditure of taxpayer funds, which might require additional scrutiny."  *Berry*, 807 F.3d at 618 n.10.  This distinction, of course, does not exist here because fee awards in this case are paid from taxpayer funds.

875 F.2d at 339 ("it would be error to award an enhancement solely on the basis of 'exceptional results'").

Because the unitary standard  described in *Perdue* was established law in the D.C. Circuit long before the *Hartman* Consent Decree was negotiated in 2000, and because the Consent Decree contains no proviso expressly permitting a standalone "success" enhancement notwithstanding the contrary D.C. Circuit rule in statutory fee-shifting cases, the Court should find that an enhancement for exceptional results *per se* is not available under the lodestar methodology contemplated by the Consent Decree.  Thus, to the extent plaintiffs seek a "success" enhancement based simply on the results class counsel obtained, the Court should hold that such an enhancement may not be awarded in this case.

Moreover, although class counsel did secure a notable victory, there are three facts that temper the magnitude of their success.  These facts have consistently been ignored by plaintiffs' counsel and were overlooked in the media reports about *Hartman* which plaintiffs' counsel presumably helped shape.  *See* ECF 1119-2 [Brackshaw Decl.] at 1 (referencing "many" interviews given by Ms. Brackshaw about "the case" and "the results").

*First*, the *Hartman* settlement's size is attributable not only to the efforts of class counsel but also to the character of the case itself.  Judge Richey conditionally certified the *Hartman* class in 1978 as including all women who applied for employment with, or then worked at, the United States Information Agency.  In 1979, after the liability trial, Judge Richey concluded that his "conditional certification of all women at the Agency as a class was erroneous because the evidence adduced dealt basically, if not only, with the women in the highly technical and specialized fields at the Agency."  Thus, Judge Richey modified the class certification to exclude women in clerical positions.  *De Medina v. Reinhardt*, 1979 WL 39, *1, *4 (D.D.C. 1979).

The "highly technical and specialized" jobs that ultimately became the subject of the case were more highly compensated than the clerical positions that were eliminated from the *Hartman* class.  Had the outcome been the reverse – that is, had the class been modified to include only the comparatively low-wage clerical positions – but every other aspect of the case remained the same, including the number of class members eligible for back pay awards and all the myriad legal and practical challenges involved in the litigation, each individual class member's back pay award in the *Teamsters* hearings, and the ultimate settlement amount, inevitably would have been much reduced.[8]

The size of individual class member's back pay awards was also affected by the simple lapse of time.  The *Hartman* class opened on October 8, 1974, and closed on November 16, 1984.  *See Hartman v. Wick*, 678 F. Supp. 312, 325-28 (D.D.C. 1988).  The first *Teamsters* hearing did not start until June 10, 1996.  *See* Special Master's March 11, 1997 Report Recommending Approval of the Damages Model Prepared by Court-Appointed Experts [submitted herewith as DEX 10-18] at 14.  Consequently, by the time the *Teamsters* hearings began, the potential back pay for *Teamsters* claimants had been accruing for more than 10-20 years depending on when a claimant sought employment at the defendant agency.  The highly compensated nature of the jobs at issue and the lengthy back pay accrual period combined to produce individual back pay awards greater than $1 million for some class members.  The sheer

---

[8]  Compensatory damages for pain and suffering were not available in this case.  *See Landgraf v. USI Film Products*, 511 U.S. 244 (1994) (1991 Civil Rights Act provisions allowing such compensatory damages do not retroactively apply in pending cases).  The *Teamsters* claimants' money damages awards consisted only of back pay and interest to compensate for delay beginning on November 21, 1991, the effective date of the 1991 Civil Rights Act.  *See* ECF 1085-1 [Def. Final Fee Opp.] at 39-40.  Successful *Teamsters* claimants were also eligible for equitable relief, i.e., instatement with front pay until they were hired by the defendant agency and retroactive federal retirement accounts.

size of the individual back pay awards, however, was the result of circumstance, not the actions of class counsel.

In short, the amounts that plaintiffs received through the *Teamsters* hearings and under the Consent Decree were directly related to the type of jobs at issue and the amount of time it took to resolve the case. Such serendipitous factors do not warrant enhanced fees in the D.C. Circuit. *See Save Our Cumberland Mountains*, 826 F.2d at 52 (denying multiplier where the outcome resulted "primarily from the character of the case rather than from the efforts of the attorneys involved"). *See also Blum*, 465 U.S. at 900 n.16 (number of persons benefitted is not a consideration of significance in calculating fees under lodestar methodology).

*Second*, by voluntarily foregoing a percentage fee award pursuant to the common fund doctrine plaintiffs' counsel significantly increased the amount of the settlement fund that was available for distribution to class members. Common fund fee awards are typical practice in large class action settlements, and such awards in the D.C. Circuit can be as much as 30% of the common fund. *See Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1272 (D.C. Cir. 1993). Because the attorneys' fees in a common fund case are paid from the fund, the class members' recoveries are reduced proportionately. *See Hartman v. Pompeo*, 2020 WL 6445873 at *6 (quoting WILLIAM B. RUBENSTEIN, 5 NEWBERG ON CLASS ACTIONS § 15:25 at 60 n.3 (5th ed.)). Plaintiffs' counsel could have sought a common fund percentage fee award from the *Hartman* settlement fund, and their decision to choose a different path increased class members' monetary awards by as much as 30% and so can distort comparisons of *Hartman* to class action cases in which fee awards were made under the common fund doctrine.

*Third*, plaintiffs' counsel artificially inflate the average class member recovery by ignoring most members of the *Hartman* class. Specifically, the *Hartman* class consisted of two

groups of women: (1) approximately 9,400 women who applied for certain entry-level Foreign Service positions, and (2) approximately 1,100 women who applied for other Foreign Service positions or for Civil Service positions. The 9,400 women in the first group received so-called *Palmer* relief, i.e., the right to reconsideration under the Foreign Service hiring system and to compete among themselves for just 39 entry-level Foreign Service positions. Women who obtained one of those 39 positions were not given retroactive seniority and did not receive any monetary relief. The *Palmer* claimants received no further remedy under the Consent Decree and did not share in the settlement fund established pursuant to the Consent Decree. *See* ECF 1083-22 [DEX 10-13] at 4 ¶ 3. The 1,100 women in the second group received so-called *Teamsters* relief, i.e., the right to individual hearings in which their relief would be determined on a claimant-by-claimant basis. The settlement fund created pursuant to the Consent Decree was distributed exclusively to the *Teamsters* claimants. *See* ECF 1085-1 [Def. Final Fee Opp.] at 4-6 & 9 n.5 (describing the composition of the *Hartman* class and the differing relief awarded to the *Palmer* claimants and the *Teamsters* claimants).

Some class members had applied for both entry-level Foreign Service positions and for Civil Service positions, so there was some overlap between the *Palmer* group and the *Teamsters* group. Consequently, the total number of *Hartman* class members was somewhat less than the sum total of the *Palmer* group plus the *Teamsters* group. But even if all 1,100 *Teamsters* claimants were also included among the 9,400 class members who received *Palmer* relief − in other words, if we assume that the *Teamsters* group was a wholly-included subset of the much larger *Palmer* group − the number of class members who received only *Palmer* relief would still outnumber the *Teamsters* claimants by more than 7:1 [i.e., (9,400 – 1,100):1,100 = 8,300:1,100 = 7.55:1]. Thus, because the class members who received only *Palmer* relief did not share in the

24

*Hartman* settlement fund or otherwise receive any monetary remedy, and because only 39 members of the *Palmer* group received a position in the Foreign Service through the remedial process, at least 87.88% of the entire *Hartman* class got nothing from the case beyond a failed assessment for an entry-level Foreign Service position [i.e., (8,300 − 39) ÷ 9,400 = 0.8788].

By focusing solely on the *Teamsters* part of the class, plaintiffs exaggerate the average class member recovery more than eightfold.  That is, in calculating the average class member recovery plaintiffs use only the number of *Teamsters* claimants (i.e., 1,100) as the divisor while the actual number of *Hartman* class members is more than eight times larger (i.e., 9,400, again assuming that the *Teamsters* group was a wholly-included subset of the *Palmer* group).

Therefore, it is inaccurate and misleading to assert that "[t]he *minimum* recovery obtained for every individual member of the class was $532,663, each." ECF 1118-5 [Puth Decl.] at 18 ¶ 18 (emphasis in original); *see* ECF 1119-1 [Pl. Mem.] at 10 ("the awards for the 1100 class members − ultimately over a half a million each with eighteen individual awards over $1 million − is still the largest *per capita* recovery in a case of its kind").

Of course, none of this changes the record-setting payment made by the government to settle the case, or alters plaintiffs' status as the prevailing party, or bars plaintiffs' counsel from seeking enhanced attorneys' fees.  Our point is simply that the results achieved were not quite so spectacular as plaintiffs' counsel repeatedly proclaim and, consistent with long-established D.C. Circuit precedent, the Court can take this fact into account in determining whether plaintiffs should receive a "quality" enhancement.

**V.     No further enhancement may be awarded based on Mr. Fredrickson's and Ms. Brackshaw's work from 1980 through 1990.**

The Special Master recommended that Mr. Fredrickson and Ms. Brackshaw receive a 25% quality enhancement (i.e., a 1.25 multiplier as plaintiffs would describe it) on their lodestar

fees for the years 1980 – 1990.  ECF 1083-11 [DEX 10-2] at 73; ECF 1083-15 [DEX 10-5] at

41.  The Court subsequently approved that recommendation.  *Hartman v. Duffey*, 973 F. Supp.

199, 202 (D.D.C. 1997).  Thus, Mr. Fredrickson and Ms. Brackshaw have already received a

quality enhancement for their work from 1980 through 1990 and, pursuant to the parties'

stipulation [ECF 1113], "[t]he fees that were previously enhanced (the 1980-1990 time for Mr.

Fredrickson and Ms. Brackshaw" are excluded from the $19 million base lodestar on which an

enhancement is sought by plaintiffs' motion.  ECF 1119-1 [Pl. Mem.] at 4 n.4.

Despite plaintiffs' agreement that they would seek no further enhancement based on Mr.

Fredrickson's and Ms. Brackshaw's work during 1980 − 1990, plaintiffs repeatedly reference

Mr. Fredrickson's work during that period as justification for the fee enhancement plaintiffs seek

with respect to other work done by him and by other individuals at other times with respect to the

merits litigation.  *See, e.g.,* ECF 1119-1 [Pl. Mem.] at 16 ("Mr. Fredrickson has testified to the

burden of litigating this case solo, on top of his regular workload, for two years, and then

committing the vast majority of his new firm's resources to the case"); 19 ("[i]n the initial stages

of *Hartman*, one man was up against the resources of the United States government"); 22 ("one

man did *all* the work *Hartman* required between October 24, 1979 (when Judge Richey ruled

against the class on liability) and February 1, 1982 (when the new firm of Webster &

Fredrickson opened its doors) *by himself*, outside the regular work week") (plaintiffs' emphasis);

30-31 ("when his original employer declined to pursue the case after the initial trial loss, he

pursued the appeal on his own time and expense for two years.  He then dedicated the scant

resources of his fledgling firm to pursuing the case").

In light of the parties' agreement that "for the purposes of this motion, [the stipulated $19

million base lodestar] is the figure to be enhanced," ECF 1119-1 [Pl. Mem.] at 4 n.4, the Court

should find that Mr. Frederickson's and Ms. Brackshaw's work from 1980 through 1990 – which is not included in the stipulated base lodestar – is irrelevant and must be disregarded in determining what enhancement, if any, is necessary to provide plaintiffs' counsel with "reasonable attorneys' fees" for the work that is actually at issue here.  For example, the remedial strategy employing "cohort analysis" that Mr. Chertkof describes as "a novel extension of existing case law," ECF 1119-3 [Chertkof Decl.] at 3 ¶ 6, provides no basis for a fee enhancement because Judge Richey directed the use of the cohort analysis methodology in the remedial opinion issued early in 1988.  *See Hartman v. Wick*, 678 F. Supp. at 336-37 & 345. The "strategy" to which Mr. Chertkof refers, therefore, involves work performed by Mr. Fredrickson and Ms. Brackshaw during the 1980 – 1990 time frame which, pursuant to the parties' agreement, is excluded from consideration for purposes of plaintiffs' motion.

Plaintiffs' assertion that "it was *Hartman* that made Voice of America an Equal Opportunity Employer," ECF 1119-1 [Pl. Mem.] at 32, is likewise outside the scope of plaintiffs' motion and the Court's consideration of it.  In the 1988 remedial opinion Judge Richey denied plaintiffs' request for prospective relief "to correct allegedly continuing discrimination at the defendant agency." *Hartman v. Wick*, 678 F. Supp. at 340.  In this connection, Judge Richey found that after his 1984 liability finding "the agency has made a successful good-faith effort to end discriminatory treatment of women in its subjective (and objective) employment practices. There is no evidence to support any assertion that this effort will not continue in [the] future with even greater success." *Id.* at 341.  Hence, whatever impact *Hartman* had on federal employment practices took place sometime between Judge Richey's 1984 liability decision and his 1988 remedial decision, and so cannot be invoked to justify the fee enhancement plaintiffs now seek.

Mr. Fredrickson's and Ms. Brackshaw's dedication and performance during the 1980 – 1990 time frame are commendable but have nothing to do with plaintiffs' motion.  Just because Mr. Fredrickson and Ms. Brackshaw were awarded quality enhancements for their work during that period does not entitle them to receive quality enhancements for other work that they did at other times, and provides no rational basis for enhancing the fees paid to other individuals for different work at different times.

**VI.    The examples proffered by plaintiffs do not demonstrate the rare and exceptional circumstances required to warrant a "Quality Enhancement."**

Plaintiffs proffer a number of specific examples that they contend demonstrate "superior lawyering" by class counsel throughout the period covered by their motion.  Those examples relate to: defendant's challenge to Judge Richey's class certification decision; the development of the damages model used to compute the back pay awards for successful *Teamsters* claimants; plaintiffs' appeal from Judge Robertson's ruling about the calculation of prejudgment interest; the review and analysis of documents pertinent to the *Teamsters* hearings, and the compilation of those documents into a "Defense Busters" database; and the performance of plaintiffs' counsel in the *Teamsters* hearings.  Plaintiffs contend that their chosen examples reflect "brilliant strategic decisions" and represent the "critical successful strategies," not subsumed in the lodestar, that led to "the exceptional results obtained" by class counsel.  ECF 1119-1 [Pl. Mem.] at 6-8.

Plaintiffs also contend that class counsel faced extraordinary challenges due to defense counsel's "monumental resistance."  *Id.* at 17-22.  In this connection, plaintiffs reprise a familiar "limitless resources of the government" trope.  *See, e.g., id.* at 36 (class counsel "shar[ed] the burden of pursuing a case against the full resources of the United States Government"); ECF 1119-2 [Brackshaw Decl.] at 2 ¶ 1 (class counsel had to litigate "in the face of the United States

Government, with its limitless resources").  But the presence of a federal defendant is not a "rare" or "exceptional" circumstance in complex federal civil litigation.  And the government obviously cannot devote "limitless" resources, or even its "full" resources to any one case because the government would then have no resources left to devote to any other matter.

In this case, the counsel of record for the defendants have always, and exclusively, been attorneys from the United States Attorney's Office for the District of Columbia who were assisted by a small group of agency counsel and support personnel employed by the defendant agency.  Further, after the plaintiffs' legal team was augmented with additional personnel after Judge Richey's 1988 remedial opinion, plaintiffs' legal team matched or exceeded defendant's team, and thereafter plaintiffs had no apparent difficulty matching or exceeding the government personnel and resources devoted to the case.  *See* ECF 1083-8 [DEX 8] at 1-4, ¶¶ 2-6.

Crowell & Moring, a "large and profitable firm" which "had the resources to commit to the case without prompt payment" agreed to join plaintiffs' legal team in 1990.  *See* ECF 1118-3 [Fredrickson Decl.] at 4 ¶ 6; ECF 1118-7 [Gies Decl.] at 2 ¶ 5.  Crowell & Moring provided the support needed to analyze the claims asserted by the *Teamsters* claimants and to prepare for and conduct the individual *Teamsters* hearings.  Crowell & Moring, therefore, "provided the proverbial laboring oar" for claims analysis and the ensuing *Teamsters* hearings.  *See* ECF 1118-7 [Gies Decl.] at 2 & 9 ¶¶ 4 & 21.

At about the same time that Crowell & Moring started its work on the case, two attorneys from Heller, Huron, Chertkof & Salzman, P.L.L.C. (hereafter "Heller Huron"), who were experts on federal pay systems, took on responsibility for issues relating to the damages model and the individual back pay awards for successful *Teamsters* claimants.  *See* ECF 1118-3 [Fredrickson Decl.] at 4 & 17 ¶¶ 6 & 38; ECF 1119-3 [Chertkof Decl.] at 2 ¶ 1.  The Heller Huron attorneys

were responsible for working with the court-appointed damages experts and ensuring that successful *Teamsters* claimants received an appropriate back pay award.  *See* ECF 1118-7 [Gies Decl.] at 9 ¶ 21.  Their work was distinct from the work being done by Crowell & Moring attorneys.  As Mr. Chertkof explains, "[t]his division of labor was important as both projects were extremely complicated and time-consuming.  By separating the two, each part of the *Hartman* team was able to confidently concentrate on their issue, knowing the other issue was in capable hands."  ECF 1119-3 [Chertkof Decl.] at 2 ¶ 2.

Mr. Fredrickson also engaged Steptoe & Johnson to serve as fee counsel and handle class counsel's requests for interim attorneys' fee payments while merits litigation was ongoing.  By delegating this work to Steptoe & Johnson, class counsel were able to concentrate their efforts on their respective roles in the merits litigation.  *See* ECF 1118-3 [Fredrickson Decl.] at 17 n.2.

All or virtually all of the $19 million base lodestar fees are attributable to the post-1990 litigation after plaintiffs had assembled their large and formidable legal team.  Accordingly, it is not accurate to portray that litigation as a "David vs. Goliath" struggle in which plaintiffs' counsel were outnumbered and overwhelmed by the government.  To be sure, the litigation was hard fought, the government offered firm resistance throughout, and plaintiffs' counsel had to overcome many difficulties before obtaining a settlement on terms acceptable to the class.  But the litigation proceeded in a relatively civilized manner, and plaintiffs do not contend that defense counsel did anything that would be deemed out-of-bounds in adversarial legal proceedings.  *See* ECF 1119-1 [Pl. Mem.] at 11 n.17 (quoting Judge Robertson); *cf. Knop v. Johnson*, 712 F. Supp. 571, 586 (W.D. Mich. 1989) (defense counsel's extensive unprofessional conduct was the "most significant" factor supporting fee enhancement).

The Assistant U.S. Attorneys used their best good faith efforts to represent their client with the same dedication, persistence, and zeal that class counsel accorded their clients and that is expected in complex federal civil litigation. The opposition that class counsel encountered here was neither rare nor exceptional. *See Campbell v. District of Columbia*, 202 F. Supp. 3d 121, 136 (D.D.C. 2016) ("sacrifices and risks are inherent in much complex civil litigation").

Plaintiffs also claim that their examples demonstrate superior lawyering because class counsel had to work under "extraordinary time limitations" and routinely rose to the "challenge of difficult litigation tasks under persistent time pressure." ECF 1119-1 [Pl. Mem.] at 22-28. For example, plaintiffs point out that class counsel prepared and filed an extensive intervention motion within 25 days after the D.C. Circuit's decision remanding the question of class certification for reconsideration by Judge Richey. *Id.* at 24; *see Hartman v. Duffey*, 19 F.3d 1459 (D.C. Cir. 1994). Although plaintiffs' counsel were obliged to file this intervention motion in a "timely" manner pursuant to Fed. R. Civ. P. 24(a), the 25-day period was a self-imposed deadline. In finding that plaintiffs had satisfied the timeliness criterion, Judge Richey relied on precedents holding that intervention motions were timely when filed 5 weeks after the denial of class certification, and within 90 days after the Supreme Court's denial of the movant's petition for certiorari. *See Hartman v. Duffey*, 158 F.R.D. 525, 531-32 (D.D.C. 1994) (citing authorities).

Class counsel's diligence in working to preserve the class certification is of course commendable but such diligence is neither rare nor exceptional. Indeed, the D.C. Circuit has found that producing high-quality legal papers in a relatively short period of time or on a short deadline is something that lawyers do on a regular basis. *See Role Models America, Inc. v. Brownlee*, 353 F.3d 962, 969 (D.C. Cir. 2004).

It is telling that plaintiffs have not cited any examples where class counsel faced a deadline that the Court or the Special Master could not or would not extend for whatever reasonable period counsel needed to complete the task at hand. *Cf. Hollowell v. Gravett*, 723 F. Supp. 107, 110 (E.D. Ark. 1989) (judge informed counsel "that no continuances would be granted"). In addition, class counsel were able to leverage Crowell & Moring's "mega-law firm" resources to meet the demands of litigating this case. *See Miller v. Holzmann*, 575 F. Supp. 2d 2, 50 n.77 (D.D.C. 2008). Meeting deadlines and managing competing priorities are core elements of a trial lawyer's job description, and so are subsumed by the lodestar fee. The litigation schedule under which class counsel worked here was not so rare and exceptional as to warrant a fee enhancement on the basis of "time pressure."

Another factor that plaintiffs contend justifies their requested multiplier involves class counsel's review and analysis of voluminous documents pertaining to the claims at issue in the *Teamsters* hearings, and then organizing those documents in a "Defense Busters" database for use at the hearings. *See* ECF 1119-1 [Pl. Mem.] at 13–17. The Special Master, however, pointed out that it "would have been impossible for Plaintiffs' counsel to have met their duty to their clients to have properly exercised their professional responsibility without going through all of the documents, analyzing them, organizing them, understanding them, and deciding which were relevant to particular claims before a single claim had been presented." *Id.* at 13–14 (quoting Special Master). Attorneys, of course, are expected to fulfill their professional obligations to their clients; that is the norm, not something rare or exceptional.

The document review and analysis project undoubtedly required many hours of tedious, meticulous, and painstaking work. This type of work, however, is essential in every document-intensive case. And class counsel were able to draw on Crowell & Moring's considerable

resources to complete the project.  Junior associates at the firm began analyzing claim forms and drafting claims analysis memos immediately after Crowell & Moring began work on the case, and many Crowell & Moring associates worked closely with Ms. Brackshaw to review and properly code documents so the documents could efficiently be retrieved when needed.  ECF 1118-3 [Fredrickson Decl.] at 11 ¶ 24; ECF 1118-7 [Gies Decl.] at 4 ¶ 11.  The work that Ms. Brackshaw and the Crowell & Morning associates did to compile the "Defense Busters" database and otherwise prepare for the *Teamsters* hearings was clearly "difficult, wearing, and time consuming, but that kind of effort has been recognized in the lodestar award."  *Delaware Valley II*, 483 U.S. at 730 (plurality opinion).

The Heller Huron attorneys' work on the damages model is another example of plaintiffs' effort to portray quotidian litigation activities as exotic and extraordinary.  *See* ECF 1119-1 [Pl. Mem.] at 21-22.  The preparation of a damages model using cohort analysis was ordered by Judge Richey in his 1988 remedial opinion, *Hartman v. Wick*, 678 F. Supp. at 336-37 & 345, and he elaborated on that order in his Order of Reference to the Special Master, ECF 1083-10 [DEX 10] at 4-5 § IV.  A contemporaneous and objective summary of the process by which the damages model was developed is set forth in the Special Master's March 11, 1997 Report Recommending Approval of the Damages Model Prepared by Court-Appointed Experts [DEX 10-18] at 5-15.  The Special Master's summary describes a generally mundane proceeding and shows "how much of a consultative process the development of the model has been." *Id.* at 15.  Both sides were fully heard, and decisions were duly made.  Although defendant's objections to the model were "much more extensive than those of plaintiffs," *Hartman v. Duffey*, 8 F. Supp. 2d 1, 2 (D.D.C. 1998), that fact does not make the proceedings rare and exceptional in comparison to the legal proceedings that routinely occur in federal courts every day.

To the extent that the issues involved in the development of the damages model were novel or complex, "[t]he novelty and difficulty presented by a particular case is fully reflected in the lodestar and cannot support its enhancement." *Save Our Cumberland Mountains*, 826 F.2d at 53; *accord Perdue*, 559 U.S. at 553; *Blum*, 465 U.S. at 898-99.  Furthermore, the experience and special skill possessed by the Heller Huron attorneys with respect to damages issues is reflected in the hourly rates used to calculate their lodestar, and it would be unreasonable double-counting to enhance their lodestar for litigating issues within their pre-existing expertise.  *See Dague*, 505 U.S. at 562-63; *Blum*, 465 U.S. at 898.  *See also Winston & Strawn*, 894 F. Supp. 2d at 130 ("attorney experience is already reflected in the Laffey rates").  The Special Master complimented the Heller Huron attorneys for being "extremely well-prepared and helpful when damages issues and the damages model have been discussed," ECF 1119-3 [Chertkof Decl.] at 8 ¶ 14 (quoting Special Master), but it would be a sad commentary on the legal profession if attorneys merited fees multiple times greater than their market rates for being "well prepared" and "helpful" to the court.

It would likewise be unreasonable to award a multiplier based on the performance of Crowell & Moring associates during the *Teamsters* hearings.  The junior attorneys who represented class members in those hearings were in a position analogous to Mr. Frederickson when he was representing plaintiffs in the early part of his career during the early stages of the *Hartman* case.  In declining to award a fee enhancement to Mr. Fredrickson for that work, the Special Master pointed out that "[b]efore 1980, Mr. Fredrickson benefitted from supervision by more seasoned lawyers who also billed for their time."  ECF 1083-11 [DEX 10-2] at 75.  Similarly, each claimant's trial team at a *Teamsters* hearing consisted of a Crowell & Moring junior associate and a senior attorney who also billed for that time.  *See* ECF 1118-7 [Gies Decl.]

34

at 6 ¶ 13.  The junior associates also received training, coaching, and guidance from more senior members of plaintiffs' legal team when preparing for the *Teamsters* hearings.  *See* ECF 1118-3 [Fredrickson Decl.] at 12 ¶ 25.  Indeed, in tacit acknowledgement that the Crowell & Moring associates' trial performance was not so exceptional as to warrant a fee enhancement given the high level of assistance they received from more senior attorneys, plaintiffs base their enhancement request more on the training class counsel provided to the associates than on the associates' resulting performance after receiving the training.

Specifically, one of the factors plaintiffs identify as grounds for a multiplied fee award is "[d]evising, and devoting substantial off the clock hours to, a 'trial school' to bring the junior associates with little or no actual trial experience from Crowell & Moring up to the level needed to assume major responsibilities in the grueling *Teamsters* schedule for individual claimants." ECF 1119-1 [Pl. Mem.] at 7.  Mr. Gies asserts that the idea of training junior associates in a structured "trial school" was an "outside the box strategy" devised by Mr. Fredrickson and Ms. Brackshaw.  ECF 1118-7 [Gies Decl.] at 5 ¶ 12.  *But see* Nat'l Institute for Trial Advocacy, *About NITA*, www.nita.org/s/about-nita (list visited July 5, 2022).

Even accepting Mr. Gies's questionable notion that training junior attorneys represents "out-of-the-box" thinking, *Perdue* made clear that "brilliant insights and critical maneuvers" by senior attorneys, a status Mr. Frederickson and Ms. Brackshaw had certainly achieved by 1990, are reflected in the reasonableness of the hourly rates charged by those attorneys, and so are subsumed by the lodestar fee.  *See Perdue*, 559 U.S. at 555 n.5 (quoting *Blum*, 465 U.S. at 898).

Moreover, the fact that the time expended by class counsel to organize and conduct their trial school "was not billed to the case," ECF 1118-7 [Gies Decl.] at 5 ¶ 12, refutes the trial school as a factor supporting a fee enhancement.  Successful attorneys in fee-shifting cases are

required to use billing judgment to prevent unreasonable fee requests.  *See Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc); *accord Hensley*, 461 U.S. at 434.  Because class counsel here previously exercised billing judgment to decide that it was not reasonable to bill the government for time attributable to their trial school, it would nullify the billing judgment rule and perforce be unreasonable to use this unbilled time as grounds for multiplying the fees that were billed to the case.  Time that was not directly billed to the government pursuant to the billing judgment rule, and so is not included in the lodestar, may not be indirectly billed to the government in the form of a lodestar enhancement.  *See Delaware Valley I*, 478 U.S. at 566-67 ("The District Court's elimination of a large number of hours on the grounds that they were unnecessary, unreasonable, or unproductive is not supportive of the court's later conclusion that the remaining hours represented work of 'superior quality'").

To the extent that plaintiffs seek enhanced fees based on class counsel's performance at the *Teamsters* hearings, the Court should not lose sight of the fact that the *Teamsters* claimants enjoyed significant advantages in those hearings that plaintiffs in conventional civil actions do not have.  Indeed, the only "rare" or "exceptional" aspects of the *Teamsters* hearings benefitted class counsel by making it easier for plaintiffs to prevail in those hearings.

In his 1988 decision on remedies, Judge Richey described a claimant's burden of proof at a *Teamsters* hearing as: "each claimant . . . must prove . . . by a preponderance of the evidence, that she applied for a position at issue in this suit during the time period relevant to this suit and that she was rejected for that position." *Hartman v. Wick*, 678 F. Supp. at 345.  Judge Robertson later clarified that it was unnecessary for a claimant to "prove *both* that she applied for a position *and* that the agency considered and rejected her application."  As Judge Robertson explained:

> A claimant may sustain her burden by showing that she applied for a job during the relevant time period and that she was unsuccessful in her application.  That

> showing entitles her to the rebuttable presumption that she was indeed rejected, and that the rejection was because of discrimination.

*Hartman v. Duffey*, 973 F. Supp. 189, 193 (D.D.C. 1997) (emphasis in original).  The claimant's burden of proof was a low hurdle, which could be cleared by the claimant's own testimony, and the Special Master did not reject a single claim due to the claimant's inability to meet her burden of proof.  ECF 1083-8 [DEX 8] at 6 ¶ 9; *see, e.g., Hartman v. Duffey*, 973 F. Supp. at 196-98.  *See also* ECF 1118-8 [1996 Fredrickson affidavit] at 14 n.2 (referencing claimants' "minimal burden of application and rejection").

Judge Richey's 1988 remedial decision further provided that, once a claimant carried her burden of proving an unsuccessful application, defendant could overcome the resulting presumption of discrimination only if defendant carried the burden of proving a legitimate, non-discriminatory reason for rejecting the claimant's application.[9]  *Hartman v. Wick*, 678 F. Supp. at 345.  In this connection, Judge Richey instructed:

> Because it is impossible to recreate the process that led to rejection of a plaintiff's employment application, all doubt must be resolved against the proven discriminator rather than the innocent applicant.  Thus, if there is any uncertainty about the actual reason that defendant rejected a claimant's employment application, that doubt must be resolved against the defendant.

*Id.* at 335 (citations and internal quotation marks omitted).

Judge Richey also made clear that defendant would suffer adverse consequences in the *Teamsters* hearings due to the absence of complete applicant files:

> [D]efendant may have difficulty showing lack of qualifications because he has not retained applicant files for most of the ten-year period at issue in this suit.  While

---

[9]  Judge Richey's remedial opinion prescribed that defendant bore the burden of proving a nondiscriminatory reason for a claimant's rejection by "clear and convincing" evidence.  Judge Robertson later amended defendant's burden of proof so that it would be judged by the preponderance standard.  *See Hartman v. Duffey*, 973 F. Supp. at 194.  Changing Defendant's burden of proof had little, if any, practical effect on outcome of the *Teamsters* hearings.  ECF 1083-8 [DEX 8] at 6-7 ¶ 10; *see, e.g., Hartman v. Duffey*, 973 F. Supp. at 195-96.

> the Court has not subjected defendant to penalty because of this routine
> destruction of files, it cannot allow the lack of information resulting from
> defendant's practices to affect the legal requirements governing this suit.  If the
> defendant-discriminator faces difficulties, they are difficulties of his own making,
> and the law cannot penalize the innocent victims of his discrimination simply in
> order to ease his tasks.

*Hartman v. Wick*, 1988 WL 39856, at *2 (D.D.C.).  Furthermore, the Special Master largely

sustained plaintiffs' objections to defendant's discovery requests, including plaintiffs' objections

to pre-hearing depositions, so that defendant did not have the benefit of the normal discovery

routinely permitted in standard civil actions.  *See* Order Regarding Discovery issued April 25,

1996 [submitted herewith as DEX 10-17].  *See also* ECF 1118-8 [1996 Fredrickson affidavit] at

18-19 ¶ 40 ("plaintiffs successfully warded off the majority of defendant's desired discovery

requests"); *Hartman v. Duffey*, 973 F. Supp. at 192 (overruling defendant's objections on

discovery issues and finding that "[t]he Special Master carefully considered the arguments of the

parties, rejecting proposals of both parties in order to achieve the just and efficient resolution of

the claims in this case").

In light of the way the *Teamsters* hearing process was structured, and plaintiffs'

unfettered ability to select the order in which claims were presented for hearing, ECF 1083-11

[DEX 10-1] at 7 § VI.A., it may be more remarkable that defendant prevailed on 2 of the 48

claims that were tried in the *Teamsters* hearings than it is that plaintiffs prevailed on 46 of those

claims.  *See* ECF 1118-8 [1996 Fredrickson Decl.] at 18 ¶ 39 (plaintiffs' counsel selected claims

for hearing "with great care to ensure the maximum strategic benefits to the class"); ECF 1119-2

[Brackshaw Decl.] at 10 ¶ 21 ("We sought to identify claimants with impeccable backgrounds,

solid educational credentials and job histories, detailed recollections of their applications and

experiences with the Agency, and, in some cases, documentary evidence including, among other

things, correspondence with the Agency acknowledging their applications.").

The high winning percentage class counsel achieved in the *Teamsters* hearings is unsurprising, and class counsel's performance at the hearings was not rare or exceptional in comparison with trial practice generally in complex federal litigation. Accordingly, the results of the *Teamsters* hearings and class counsel's performance at those hearings does not warrant enhanced fees.

Plaintiffs rely heavily on class counsel's successful efforts to uphold Judge Richey's class certification decision as grounds for a fee enhancement. *See, e.g.*, ECF 1119-1 [Pl. Mem.] at 6-7 (change in the law concerning class certification "is a ground for awarding an enhancement"); 33 (defendant's challenge to class certification threatened "to obliterate the entire case"). Plaintiffs' decision to highlight the class certification issue is a curious one because, in light of the Court of Appeals' decision affirming class certification, class counsel's exertions with respect to the certification issue amounted mostly to wasted time. *See id.* at 24 & n.24 ("class counsel devoted over 1600 hours to the class certification issue," spread across 3 firms).

Except in two minor respects, the D.C. Circuit did not reach the merits of defendant's arguments on class certification and class-wide liability because it found that those arguments were either waived or barred by law of the case. *See Hartman v. Duffey*, 88 F.3d 1232 (D.C. Cir. 1996). For example, the Court pointed out that defendant "had ample opportunity to raise the [vicarious] exhaustion issue in its previous appeal when it challenged class certification," and so declined to address the merits of defendant's arguments on this issue "because of defendant's failure to pursue it in its prior appeal." *Id.* at 1236. In this connection, the Court observed:

> By arguing the exhaustion point at the appropriate (much earlier) juncture, the [defendant] could perhaps have undone certification at one stroke. Instead, the [defendant] waited to raise this issue until this late date, almost two decades into litigation and *after* our second opinion in this case focusing almost exclusively on class certification.

*Id.* (emphasis in original).

The Court also pointed out that defendant did not address "at all" the different personnel systems under which Foreign Service and Civil Service applicants are hired, even though the Court, after analyzing *General Tel. Co. v. Falcon*, 457 U.S. 147 (1982), had concluded in defendant's prior appeal that the "principal problem" with the certification in *Hartman* was that the class included both Foreign Service and Civil Service applicants. Thus, the court ruled that issue "is out of the case," and further concluded that there was "no properly preserved error in the class certification." *Hartman v. Duffey*, 88 F.3d at 1237-38. The Court likewise found "no properly preserved error in the analysis by which the district court reached its prior finding of liability," and so declined to consider defendant's arguments on the class-wide liability finding. *Id.* at 1239.

The Court also criticized class counsel. Although the Court found that defendant had waived its argument about vicarious exhaustion, the Court noted that "plaintiffs did not raise this waiver problem." Hence, the Court was compelled to decide *sua sponte* whether plaintiffs' oversight amounted to "a waiver of a waiver." The Court excused plaintiffs' blunder only because "[w]e think it would be in only the most extraordinary case that a second-time appellant could escape the consequences of its earlier omission at the end of nearly twenty years of litigation." *Id.* at 1236. The D.C. Circuit did not view *Hartman* as such an "extraordinary case."

Defendants believe that the government's challenge to class certification presented serious issues that the Court of Appeals should have addressed on the merits. Still, in the Court of Appeals's telling, the ultimate resolution of the class certification issue in plaintiffs' favor was attributable more to defendant's missteps and unforced errors than it was to "superior lawyering" by plaintiffs' counsel. *See* ECF 1119-1 [Pl. Mem.] at 11 n.17 ("the extraordinary results cannot

be the result of 'inferior performance by defense counsel, unanticipated defense concessions, unexpectedly favorable rulings by the court, an unexpectedly favorable jury or simple luck'" (quoting *Perdue*, 559 U.S. at 553)).

Plaintiffs also contend that their appeal from Judge Robertson's ruling about the calculation of prejudgment interest was a "brilliant" strategic decision because it "put settlement pressure on the government."  ECF 1119-1 [Pl. Mem.] at 2; *see* ECF 1118-3 [Fredrickson Decl.] at 23 ¶ 55 ("In my view, it was the strength of our arguments on appeal that finally caused the government to realistically assess its exposure").  Appealing from an adverse district court ruling, however, is hardly novel strategy.  Indeed, *failing* to appeal from Judge Robertson's prejudgment interest ruling would have flirted with legal malpractice, and so that appeal does not amount to a "rare" or "exceptional" circumstance that warrants enhanced fees.

Even accepting plaintiffs' contention at face value, the Supreme Court has noted that "brilliant insights and critical maneuvers" by senior attorneys are already accounted for in those attorneys' hourly rates and the lodestar fee.  *See Perdue*, 559 U.S. at 555 n.5 (quoting *Blum*, 465 U.S. at 898).  Moreover, Mr. Fredrickson can only speculate about what motivated the government to settle this case and so is not a competent witness to testify about that subject.  By contrast, the former Assistant U.S. Attorney who was lead defense counsel at the time of the settlement testifies that he has no reason to believe that plaintiffs' appeal from the prejudgment interest ruling had any effect on the decision to approve the settlement.  *See* 2022 Decl. of Daniel F. Van Horn [DEX 11 submitted herewith] at 3 ¶ 6.

In defendant's then lead counsel's view, the critical element supporting the government's decision to settle the case was the analysis of a random sample of 50 *Teamsters* claimants whose claims were processed through the damages model created by the court-appointed damages

experts.  That procedure finally enabled defense counsel to evaluate the government's potential exposure with the level of confidence needed to support a settlement in an amount plaintiffs would accept.  *Id.* ¶¶ 7-10.

Until plaintiffs agreed to provide the information required for a comprehensive analysis of the claims of the 50 randomly selected claimants, officials within the U.S. Attorney's Office and the Department of Justice had expressed concern that plaintiffs' right to select the order in which the *Teamsters* claims were presented for hearing was being used to advance their strongest claims, thereby skewing the results in the *Teamsters* hearings in plaintiffs' favor and preventing those hearings from functioning as true "Bellwether Trials" from which the aggregate value of all the *Teamsters* claims could be accurately projected.  *See* ECF 1118-3 [Fredrickson Decl.] at 22 ¶ 51.  *See generally In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 204 F. Supp. 3d 962, 968 (S.D. Ohio 2016) ("The Court ultimately accepted the six cases to serve as bellwether trials – three plaintiffs' choices and three chosen by DuPont"); *Smiley v. Blasingame, Burch, Garrard & Ashley, P.C.*, 835 S.E.2d 803, 805 n.2 (Ga. App. 2019) (describing purpose of Bellwether Trials).  In fact, plaintiffs' insistence on selecting the order in which the *Teamsters* claims were presented likely prolonged the litigation and delayed a settlement.  *See* DEX 11 [2022 Van Horn Decl.] at 4 ¶ 11.  Whether this reflects "brilliant" strategy is open to question.

* * * * *

The Court began its 2020 opinion by stating that "[t]his case is in all respects extraordinary."  *Hartman v. Pompeo*, 2020 WL 6445873 at *1.  Based on the foregoing, the Court should reconsider and revise this assessment.  The litigation activities that class counsel undertook in this case are entirely typical of litigation activities in complex federal civil cases.  Class counsel adopted logical strategies that they systematically followed to prosecute the case

for the plaintiffs.  They assembled a large and capable legal team that enabled a division of labor so that work could be assigned to the personnel best suited for each task.  Crowell & Moring supplied a host of eager junior associates to staff the *Teamsters* hearings and do the dreary grunt work of claims analysis, document review and coding, and hearing preparation.  Specialized litigators were engaged to handle damages issues and attorneys' fees so that Mr. Fredrickson and Ms. Brackshaw did not become bogged down with collateral matters and could stay focused on the main effort.  And Mr. Fredrickson could call on Mr. Gies and other senior partners at Crowell & Moring, who had experience serving as national coordinating counsel in class actions and other types of complex litigation, if he needed help with strategic planning or coordinating the activities of plaintiffs' legal team.  *See* ECF 1118-7 [Gies Decl.] at 9-10 ¶¶ 21-23.  None of that work is unusual or extraordinary in complex federal civil litigation.

Mr. Fredrickson and the other members of plaintiffs' legal team performed their respective roles admirably, and brought the case to a successful conclusion.  They worked hard, they worked long, and they won.  But that isn't extraordinary.  As the Supreme Court explained:

> [W]hen an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests.  Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his post-engagement performance.

*Delaware Valley I*, 478 U.S. at 565-66.

The defining characteristics of the *Hartman* class action do not involve "rare" or "exceptional" circumstances not subsumed by the lodestar.  What made *Hartman* extraordinary is how much work there was and how long it all went on.  The lodestar already compensates class counsel for both the amount and the duration of their work.  Plaintiffs' fee counsel reports

that class counsel committed over 100,000 hours to the successful prosecution of this case.  *See*

ECF 1119-1 [Pl. Mem.] at 13.  Class counsel have been compensated for all of that time at

historic market rates with interest to compensate for delay as permitted by law.  Class counsel

thus has received the "reasonable attorneys' fees" allowed by the Consent Decree and by Title

VII's statutory fee-shifting provision.  No further fee award or enhancement is warranted.

<u>CONCLUSION</u>

Plaintiffs' motion is akin to a Potemkin village: the hundreds of pages they have submitted make for an impressive pile of paper, but little is there once you look behind it.  As shown above, careful inspection of the assertions and arguments in plaintiffs' motion reveals that plaintiffs have failed to satisfy their burden to prove "that enhancement [is] necessary to provide fair and reasonable compensation." *Blum*, 465 U.S. at 901; *accord Thompson*, 836 F.2d at 622. Notwithstanding these inadequacies, and despite defendant's continuing good faith efforts to resolve disputed issues amicably by stipulation and thereby avoid litigation where possible, plaintiffs nonetheless have burdened this Court with a vast, overreaching motion in hopes of securing one more very large payout before this case at long last is put to rest.  But because plaintiffs have presented no basis upon which the Court can properly find that an enhancement to the stipulated $19 million base lodestar is justified, the Court should deny plaintiffs' motion with prejudice.  A proposed Order is submitted herewith.

Pursuant to LCvR 7(f), an oral hearing on plaintiffs' motion is hereby requested.

Dated:  July 8, 2022                    Respectfully submitted,

                                        MATTHEW M. GRAVES, D.C. Bar No. 481052
                                        United States Attorney

                                By: /s/ *Peter C. Pfaffenroth*
                                        PETER C. PFAFFENROTH, D.C. Bar No. 496637
                                        Assistant United States Attorney
                                        U.S. Attorney's Office, Civil Division
                                        601 D St. N.W.
                                        Washington, D.C. 20530
                                        (202) 252-2513
                                        peter.pfaffenroth@usdoj.gov

45